1  Paul Marron, Esq., State Bar No. 128245
   MARRON LAWYERS
2  320 Golden Shore
   Suite 410
3  Long Beach, CA 90802
   (562) 432-7422
4
   Attorneys for Plaintiffs SUPERSHUTTLE
5  INTERNATIONAL, INC., SUPERSHUTTLE
   FRANCHISE CORPORATION, SUPERSHUTTLE
6  LOS ANGELES, INC., MINI-BUS SYSTEMS, INC.,
   SACRAMENTO TRANSPORTATION SERVICES,
7  INC., SUPERSHUTTLE OF SAN FRANCISCO,
   INC. AND CLOUD 9 SHUTTLE, INC.



8

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11

12  SUPERSHUTTLE INTERNATIONAL, INC.,
    SUPERSHUTTLE FRANCHISE
13  CORPORATION, SUPERSHUTTLE LOS
    ANGELES, INC., MINI-BUS SYSTEMS,
14  INC., SACRAMENTO TRANSPORTATION
    SERVICES, INC., SUPERSHUTTLE OF SAN
15  FRANCISCO, INC. AND CLOUD 9
    SHUTTLE, INC.
16

17              Plaintiffs,
18              -v-

19  PATRICK W. HENNING, CALIFORNIA
    EMPLOYMENT DEVELOPMENT
20  DEPARTMENT, and DOES 1 through 30,
    inclusive,
21

22              Defendants.

23

| Case No.: |
|---|
| Assigned to: **09 CV 1825 JAH - NLS** |
| **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

24     Plaintiffs SuperShuttle International, Inc., SuperShuttle Franchise Corporation,

25  SuperShuttle Los Angeles, Inc., Mini-Bus Systems, Inc., Sacramento Transportation Services,

26  inc., SuperShuttle of San Francisco, Inc. and Cloud 9 Shuttle, Inc. (collectively, "SuperShuttle"),

27  allege against defendants, Patrick W. Henning, in his personal and official capacity, the California

28

                                    1

           COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Employment Development Department and the Doe Defendants (collectively, the "Defendants")

on information and belief, as follows:

## INTRODUCTION

1.      This is an action for declaratory and injunction relief brought pursuant to the Equal

Protection Clause of the United States Constitution, the Due Process Clause of the Fifth and

Fourteenth Amendment to the United States Constitution, Title 42 U.S.C. § 1983, the Contracts

Clause in the United States Constitution and under the laws and the constitution of the State of

California.

2.      Defendants have acted to invalidate and impair vested contractual rights of

SuperShuttle and its franchisees by applying tests and criteria from a "Taxicab Information Sheet,"

derived from the Department's audits of companies in the taxicab industry.  Plaintiffs are not

involved in the taxicab business, but rather the on-demand shared ride shuttle industry.  The on-

demand shared ride structure under which SuperShuttle and its franchisees operate, including

requirements imposed on both SuperShuttle and its franchisees by the California Public Utilities

Commission ("CPUC" or the "Commission") involves factors which greatly increase the unique

and independent business nature of SuperShuttle franchisees.  The CPUC, a body of State

Constitutional origin, possesses broad jurisdiction to regulate both SuperShuttle and its franchisees

and has exercised its authority to proscribe the relationship between SuperShuttle and its

franchisee-drivers.

3.      The Taxicab Information Sheet was not promulgated pursuant to the legal

requirements for administrative rule making as set forth in the California Administrative

Procedure Act and as such, is void of any legal effect.  At a minimum, the Taxicab Information

Sheet should be revised and updated to reflect the fact that the *Santa Cruz Transp. v.*

*Unemployment Ins. Appeals Bd.*, 235 Cal. App. 3d 1363 (Cal. Ct. App. 1991) decision ("*Santa*

2

*Cruz*") on which it is based upon is almost twenty-years old.  The factors on which the *Santa Cruz*

decision is based is not indicative of how things currently operate in the taxicab and on-demand

airport shuttle industry.  The Taxicab Information Sheet needs to be revised and updated to reflect

technological changes such as, but not limited to, the use of computers which allow taxicab drivers

and SuperShuttle franchisees to see each fare presented to them along with an option to accept or

reject the fare and the ability of SuperShuttle franchisees to log into SuperShuttle's proprietary

fare generation system on any given night and schedule all of their fares and pickups for the next

day.  These technological advances were not in place when the *Santa Cruz* opinion was issued and

as such, the Taxicab Information Sheet is outdated and need to be revised to reflect changes which

have fundamentally altered the taxicab and on-demand airport shuttle industry.

4.     Defendants' application of the Taxicab Information Sheet to the airport on-demand

shared ride shuttle industry is arbitrary, capricious and threatens to unreasonably damage

SuperShuttle in its business dealings by throwing uncertainty into long established contractual

rights and obligations created by its licensing and franchise contracts.

5.     An actual and justiciable controversy has arisen between SuperShuttle and the

Defendants with respect to the vested rights established in the franchise contracts.  SuperShuttle's

rights under the franchise contracts will be impaired if the Defendants invalidate the contracts

through its actions.

6.     Plaintiffs have not been adequately notified nor have they been afforded an

opportunity to be heard prior to the Defendants' adoption of these tests and criteria, in violation of

Plaintiffs' constitutional rights under color of law.

7.     Furthermore, Defendants appear to have made an actual or de facto agency-wide

policy determination that all airport on-demand shared ride shuttle companies operating within

California are to be characterized in audits as operating under an employee-based, not independent

franchisee, business model. Accordingly, Defendants are attempting to secure an employee finding to be used to invalidate SuperShuttle's franchisee contracts.

8.      Defendants are pursuing this course notwithstanding the fact that the California Public Utilities Commission, in a carefully considered and comprehensive decision, has determined that the business structure to which SuperShuttle and its franchisees have agreed does not contravene its regulations, state statues or sound public policy. Were the course followed by the Defendants to come to fruition, the Commission's decision would be effectively nullified.

9.      The Court should declare the Taxicab Information Sheet to be invalid and enjoin its enforcement until the Defendants have complied with the administrative ruling making procedures set forth in the California Administrative Procedure Act. At minimum, the Court should order the Taxicab Information Sheet to be updated and revised to take into account new technological advances which did not exist at the time the Taxicab Information Sheet was created.

10.     This Court should also declare the franchise contracts between SuperShuttle and its franchisees to be valid and enforceable, imposing legal obligations and duties upon both parties and that the franchisees are independent contractors, not employees.

## JURISDICTION AND VENUE

11.     This action arises under the Constitution of and the laws of the United States, including the Equal Protection Clause, the Due Process Clause of the Fifth and Fourteenth Amendment, the Civil Rights Act, 42 U.S.C. § 1983 and the Contracts Clause. This Court has jurisdiction of this action pursuant to Title 28 U.S.C. § 1331. Additionally, the Court has jurisdiction of this action pursuant to Title 28 U.S.C. § 1367(a) in that the state law claims are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. The Court's authority to

4

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

grant declaratory relief and other appropriate relief is founded upon Title 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper in this Court under Title 28 U.S.C. § 1391(b) in that the claims stated herein arose in this Judicial District and the defendants reside and transact business within this District.  In addition, section 401 of the California Code of Civil Procedure states that venue is proper in any location where the California Attorney General maintains an office.

## THE PARTIES

13.     Plaintiff SuperShuttle International, Inc. ("SSI") is a Delaware corporation with its principal place of business in Scottsdale, Arizona.  SSI is, and at all times mentioned herein was, qualified to do business in California.

14.     Plaintiff SuperShuttle Franchise Corporation ("SSFC") is a Delaware corporation with its principal place of business in Scottsdale, Arizona.  SSFC is, and at all times mentioned herein, was qualified to do business in California.

15.     Plaintiff SuperShuttle Los Angeles, Inc. ("SuperShuttle Los Angeles") is a California corporation with its principle place of business in Los Angeles, California. SuperShuttle Los Angeles is, and at all times mentioned herein, was qualified to do business in California.

16.     Plaintiff Mini-Bus Systems, Inc. ("Mini-Bus Systems") is a California corporation with its principle place of business in Ontario, California.  Mini-Bus Systems is, and at all times mentioned herein, was qualified to do business in California.

17.     Plaintiff Sacramento Transportation Services, Inc. ("Sacramento Transportation Services") is a California corporation with its principle place of business in Sacramento, California.  Sacramento Transportation Services is, and at all times mentioned herein, was qualified to do business in California.

5

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

18.    Plaintiff SuperShuttle of San Francisco, Inc. ("SuperShuttle San Francisco") is a California corporation with its principle place of business in San Francisco, California. SuperShuttle San Francisco is, and at all times mentioned herein, was qualified to do business in California.

19.    Plaintiff Cloud 9 Shuttle, Inc. ("Cloud 9 Shuttle") is a California corporation with its principle place of business in San Diego, California.  Cloud 9 Shuttle is, and at all times mentioned herein, was qualified to do business in California.

20.    Hereinafter, plaintiffs SSI, SSFC, SuperShuttle Los Angeles, Mini-Bus Systems, Sacramento Transportation Services, SuperShuttle San Francisco and Cloud 9 Shuttle may be referred to collectively as "Plaintiffs" or "SuperShuttle."

21.    Defendant Patrick W. Henning is the Director of the Employment Development Department ("EDD" or the "Department") and is named in this action in his personal and official capacity as Director of the EDD.

22.    Defendant EDD is a public agency of the State of California, duly organized and existing under the constitution and laws of the State of California.  The Department is responsible for, among other matters, the administrative, education, customer service, and enforcement functions for the audit and collection of unemployment insurance, disability insurance, employment training tax, and personal income tax withholding.  The EDD has a duty to act in accordance with the law and in taking the actions complained of herein, the EDD has acted through its staff, employees and agents.

23.    Plaintiffs are unaware of the true names and capacities, of the defendants sued herein as Does 1-30 and therefore sue said defendants, personally and in their official capacity, by such fictitious names under California Code of Civil Procedure section 474.  Plaintiffs are informed and believe, and based thereon allege, that each of the defendants designated herein as a

6

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Doe is responsible in some manner for the acts and omissions of the defendants named in this action and that each of said defendants was at all times acting within the course of his, her, or its agency and employment in committing said acts and omissions.  Plaintiffs will seek leave of the court to amend this Complaint to reflect the true names and capacities of the defendants designated hereinafter as Does when such identities become known.  Hereinafter, Defendants Henning, EDD, and those designated herein as Does shall be referred to collectively as the "Defendants."

24.     Defendants are "persons" within the meaning of Title 42 U.S.C. § 1983, and each of the actions complained of herein was taken under color of state law.

## FACTUAL BACKGROUND ON THE FRANCHISE BUSINESS MODEL

25.     SuperShuttle has created a viable franchise business model that has been approved by the United States Federal Trade Commission and the California Department of Corporations.

26.     The franchise concept has evolved into a heavily regulated industry in which the franchisee undertakes to conduct a business or sell a product or service in accordance with methods and procedures set forth by the franchisor, and the franchisor undertakes to assist the franchisee through advertising, promotion and other advisory services.  Thus, franchising is a business model whereby a company (franchisor) grants a license to an independent business owner (franchisee) to furnish a product, name, trademark, and/or method of doing business.

27.     Most franchises share common characteristics and a common structure.  To the franchisor, franchising offers a means of expanding its trademark, product and/or business method more quickly than would otherwise be possible.  In franchising law, the franchisor is permitted to protect its hard-earned trademark, product or business practice while still being able to offer its use to the individual franchisee in order to expand the business.

7

28.     A well-known benefit for the franchisor is that the labor force tends to be more competent and highly motivated since the individual franchise owners are largely responsible for the success of their franchises and will put forth a strong, constant effort to make sure their businesses run smoothly and are profitable.  Franchisees benefit by facing a reduced risk of owning a business that is backed by a more experienced franchising company than they ordinarily would experience in starting up a business from scratch in return for the significant initial investment, licensing fees and other costs that franchisees must pay to the franchisor.

29.     The reduced risk can be attributed to the fact that the franchisor typically has had some experience and has national or regional name recognition.  Franchisors also provide franchisees with a proven and effective method of operation through their years in the business, with management assistance and training, and with marketing assistance and planning.

## SUPERSHUTTLE'S FRANCHISE BUSINESS MODEL

30.     In the late 1990's, SuperShuttle analyzed many of the foregoing characteristics and benefits of the franchise business model when it became increasingly difficult to maintain its employee-based business in a very highly regulated segment of the transportation industry. SuperShuttle's business was suffering from poor driver morale (evidenced by a 200% annual turnover rate among its employee drivers) which in turn translated into poor customer service and a high rate of complaints.

31.     SuperShuttle announced a cessation of operations and then entered into negotiations with its drivers' union to work in unison to wind down its employee operations. The drivers' union negotiated effects bargaining agreements with SuperShuttle and the union members accepted the agreements.  As part of the concessions made by SuperShuttle during the arms-length negotiations, SuperShuttle agreed to pay significant consideration to the drivers as part of the operations shut-down.

8

32.     After the shut-down, SuperShuttle offered independent contractor and/or franchise contracts to its former drivers and began operating under its current franchise business model.

33.     At approximately the same time, however, the Commission had issue the decision to which reference is made in Paragraph 8, *supra*, affirming that nothing in its regulations, state law or sound public policy precluded carriers under its jurisdiction, such as SuperShuttle, from engaging independent contractors holding the appropriate Commission authority as an alternative to hiring employee drivers.  A true and correct copy of CPUC *Order Instituting Investigation into the Passenger Stage Corporation Operations of Prime Time Shuttle International, Inc.,* 1996 Cal. PUC LEXIS 854, 67 CPUC2d 437 (August 2, 1996) is attached hereto as Exhibit A.

34.     The California Public Utilities Commission based its decision in *Prime Time Shuttle* largely on CPUC General Order 158-A.  In pertinent part, CPUC General Order 158-A states that "[e]very driver of a vehicle [other than a Public Stage Corporation certificate holder] shall be ... under the complete supervision, direction and control of the operating carrier and shall be ... an employee of the certificate holder ... [or] an employee of the sub-carrier ... [or] *an independent contractor who holds charter-party authority and operating as a sub-carrier.*"  CPUC General Order 158-A (emphasis added).  What this means is that the CPUC has expressly made the "independent driver" an available option to Public Stage Corporation carriers such as SuperShuttle *notwithstanding* that such drivers would be under the "complete supervision, direction and control" of the operating carrier.  A true and correct copy of the CPUC General Order 158-A is attached hereto as Exhibit B.

35.     With the increasing success of a franchise model, the company expanded its franchise program; i.e., after initially offering one year franchise agreements, offering 10 year agreements and replacing independent contractor based operations with franchised operations.

### The Franchisees Operate as Independent Businesses

9

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

36.     From an economic perspective, SuperShuttle functions like a transportation broker, marketing transportation to and from airports, and matching passengers who need transportation to and from the airport with franchisee owner-operators willing to transport them.  SuperShuttle does not earn any revenue from providing transportation to passengers.  Instead, revenue is earned solely from franchise and leasing fees paid to SuperShuttle from the independent franchisees.

37.     SSI is the parent corporation of a consolidated group that includes several subsidiaries such as SSFC.  SSFC's function is to establish and maintain the SuperShuttle franchise system.  This function includes developing franchise documents to comply with state and federal law and for licensing SuperShuttle operating companies to use the SuperShuttle trademark, proprietary systems and marketing system.

38.     With regard to SuperShuttle operating companies doing business in California, SSFC's business necessitates dealing with the California Department of Corporations.  The California Department of Corporations regulates franchise operations within the state.  The California Department of Corporations approves offering circulars distributed to potential franchisees, including all of the disclosures contained in the offering circulars, as well as the text of the franchise agreements.  SSFC prepares these documents and obtains approval from the California Department of Corporations before providing these documents to the local operating companies.

39.     SSFC licenses to local operating companies called "City Licensees" the right to use the SuperShuttle trademark, proprietary systems and marketing system in various California metropolitan areas.  Plaintiffs SuperShuttle Los Angeles, Mini-Bus Systems, Sacramento Transportation Services, SuperShuttle San Francisco and Cloud 9 Shuttle are City Licensees and in most instances, are wholly-owned subsidiaries of SSI, certified and subject to broad regulation by the California Public Utilities Commission.

10

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

40.   After the California Department of Corporations approves the offering circulars and the franchise contacts, they are sent to the City Licensees, who sign these contracts with the independent franchisees.

41.   A SuperShuttle franchise cannot be awarded to anyone who has not gone through the process of obtaining authority from the California Public Utilities Commission to operate as a bona fide independent business and company and serve as a Transportation Charter Party Carrier ("TCP") in California pursuant to the Passenger Charter-Party Carrier's Act (Section 5351 *et seq* of the California Public Utilities Code).  Once a TCP permit is obtained, the holder is entitled to provide passenger transportation services for compensation.

42.   Under California law, all franchisees must be holders of a TCP permit.  When issuing TCP permits, the qualification of the applicant is evaluated solely with regard to the applicant and does not consider whether the applicant will do business with SuperShuttle or anyone else.  In addition, all TCP permit holders must file a statement with the CPUC that it is shouldering the worker's compensation requirements required under California law or that it does not employ any person in any manner so as to become subject to the workers' compensation laws of the state.  Accordingly, this indicates legislative intent towards the franchisees operating as separate independent businesses since the franchisees themselves bear the burden of obtaining its own worker's compensation insurance or certifying to the CPUC that it is not subject to workers' compensation laws.  In addition, the CPUC specifically authorizes Passenger Stage Corporations like SuperShuttle to use "independent owner-drivers[s]" *notwithstanding* the fact that such drivers would be under the "complete supervision, direction and control" of the operating carrier.  *Order Instituting Investigation into the Passenger Stage Corporation Operations of Prime Time Shuttle International, Inc.*, 1996 Cal. PUC LEXIS 854, 67 CPUC2d 437 (August 2, 1996).  This is a factor that is not recognized or taken into consideration by the *Santa Cruz* test or by the EDD.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

43.     As noted previously, SuperShuttle assists in arranging for the transportation of passengers by entering into franchise contracts with individuals, partnerships, limited liability companies or corporations who wish to provide transportation services directly to the public using SuperShuttle's trademarks.  As a practical matter, for a shared ride business to operate profitably, its operators need to subscribe to a marketing and reservation service (such as the one provided by SuperShuttle) in order to effectively pool all passengers together for transport to destinations within close proximity of each other.  Shared ride operators simply cannot function without utilizing such a service because it is ineffective and inefficient to deliver passengers one destination at a time.  In the nascent days of shared ride service at airports, it was possible for a single operator to "troll" the airport in search of passengers to deliver to various points in the surrounding area; today, airport officials and law enforcement issue citations for such practices, placing a greater premium on access to a base of pre-arranged passengers.

44.     In addition, franchisees are compensated directly by passengers.  Fares are established and/or approved by the California Public Utilities Commission or the local airport authority.  These franchisees then pay SuperShuttle a fee for certain privileges and services in support of their business such as the right to use SuperShuttle's proprietary fare generation and reservation system to secure those paying passengers.

### The Franchise Business Model Provides Entrepreneurial Opportunity

45.     As independent business owners, the franchisees have much more flexibility, independence and autonomy than that of a typical employee.

46.     Franchisees decide how many hours and days that they will work.  The franchisees hire sub-drivers who operate the vans in the hours when a franchisee may not wish to operate the van, thus allowing the franchisee to leverage his or her investment and earn profit off the labor of

12

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

others, a freedom that employees do not have.  There are many franchisees that have purchased multiple franchises in order to maximize revenue.

47.     The franchises offered by SuperShuttle allow operation either 14 hours per day, or 24 hours per day, 7 days per week, 365 days per year.  Successful franchisees take full advantage of these operation periods by hiring sub drivers to operate the franchisee's van(s).

48.     Franchisees also purchase or lease the vans and same may be used for personal tasks or other private business concerns of the franchisee.  As the owner of their franchise's vehicles, franchisees have the choice of where to have their vehicle maintained and serviced.

49.     Because the franchisees own or lease their own vehicles, they are at liberty to take their vans home at the end of their workday and store it at their residence.  This allows them to maximize their time and efficiency by allowing them to start their shifts straight from home and accept dispatches close to their residence near the end of the day.

50.     Franchisees also learn a number of different skills in order to make their businesses operate more efficiently and more profitably.  For instance, among other things, franchisees learn through experience which routes are quickest at certain times of day; franchisees much learn how to schedule drop offs/pick ups to maximize fares collected and time spent on the road; franchisees much learn how to deal with fluctuating fuel and maintenance costs to maximize profits; etc.

51.     The switch to a franchise business model has contributed to increased productivity and revenue for both the franchisees and SuperShuttle.  In addition, the switch has also increased customer satisfaction and reduced the number of complaints filed by the riding public.  Turnover has decreased significantly, service levels have increased to unprecedented levels and the accident incident rate has fallen as well.

## EDD'S TAXICAB INFORMATION SHEET

13

52.     Historically, the EDD has applied a particular set of tests that it derived from the California Court of Appeals' opinion in *Santa Cruz Transp. v. Unemployment Ins. Appeals Bd.*, 235 Cal. App. 3d 1363 (Cal. Ct. App. 1991) when auditing the operations of taxicab companies as part of its enforcement functions for the audit and collection of unemployment insurance.

53.     *Santa Cruz Transp. v. Unemployment Ins. Appeals Bd.* was a case where the court determined that certain taxicab drivers were employees of the taxicab company.  The EDD described and illustrated these tests (and assigned each a weight) in an "information sheet" that it published, titled EDD Information Sheet, Taxicab Industry, DE 231TC Rev. 3 (7-03) (the "Taxicab Information Sheet").  A true and correct copy of the Taxicab Information Sheet is attached hereto as Exhibit C.

54.     Plaintiffs are informed and believe, and on that basis allege, that the Defendants have determined, based upon little or no review or study, that the airport on-demand shared ride shuttle industry should be evaluated using the same tests and criteria that it has created for the taxicab industry.  In turn, the EDD is the using the Taxicab Information Sheet to audit SuperShuttle in an audit that is without conclusion.  Although there are common elements, the taxi and airport shuttle industry also operate in distinct ways as well; i.e., under a different regulatory scheme; the taxi industry is typically subject to distinct local regulation while the on-demand shared ride shuttle industry is subject to a comprehensive set of regulations promulgated at a statewide level by the CPUC the most notable of which, CPUC General Order No. 158-A "Rules And Regulations Governing The Operation Of Passenger Stage Corporations And The Construction And Filing Of Tariffs And Time Tables" expressly permits the relationship between SuperShuttle and its franchisees that Defendants seek to terminate; the taxi industry is focused on single riders and has a flag down aspect; the shuttle industry is focused on shared rides and pre-

14

existing reservations; the companies have different ways of marketing their services; have different client bases; and have different operational systems, including dispatching services.

55.     Furthermore, SuperShuttle's franchise agreements have been approved by EDD's sister state agency, the California Department of Corporations, and also approved by the Federal Trade Commission.  EDD's use of the Taxicab Information Sheet to invalidate and impair these contracts is a violation of Plaintiffs constitutional rights.  SuperShuttle's franchisees also operate as independently licensed sub-charterers under a complicated regulatory scheme promulgated by the California Public Utilities Commission and local airport authorities.  These agencies are charged with protecting public safety, insuring service reliability and reasonable fare levels and have set up regulatory schemes that foster the franchised independent contractor structure under which SuperShuttle and its franchisees operate.

56.     The Defendants' application of the Taxicab Information Sheet to the airport on-demand shared ride shuttle industry is improper because the Taxicab Information Sheet is an "underground regulation" that has not been adopted pursuant to the California Administrative Procedure Act and filed with the California Secretary of State.[1]

57.     The California Administrative Procedure Acts requires that the EDD must have performed the following prior to the adoption of the Taxicab Information Sheet:

    a.   File its determination upon issuance with the Secretary of State;

    b.   Make its determination known to the agency, the Governor, and the Legislature;

---

[1] In addition, if Defendants were to invalidate the vested contractual rights of SuperShuttle, they would likely use another "underground regulation" to impose a significant penalty on SuperShuttle for not issuing Federal forms to its franchisees.  The EDD presently has a rule in place requiring that a penalty assessment made under Unemployment Insurance Code § 13052 and 13052.5 be paid in full before a petition for refund or reassessment can be made.  Not only is this rule unconstitutional as violates due process, but it also constitutes an "underground regulation" and is thus invalid.  Accordingly, the Court should also enjoin the EDD from enforcing this rule until the EDD has adhered to the requirements set forth in the California Administrative Procedure Act.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

    c.  Publish its determination in the California Regulatory Notice Register within 15 days of the date of issuance; and

    d.  Make its determination available to the public and the courts.

Defendants have not complied with these requirements and are now taking the position that it will apply the Taxicab Information Sheet to the airport shuttle industry, an industry that has not received notice or opportunity to comment on this "underground regulation."

58.    The California Supreme Court has held that the "purpose of the [Administrative Procedure Act] is to ensure that those persons or entities whom a regulation will affect have a voice in its creation, as well as notice of the law's requirements so that they can conform their conduct accordingly." *See Morning Star Co. v. State Board of Equalization*, 132 P. 3d 249, 254 (Cal. 2006). There is no question that in this case, the on-demand airport shared-ride shuttle industry has not had an opportunity to be heard before this regulation was adopted by the Department.

59.    Defendants' application of the Taxicab Information Sheet to invalidate and impair the franchise contracts will cause the Plaintiffs to suffer a violation of its constitutional rights. At all relevant times, the EDD has acted through its staff, employees and agents under the color of law.

## Defendants Act Abusively Towards Plaintiffs With Willful Disregard Of The Law

### The M&M Luxury Shuttle Decision

60.    Not satisfied with just using an illegal "underground regulation" to invalidate and impair Plaintiffs vested contractual rights, Defendants have pursued numerous other methods to obtain an employee determination against SuperShuttle. However, there is an Administrative Law Judge decision directly on point that holds that on-demand airport shared ride shuttle operators are independent contractors, not employees. *M & M Shuttle, Inc. v. Employment Development*

16

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

*Department*, Case Nos. 2056607, 2056608 and 2056611, OA Decision No. 2056607.  EDD

regulators have consistently ignored this decision or (unsuccessfully) pursued cases designed to

establish countervailing authority, in an effort to have a "basis" to ignore the decision and to find a

basis for an employee determination against SuperShuttle.

61.     In January 2008, an administrative law judge issued the decision as to the

employment status of California Public Utilities Commission licensed sub-carriers.  *See M & M*

*Shuttle, Inc. v. Employment Development Department*, Case No. 2056607, 2056608 and 2056611,

OA Decision No. 2056607 (the "*M&M* Decision").  In that decision, the administrative law judge

reached the conclusion that owner-operated, CPUC-licensed, airport shuttle drivers are not, and

cannot be, deemed to be "employees."  A true and correct copy of the *M&M* Decision is attached

hereto as Exhibit D.

62.     Upon information and belief, David Rhoades (a senior management auditor for

EDD who is currently in process of auditing the Plaintiffs) was instructed by high level EDD

executives to hold off on his audit determination while the *M&M* Decision was being appealed to

the California Unemployment Insurance Appeals Board ("CUIAB").  Mr. Rhoades indicated that

if the CUIAB affirmed that M & M drivers were independent contractors, that EDD would likely

conclude that SSI operated with franchised independent contractors.  In fact, SuperShuttle San

Francisco was in the process of acquiring the M & M Luxury Shuttle company during its audit and

hearings before the CUIAB, and the company was incorporated into SuperShuttle's operations

prior to the final CUIAB affirmance of the independent contractor status of M & M shuttle drivers.

63.     In July 2008, the California Unemployment Insurance Appeals Board issued an

order affirming the administrative law judge's decision that the owner-operators in *M&M Luxury*

*Shuttle* were in fact, independent contractors and not employees.  *See M&M Luxury Shuttle, Inc. v.*

*Employment Development Dept.*, Case No. 160078 (T), OA Decision No. 2056607.

17

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

64.     On information and belief, after the *M & M* Decision was issued, Mr. Rhoades was instructed, either directly or indirectly, to reverse his position and find that SuperShuttle's independent franchisees were in fact employees, thus allowing EDD to collect potentially millions in dollars of tax revenue, fines and penalties.  Additionally, Mr. Rhoades and EDD's legal department then commenced a transparent effort to circumvent the *M & M* Decision, which was troubling to EDD because of the precedent it set, and the fact that it seemed to direct an independent contractor finding in the SuperShuttle audit.

65.     In addition, during a January 29, 2009 conference call between SuperShuttle counsel and Shannon Pavao of the EDD Legal Department, Mr. Pavao stated that EDD executives were aware of the *M&M* Decision, but that the decision would not have any bearing on SuperShuttle because "M&M Luxury Shuttle is not similar in operation to SuperShuttle." Furthermore, Mr. Pavao stated during the call that it was going to be up to "[EDD auditor] Rhoades to come up with a conclusion to his audit" and that he did not "have any clue which way Rhoades was leaning" in his audit.  Strangely, Mr. Pavao told SuperShuttle counsel that Mr. Rhoades "was not aware of the *M&M* Decision" and that the "*M&M* Decision would not play a role in Mr. Rhoades audit findings" despite the fact that Mr. Rhoades was the person who notified SuperShuttle counsel that if the *M&M* Decision was affirmed by the CUIAB, then he would likely find in his audit that SuperShuttle franchisees are independent contractors, not employees.

### The Annette Juarez Case

66.     In September 2008, EDD seized on the individual case of claimant Annette Juarez as an "antidote" to the *M & M* Decision and as a potential counter precedent on which EDD could reach an employee finding against SuperShuttle.[2]  *See In The Matter of Annette M. Juarez*, Case

---

[2] A full examination of the Annette Juarez' proceedings indicates that she was a delusional antagonist who made numerous outlandish and unsubstantiated claims against SuperShuttle, prodded on by the EDD who, as demonstrated throughout the complaint will go to Herculean efforts in order to secure an employee finding to be used against

18

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

No. 2554901.  Annette Juarez is a former SuperShuttle franchisee who filed an individual unemployment benefits claim against SuperShuttle, after she voluntarily terminated her franchise and requested (and signed) a mutual general release with SuperShuttle.

67.     SuperShuttle received notice of Ms. Juarez' claim on or about September 18, 2008 and timely responded on September 24, 2008.

68.     On September 23, 2008, EDD auditor David Rhoades met with counsel for SuperShuttle at his offices in Bakersfield, California, on general matters related to the company tax audit.  At this meeting, counsel for SuperShuttle again confirmed that the SuperShuttle audit was being monitored by regional and executive level managers and attorneys within EDD. Counsel also learned that high level management and attorneys within EDD were concerned that in light of the *M & M* Decision, EDD's chances of defending an employee decision in the SuperShuttle audit had an undesireable risk of being overturned or unjustified.

69.     The subject of the Juarez claim came up during this September 23, 2008 meeting between Mr. Rhoades and SuperShuttle counsel.  At this time it was unknown to counsel for SuperShuttle and presumably Mr. Rhoades, what decision the EDD Adjudication Unit would make about Ms. Juarez' claim.  However, the discussion went to the effect that individual claims often are decided in favor of benefits for the individual claimant, because individual claimants present a sympathetic case to adjudicators and administrative law judges.

70.     When asked if EDD felt that the individual Juarez unemployment benefits claim would be comparatively easy to get an "employee" determination in, because of the sympathy evoked by individual claimants, and thus provide competing authority against the *M & M*

---

SuperShuttle.  Ms. Juarez' claims were clearly untruthful and frivolous as they were rejected by THREE independent fact finders - the initial EDD examiner who denied Ms. Juarez unemployment benefits because he/she found that Ms. Juarez voluntarily departed SuperShuttle without cause; the administrative law judge who affirmed the EDD examiner's notice denying Ms. Juarez unemployment benefits and; the California Unemployment Insurance Appeals Board of affirmed the administrative law judge's opinion.  The fact that EDD willingly took up a case as groundless as Ms. Juarez' indicates a lack of impartiality and fairness.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Decision, Mr. Rhoades replied "Yes."  Mr. Rhoades said that SuperShuttle's counsel ought to get involved in the Juarez proceedings, because it provided an opportunity to make a finding whether SuperShuttle franchisees were employees.  When asked why the *M & M* Decision had not already effectively made a finding (for SuperShuttle and the shared ride industry in general), Mr. Rhoades acknowledged that the *M & M* Decision was problematic for EDD.

71.     On September 25, 2008, EDD's Unemployment Benefits Determination and Adjudication Department in Victorville, CA (which handles individual unemployment benefit claims, separate from the tax audit division Mr. Rhoades works for in Bakersfield) issued a Notice of Determination to Ms. Juarez which concluded that she had voluntarily terminated her association with SuperShuttle and thus, was not entitled to benefits.

72.     The determination notice made no findings on what is known as an Unemployment Insurance Code § 621 (employee status) issue, it apparently not being necessary to make a status finding when the claimant is ineligible for benefits because the EDD finds that the individual left voluntarily without good cause.  A copy of the EDD Notice of Determination is attached hereto as Exhibit E.

73.     With apparent extensive behind the scenes help from Mr. Rhoades and EDD's lawyers, Ms. Juarez appealed her denial of benefits to the California Unemployment Insurance Appeals Board ("CUIAB" or the "Board").  The Board's mission statement states that it is an independent judicial arm of EDD, which handles appeals of individual claimants' decisions and tax audit decisions.

74.     The CUIAB appeals process involves an initial appeal hearing before an administrative law judge.  Parties dissatisfied with the decision of the administrative law judge can then appeal to the actual California Unemployment Insurance Appeals Board, which is an

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

adjudicative nine member body appointed by the Governor and supported by a large staff of career lawyers who act as counsel to the Board.

75.     CUIAB's administrative law department set  Ms. Juarez' appeal hearing for a one and a half hour hearing on December 23, 2008, at which the issue to be determined was whether Ms. Juarez had voluntarily terminated her association with SuperShuttle without cause.  Counsel for SuperShuttle did not receive notice of the December 23 hearing until four business days before the date of the hearing (December 17, 2008).  Because of illness and witness scheduling problems due to the proximity of the hearing to the Christmas holiday, counsel for SuperShuttle, Jerry Burger, then contacted EDD's Legal Department to see if they opposed a continuance to the hearing.  Mr. Burger spoke with Shannon Pavao, an attorney in EDD's Legal Department.  Mr. Pavao stated to Mr. Burger that he did not object to a continuance of the hearing.  However, at no time during this phone call (or any time before or afterwards) did Mr. Pavao advise Mr. Burger of EDD's intent to contact the administrative law department as set forth below.

76.     EDD's Legal Department was dissatisfied with the setting of the appeal as well. After speaking with Mr. Burger, Mr. Pavao of EDD's Legal Department contacted the clerk's office at the administrative law department, seeking to reset the hearing for a later date.  Mr. Pavao also attempted to increase the hearing time from ninety-minutes to over half a day along with petitioning the administrative law department to change the scope of the hearing to a California Unemployment Insurance Code section 621 hearing on employee status.

77.     At no time prior to the hearing did EDD attorney Shannon Pavao contact Mr. Burger to advise of EDD's desire to turn the hearing into a hearing on Ms. Juarez' employment status, or that such a request was going to be made to the administrative law department of the CUIAB.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

78.     On December 19, 2008, without informing Mr. Burger that EDD sought to change the scope of the hearing, Mr. Pavao first spoke with clerk(s) at the administrative law department. He then was put through to a duty judge, who is on call to handle telephonic requests.  That judge denied the request to reset the hearing or broaden the scope of the hearing, and a continuance.  Mr. Pavao's efforts eventually received the attention of the Chief Administrative Law Judge.  A note to the court file indicated that the Chief Administrative Law Judge called EDD Legal (Mr. Pavao) on December 19, 2008 and informed them that the Juarez case was only a benefits determination based on the claimant's appeal and that there would be no section 621 determination on status.

79.     Ms. Juarez' appeal then proceeded before Administrative Law Judge D. F. Blake on December 23, 2008.  Despite Chief Administrative Judge's prior determination that the appeal would not include a section 621 determination on employment status, EDD Legal Department dispatched Senior Staff Counsel Theodore Goodwin and Mr. Rhoades to attend the hearing.  On information and belief, they in fact met with Ms. Juarez on December 22nd and for many hours prepared her for the hearing.  In a step completely inconsistent with the impartiality and fairness that is supposed to characterize government agencies, EDD Legal's Senior Staff Counsel Goodwin sought to directly appear as counsel for Ms. Juarez in the hearing for which it was not a party. Despite the order of the Chief Administrative Law Judge, EDD Legal Senior Staff Counsel Goodwin sought to re-open the issue of employee status, stating EDD wished to secure an administrative decision that Ms. Juarez had in fact been an employee who did not voluntarily resign her position.

80.     Judge Blake was initially confused in that he believed that if EDD's Legal Department was appearing at the hearing, it was to defend the EDD Adjudication Unit's determination that Ms. Juarez had voluntarily resigned her association with SuperShuttle and was not entitled to benefits.  In a colloquy between EDD Senior Counsel Goodwin and Judge Blake, it

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

came out that EDD sought to appear on behalf of Ms. Juarez and argue for the overturning of the determination of its adjudication unit's findings that Ms. Juarez was not entitled to benefits.

81.     Aware of EDD internal procedure, Judge Blake noted that EDD has its own internal review process, whereby EDD may internally review (and change) an unemployment benefits determination within thirty-days of the original determination.  Judge Blake pointedly asked EDD Legal's Senior Staff Counsel Goodwin why EDD had not engaged in an internal review and reversed its initial finding against Ms. Juarez.  Mr. Goodwin had no answer and stated that "the decision [to reevaluate Ms. Juarez's claim] was made after the 30-day period."

82.     After further colloquy, Judge Blake resolved that EDD would be allowed to state for the record that it had "no objection" to reversal of the prior findings of the EDD Adjudication Unit.  However, Judge Blake barred EDD Legal from appearing on the merits to seek a reversal of the decision of EDD's Adjudication Unit.

83.     Apart from the judge's apparent surprise and confusion on the record, he described EDD's machinations as "unusual" and denied these requests and prohibited the EDD from using the benefits hearing as a means to obtain an employee finding against the Plaintiffs.

84.     The above-facts, including EDD's own omission to utilize its internal review process to change its own decision, suggest that EDD in fact believed its original decision to deny benefits was correct.  The maneuverings of EDD's Legal Department in then belatedly seeking to secure a reversal with a highly "unusual" appearance at a benefits hearing and attempted use of an individual claimant as a "stalking horse" to secure an employee status decision is consistent with the statements of Mr. Rhoades on September 23rd, namely, that EDD sought to use the Juarez case as a means of countering the *M & M* decision from EDD's own independent judicial arm.  This pattern is also consistent with a government agency intent on reaching a pre-determined result and willingness to circumvent the authority of cases from its own independent judiciary.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

85.     Not satisfied with yet another failure, Defendants appear to have now violated California confidentiality statutes by communicating about internal agency audit proceedings with outside attorneys.

<u>EDD Appears To Have Violated California Confidentiality Statutes By Communicating With Third-Party Attorneys</u>

86.     Presently, there is a pending class action titled *Kairy et al v. Supershuttle International et al*, Case No. 3:2008cv02993 in the Northern District of California involving SuperShuttle and some franchisees.  Plaintiffs claim for the purposes of the class action, that they were employees of SuperShuttle, and not independent franchisees.  The EDD may have entered into an improper de facto alliance with the plaintiffs' lawyers in the *Kairy* case, in order to secure an employee determination to be used against SuperShuttle.

87.     Sections 1094 and 2111 of the California Unemployment Insurance Code and Section of 1040 of the California Evidence Code prohibits EDD personnel from disclosing any information obtained in the course of the administration of its duties to third-parties.  In addition, in discharging its duties, EDD must be absolutely fair and unbiased.

88.     Plaintiffs are informed and believe, and upon such information and belief allege that EDD management and attorneys within EDD may have disclosed confidential information obtained from an ongoing audit of SuperShuttle to attorneys representing the *Kairy* plaintiffs.  Moreover, even if EDD has shielded its communications with the plaintiffs' lawyers under the guise of "investigatory privilege," EDD lawyers may be operating with the plaintiffs class action lawyers at such a level of familiarity, coordination and routine exchange of information, that the impartiality of EDD's lawyers (and potentially management) are compromised, and at minimum, EDD may be conducting itself in a way that creates an appearance of impropriety, and in a way which makes the impartiality of the audit suspect.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

89.     For example, on information and belief, EDD's lawyers and management have had multiple conference calls with the *Kairy* plaintiffs' lawyers.  Although these calls might be justified in part as investigatory, the circumstances of the call(s) suggest inconsistencies with investigatory privilege and potential violation of strict confidentiality rules.  Such calls apparently were conference type calls involving multiple participants (statewide call).  As well, the identity of participants (plaintiffs' lawyers, EDD senior managers and EDD lawyers vs. investigators interviewing witnesses) (not limited to an investigator interviewing a witness) and potential multiplicity of calls suggest an atmosphere which is inconsistent with impartial investigation and the strict confidentiality EDD is subject to.

90.     The coordination and familiarity has reached such levels that the communication apparently involves regular plaintiffs lawyer "updates" to EDD regarding the progress of the class action.  For example, on December 26, 2008, Aaron Kaufmann, an attorney representing plaintiffs in the *Kairy* class action, sent an email regarding some proposed stipulations in the class action to Rick Stevens, an attorney in the EDD Legal Department.   Mr. Stevens is the senior EDD counsel directing the legal aspects of EDD's campaign to classify SuperShuttle franchisees as employees.  Mr. Kaufmann apparently inadvertently included counsel defending SuperShuttle as recipients of the e-mail and/or included Mr. Stevens as a disclosed copy instead of a blind copy.  Regardless, what manifests is the potential for there being a pattern of regular communication and updating between EDD and the plaintiffs' class action lawyers.

91.     This suggests an appearance of impropriety in that the Department may have improperly entered into a formal or de facto joint effort with the *Kairy* plaintiffs' contingency fee attorneys to secure an employee determination to be used against SuperShuttle.

**Annette Juarez Appeals the Administrative Law Judge's Decision to the California Unemployment Insurance Appeal Board at the Direction of and with the Assistance of the Department's Lawyers**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

92.     As discussed, *supra*, despite Defendants efforts to confuse the issue and interfere in a judicial proceeding for which it was not a party, the administrative law judge ruled in the Annette Juarez case that Ms. Juarez voluntarily terminated her franchise agreement without cause and thus was ineligible for unemployment benefits.  Undeterred by yet another setback, the Defendants proceed to go one step further by appearing to have ghost written parts of Ms. Juarez's appellate brief.

93.     A review of Ms. Juarez's brief to the CUIAB shows that several portions of the brief contain allegations that appear to have been written by the lawyers within the Department (or written by Ms. Juarez at the Department's direction).  For instance, the use of the term "constructive discharge" magically appears for the first time in Ms. Juarez's brief, despite the term never having been previously raised by Ms. Juarez in any filing to the EDD or in any letters sent to SuperShuttle after her voluntary departure.  Coincidentally (or maybe not so much), the issue of constructive discharge also happens to appear in the amicus brief to the CUIAB that Defendants submitted on Ms. Juarez's behalf (and authored at the same time as Ms. Juarez' brief).

94.     Furthermore, Ms. Juarez repeatedly refers to the *Kairy* class action in her brief to the CUIAB.  The *Kairy* class action lawsuit was in full bloom at the time of the initial hearing before the administrative law judge and thus, Ms. Juarez had ample time to raise this issue before or during the hearing.  However, her brief before the administrative law judge does not mention the *Kairy* class action at all.

95.     The timing of certain actions by EDD's Legal Department, Ms. Juarez and the plaintiffs' lawyers in the Kairy case again suggests coordinated effort between EDD and the plaintiffs' lawyers and/or their clients, in a joint effort to secure an employee decision that exceeds the scope of propriety in terms of the conduct of EDD and/or EDD lawyers.  For instance, as discussed, *supra*, on December 26, 2008, plaintiffs' attorney Aaron Kaufman sent an email to

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1   EDD attorney Rick Stevens.  At this point in time, Ms. Juarez had likely become EDD's chosen

2   representative to pursue an employee determination via decisions through EDD's Adjudicative

3   Unit and through the CUIAB appeal process if necessary.  However, after having in-depth

4
5   preparation for the December 23rd appeal hearing from EDD Senior Counsel Goodwin, Ms.

6   Juarez then signed a consent form to participate in the class action on February 17, 2009.  About

7   one week after Ms. Juarez joined the *Kairy* class action lawsuit, with help from plaintiffs'

8   attorneys and/or EDD lawyers, she filed her written appeal with the CUIAB.  Ms. Juarez has in

9   fact admitted consulting with her class action attorneys on multiple occasions regarding her

10  unemployment benefits claim within the EDD.

11      96.     Apart from her contact with the class action lawyers to perpetuate her efforts to

12  secure an employee finding before the CUIAB, Ms. Juarez has repeatedly conferred on the phone

13
14  and in person with representatives of the EDD Legal Department, and EDD's lawyers appeared to

15  argue her case at her benefits hearings.  SuperShuttle alleges that discovery will establish a far

16  more profound set of facts suggesting that EDD has crossed the line from impartial government

17  agency into one acting in an arbitrary and capricious manner, which ignores impartiality, due

18  process and fairness concerns in the way it runs its audit of SuperShuttle.  Moreover, the existing

19  set of facts known to SuperShuttle raises colorable issues regarding an arbitrary and capricious

20  audit which has denied SuperShuttle due process and its right to impartial treatment by

21
22  government investigators.

23      97.     With regard to Ms. Juarez's CUIAB appeal, EDD again abandoned its required

24  neutrality and impartiality and instead collaborated with and worked through Ms. Juarez to violate

25  SuperShuttle's due process rights by petitioning the CUIAB to allow the introduction of new

26  evidence on appeal.  The CUIAB correctly denied the request to admit new evidence and held

27  that:

28

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

> To consider this [new] information now would violate due process because the parties have not had the opportunity to rebut or refute the evidence or question witnesses about it. Moreover, the administrative law judge did not have an opportunity to consider this information in arriving at a decision. For these reasons ... we have not considered this information in our deliberation, for to do so now would be improper and would violate due process.

98.     In the end, the CUIAB affirmed the administrative law judge's decision that Ms. Juarez voluntarily terminated her franchise contract without good cause, further frustrating Defendants' efforts to evade the holding of the *M&M* Decision.

99.     The Department can be anticipated to continue cherry picking former SuperShuttle franchisees in an ongoing effort to obtain an employee determination to be used to not only counter the effects of the *M&M* Decision, but to be used to invalidate the franchise contracts between the franchisees and SuperShuttle.  In fact, SuperShuttle's audit commenced in February of 2007.  Despite indications of a quick decision in SuperShuttle's favor if the *M & M* Decision established independent contractor, SuperShuttle's audit has now continued along for two years and seven months without a decision, and appears to be in a clear delay pattern, until EDD is able to secure an employee determination to be used against SuperShuttle.

100.     Moreover, despite the establishment of readily ascertainable potential audit standards that actually are reflective of the industry and decision in the M & M case such as focusing on where passed-through regulations and so-called "controls" actually arise, EDD continues to use the improperly adopted and outdated Taxi Information Sheet.  The absence of clear standards such as those delineated in the *M & M* Decision itself allows for capricious and arbitrary audit results, that fail to take into account the unique aspects of the airport shuttle industry; i.e., EDD attempts to emphasize "control" as evidence of employee status in its presentations, such as before the CUIAB in the Juarez case.  In doing so, EDD has ignored the

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

regulations and constitutional mandate of CPUC General Order 158-A, which states in pertinent part: that "[e]very driver of a vehicle [other than a Public Stage Corporation certificate holder] shall be … under the complete supervision, direction and control of the operating carrier and shall be … an employee of the certificate holder … [or] an employee of the sub-carrier … [or] *an independent contractor who holds charter-party authority and operating as a sub-carrier.*" (emphasis added).  SuperShuttle is entitled to protection from this arbitrary and capricious government enforcement and thus is forced to file this lawsuit in order enjoin the illegal selective prosecution engaged in by the Defendants.

101.   SuperShuttle requests the Court to issue a declaration that the franchise contracts are valid and enforceable, imposing legal obligations and duties upon both parties, and that SuperShuttle's franchisees are independent contractors.  In addition, the Court should declare the Taxicab Information Sheet to be invalid and enjoin its enforcement until the Defendants have complied with the administrative ruling making procedures set forth in the California Administrative Procedure Act.  At a minimum, the Court should order that the Taxicab Information Sheet be revised and updated to reflect the technological advances which have fundamentally changed how the taxicab and the on-demand air shuttle industry operates.

## FIRST CLAIM FOR RELIEF

### (Violation of the Equal Protection Clause)

### (Fourteenth Amendment to the United States Constitution)

102.   Plaintiffs re-allege each of the allegations contained in paragraphs 1 through 101, inclusive, and incorporate them herein by reference.

103.   Plaintiffs have been specifically singled out by the Defendants who have attempted on numerous occasions to secure a finding that SuperShuttle franchisees are employees and not independent businesses.

29

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

104.    The Defendants are attempting to avoid an unfavorable prior decision holding that airport shuttle operators are independent contractors, not employees and have even gone so far as to interfere with an administrative hearing to which it was not a party and violated California confidentiality statutes by communicating about internal audit proceedings with outside attorneys.

## SECOND CLAIM FOR RELIEF

### (Denial of Procedural Due Process)

### (Fifth and Fourteenth Amendments to the United States Constitution)

105.    Plaintiffs reallege each of the allegations contained in paragraphs 1 through 104, inclusive, and incorporate them herein by reference.

106.    The Taxicab Information Sheet was not adopted pursuant to the California Administrative Procedure Act.

107.    Plaintiffs have been informed that the EDD has determined that the airport on-demand shared ride shuttle industry should be audited under the same standards as that of the taxi industry and therefore should be evaluated by the factors listed in the Taxicab Information Sheet, which in itself was not adopted in conformance with the California Administrative Procedures Act.

108.    Plaintiffs have not been adequately notified nor have been afforded an opportunity to be heard before the EDD's adoption of the Taxicab Information Sheet.  This depravation is a violation of Plaintiffs constitutional rights under color of law.

## THIRD CLAIM FOR RELIEF

### (Denial of Substantive Due Process)

### (Fifth and Fourteenth Amendments to the United States Constitution)

109.    Plaintiffs reallege each of the allegations contained in paragraphs 1 through 108, inclusive, and incorporate them herein by reference.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

110.    The franchise contracts entered into by SuperShuttle constitutes a vested and cognizable property interest created by federal and state law and protected by the Due Process Clause of the Fourteenth Amended to the United States Constitution.

111.    Defendants' actions complained of herein have deprived SuperShuttle of rights, privileges and immunities secured by the Due Process Clause, in that the Defendants application of the Taxi Information Sheet to the airport shuttle industry was unfair, arbitrary and capricious, and lacking in a rational basis.  Prior to its action, the Defendants were aware of SuperShuttle's rights as the California Department of Corporations and the Federal Trade Commission granted SuperShuttle the right to issue franchises and the right enter into valid franchise contracts.  Despite this knowledge, the Defendants are attempting to invalidate the franchise contracts without proceeding in the manner required by law, taking action unsupported by substantial evidence, in knowing and direct contravention of the law.

112.    Accordingly, the Defendants' actions should be declared to be in violation of, and preempted by, constitutional guarantees of due process, and should be set aside and enjoined by the Court on that basis.

### FOURTH CLAIM FOR RELIEF

### (Violation of Civil Rights Act)

### (42 U.S.C. § 1983)

113.    Plaintiffs reallege each of the allegations contained in paragraphs 1 through 112, inclusive, and incorporate them herein by reference.

114.    Title 42 U.S.C. § 1983 provides in relevant part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

31

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

115.    At all times relevant hereto, Defendant Henning, the EDD and the Doe Defendants acted "under color of law" within the meaning of section 1983.

116.    At all times relevant hereto, Defendant Henning, the EDD and the Doe Defendants acted pursuant to an expressly adopted official policy or longstanding practice or custom of the Department.

117.    As heretofore alleged, the Defendants' actions violated Plaintiffs' rights, privileges and immunities under the Equal Protection Clause, the Due Process Clause and the Contracts Clause of the United States Constitution, all as secured by section 1983.

118.    Accordingly, the Defendants' actions should be declared in violation of, and preempted by, section 1983, and should be set aside and enjoined by the Court on that basis.  In addition, Plaintiffs are entitled to recover its attorneys' fees and costs incurred in bringing this action pursuant to 42 U.S.C. § 1988 and as otherwise provided by law.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Relief)

### (28 U.S.C. §§ 2201, 2202)

119.    Plaintiffs reallege each of the allegations contained in paragraphs 1 through 118, inclusive, and incorporate them herein by reference.

120.    Plaintiffs bring this claim pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

121.    As alleged above, an actual controversy has arisen and now exists within the meaning of 28 U.S.C. § 2201 as to whether the franchise contracts entered into between the City Licensees and the franchisees are valid and enforceable.  Plaintiffs' rights, status and other legal

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

relations have been immediately and adversely affected by the Defendants' attempt to invalidate the contracts.

122.    The Court has the power to adjudicate the rights of the parties with respect to this controversy and should grant declaratory relief and other appropriate relief under 28 U.S.C. §§ 2201 and 2202, as prayed for herein.

## SIXTH CLAIM FOR RELIEF

**(Declaratory Judgment and Injunction Based on Violations of Constitutional Provisions Prohibiting Impairment of Contract Obligations)**

**(United States Constitution, Art. I, § 10; California Constitution, Art. 1, § 9; 28 U.S.C. §§ 2201, 2202)**

123.    Plaintiffs reallege each of the allegations contained in paragraphs 1 through 122, inclusive, and incorporate them herein by reference.

124.    The United States Constitution provides, at Article I, § 10, that "No State shall … pass … Law impairing the obligation of Contracts."  Similarly, the California Constitution provides, at Article 1, § 9, that "[A] law impairing the obligation of contracts may not be passed." The franchise contracts between the City Licensees and the franchisees constitute binding contracts based on adequate consideration that establishes a vested right that cannot be impaired by the Defendants.  Once a valid contract has been created, it is secured against impairment by subsequent state actions.  Accordingly, Defendants' application of the Taxi Information Sheet to invalidate the franchise contracts violates both federal and state constitutions provisions on impairment of contracts.

125.    An actual and justiciable controversy has arisen between the Plaintiffs and the Defendants with respect to the Plaintiffs' vested rights in the franchise contracts that are protected

33

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

by Article I, § 10 of the United States Constitution and Article 1, § 9 of the California Constitution.

126.   Neither the Taxi Information Sheet nor any subsequent action of the Defendants can supersede rights that are guaranteed to Plaintiffs by the United States Constitution or the California Constitution.

127.   The Defendants' position and actions in the present case constitute a substantial impairment of Plaintiffs' protected interests and does not further any substantial government interest.

128.   Plaintiffs' rights under the franchise contracts are impaired because they will be precluded from operating a viable franchise business when the application of the Taxi Information Sheet invalidates the contracts.  Defendants do not advance any substantial public purpose where it acts to invalidate a viable and legitimate business model and by denying California citizens the manifest benefits of choice in transportation to and from an airport.

129.   Accordingly, Defendants' application of the Taxi Information Sheet to invalidate the franchise contracts is unconstitutional under Article I, § 10 of the United States Constitution and Article 1, § 9 of the California Constitution and thus void and of no effect.  Plaintiffs will be damaged and irreparably harmed when its franchise contracts are invalidated by the Defendants' actions.  Accordingly, Defendants should be enjoined preliminarily and thereafter permanently, from applying the Taxi Information Sheet to the Plaintiffs.

## SEVENTH CLAIM FOR RELIEF

### (Declaratory Judgment Based Upon Violations of State Law)

### (California Code Civ. Proc. § 1060 and California Gov. Code § 11350 and California Pub. Util. Code § 1759)

34

130.    Plaintiffs reallege each of the allegations contained in paragraphs 1 through 129, inclusive, and incorporate them herein by reference.

131.    An actual controversy has arisen and now exists between Plaintiffs and Defendants relating to their respective rights and duties in that Plaintiff contends that the EDD's state-wide policy of adopting the tests and criteria that it uses in the taxicab industry for making its determinations regarding the employment status of drivers in the airport on-demand shared ride shuttle industry is invalid and unenforceable, both on its face and as construed by Defendants, in that this agency guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has not been adopted as a regulation and filed with the Secretary of State pursuant to the provisions of Cal. Gov. Code § 11340.5, whereas Defendants dispute this contention and contend that the policy and its application to Plaintiffs is valid.

132.    Plaintiffs desire a declaration of their rights with respect to the application or non-application of the EDD's state-wide policy to Plaintiffs, with particular reference as to the legality of EDD's adoption of the tests and criteria that it uses in the taxicab industry for making its determinations regarding the employment status of drivers in the airport on-demand shared ride shuttle industry.

133.    Such a declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights and obligations under regulations promulgated by the EDD and with respect to their contractual rights and obligations with their licensees and franchisees.

134.    In addition, the Court should issue a declaration that EDD is not permitted to interfere with and usurp the CPUC's statutory and constitutional authority to address issues within its jurisdiction.

35

## EIGHTH CLAIM FOR RELIEF

### (Injunction Based on Violations of State Law)

### (California Code Civ. Proc. § 525, California Gov. Code § 11350 and California Pub. Util. Code § 1759)

135. Defendants reallege each of the allegations contained in paragraphs 1 through 134, inclusive, and incorporate them herein by reference.

136. Defendants have adopted a state-wide policy of using the tests and criteria that the EDD uses in the taxicab industry for making its determinations regarding the employment status of drivers in the airport on-demand shared ride shuttle industry.

137. This state-wide policy is invalid and unenforceable, both on its face and as construed by Defendants, in that this agency guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule has not been adopted as a regulation and filed with the Secretary of State pursuant to the provisions of Cal. Gov. Code § 11340.5.

138. Plaintiffs contend that Defendants state-wide policy as applied to the airport on-demand shared ride shuttle industry is arbitrary, capricious and threatens to cause Plaintiffs irreparable harm by throwing uncertainty into their business and destroying long established contractual rights and obligations created by SuperShuttle licensing and franchise agreements - agreements embracing an operating system approved over a decade ago by the CPUC- unless this Court enjoins the EDD's enforcement of said policy against Plaintiffs pending judgment in this action and thereafter permanently enjoins Defendant from enforcing said policy against Plaintiffs unless, and until, Defendants have adopted the policy as a regulation and filed it with the Secretary of State pursuant to the provisions of Cal.Gov. Code § 11342.5.

139. In addition, the Court should enjoin EDD's enforcement efforts against SuperShuttle because the EDD is seeking to usurp the CPUC's statutory and constitutional

36

authority to address issues within its jurisdiction, including, but not limited to the regulation of on-demand airport shuttle services.

140.   Unless this Court gives appropriate provisional and final preventive relief, Plaintiffs will be obliged to incur the substantial cost of defending themselves in administrative proceedings, against charges having no legal merit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants and each of them as follows:

1.   For a declaration and judgment that the Franchise Contracts between Plaintiffs and the franchisees are valid and legitimate, creating legal duties and obligations on behalf of both parties;

2.   For a declaration and judgment that the Plaintiffs' franchisees are independent contractors, not employees;

3.   For a declaration and judgment that the Defendants' actions deprived the Plaintiffs of its rights without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and are therefore void and invalid;

4.   For a declaration and judgment that the Defendants' actions violate 42 U.S.C. § 1983, and are void and invalid, and an award of attorneys' fees and costs according to proof;

5.   For a declaration of the respective right and obligations of the parties as to the Defendants' action based on constitutional and statutory rights and duties at issue herein;

6.   For a declaration and judgment that Defendants' actions would substantially interfere with Plaintiffs' vested rights, which are protected by both the federal and state constitutions.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

7.     For a declaration by this Court that the EDD's state-wide policy of adopting the tests and criteria that it uses in the taxicab industry for making its determinations regarding the employment status of drivers in the airport on-demand shared ride shuttle industry is invalid and unenforceable;

8.     For a temporary restraining order and preliminary injunction enjoining the Defendants, their employees and all persons acting in concert with them from enforcing or attempting to enforce a policy of adopting the tests and criteria that the EDD uses in the taxicab industry for making its determinations regarding the employment status of drivers in the airport on-demand shared ride shuttle industry unless, and until, Defendants have adopted the policy as a regulation and filed it with the Secretary of State pursuant to the provisions of Cal. Gov. Code § 11342.5 [and/or revised the Taxicab Information Sheet to reflect new technological advances which have fundamentally altered the taxicab and on-demand airport shuttle industry];

9.     For a permanent injunction enjoining the Defendants, their employees, and all persons acting in concert with them from doing any of the above-described acts after judgment.

10.    For cost of suit incurred herein and for reasonable litigation expenses; and

11.    For such other and further relief as the Court may deem just and proper.

Dated: August 21, 2009                    MARRON LAWYERS

By: _____
Paul J. Marron, Esq.
Attorneys for Plaintiffs SUPERSHUTTLE INTERNATIONAL, INC., SUPERSHUTTLE FRANCHISE CORPORATION, SUPERSHUTTLE LOS ANGELES, INC., MINI-BUS SYSTEMS, INC., SACRAMENTO TRANSPORTATION SERVICES, INC., SUPERSHUTTLE OF

38

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

# EXHIBIT A

Exhibit A


LexisNexis·

LEXSEE 1996 CAL. PUC LEXIS 854

Order Instituting Investigation into the Passenger Stage Corporation Operations of Prime
Time Shuttle International, Inc.; Order Instituting Investigation and Order to Show Cause
why Prime Time Shuttle International, Inc.'s certificate of Public Convenience and Neces-
sity should not be suspended or revoked

Decision No. 96-08-034, Investigation No. 93-05-004 (Filed May 7, 1993), Investigation
No. 95-07-001 (Filed July 6, 1995)

California Public Utilities Commission

*1996 Cal. PUC LEXIS 854; 67 CPUC2d 437*

August 2, 1996

Anderson, Donovan & Poole, by Ellis Ross Anderson, Attorney at Law, for Prime Time Shuttle International, Inc.,
respondent.

Judy Robertson, for SuperShuttle International, Inc.; John E. deBrauwere, Attorney at Law, for himself; and Timo-
thy A. Hogen, Assistant City Attorney, for Los Angeles International Airport; interested parties.

Eleanor M. W. Youngsmith, Attorney at Law, Larry E. McNeely, Toni D. Crowley, and Mark Clairmont, for Safety
and Enforcement Division.

**PANEL:** [*1]

P. Gregory Conlon, President; Daniel Wm. Fessler, Jessie J. Knight, Jr., Henry M. Duque, Josiah L. Neeper, Com-
missioners

**OPINION: INTERIM OPINION**

**1. Summary**

The respondent in these two consolidated investigations, Prime Time Shuttle International, Inc. (Prime Time), the
holder of a certificate of public convenience and necessity (CPCN or certificate) from the Commission to operate as a
passenger stage corporation (PSC), has violated (1) various provisions of the Public Utilities (PU) Code, (2) applicable
rules of this Commission and of the Los Angeles International Airport (LAX), n1 and (3) the terms under which Prime
Time entered into a Commission-approved settlement of the earlier of these investigations. [*2]

n1 The acronym "LAX" is used to refer both to the airport itself and to the airport's governing body.

Specifically, Prime Time has violated, and continues to violate, the LAX rule that operators of ride-share van ser-
vices use employee drivers, and not use independent contractors, in transporting passengers to or from LAX. Prime
Time's failure to comply with the LAX rule violates this Commission's General Order (GO) 158-A, n2 the prior settle-
ment with Commission staff, and statutory provisions mandating compliance with Commission orders.

n2 GO 158-A and (to a lesser extent) GO 157C contain the principal Commission rules applicable to the
airport ride-share industry. The original versions of these GOs were adopted in Decision (D.) 89-10-028, *33
CPUC2d 5 (1989).* The successive revisions to these GOs, designated by the letter after the number, do not
change the substance in any way material to this proceeding. For convenience, we will refer generally in today's

Exhibit A-000001

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

decision to the versions now in effect, i.e., GO 158-A and GO 157-C. This practice seems less confusing than citing the version contemporaneously in effect as of the various events discussed herein.

An aggravating factor [*3]  in regard to these violations was the response of Prime Time to repeated notices from the Commission's Safety and Enforcement Division staff (S&E) of these and other alleged violations. When Prime Time failed to persuade LAX to change the rule in question, Prime Time's president, John Kindt, engaged in a prolonged, deliberate letter-writing campaign attacking the integrity and veracity of various members of S&E. These attacks lacked foundation in fact; they resulted from Mr. Kindt's inability or unwillingness to deal constructively with the strong differences of opinion existing between S&E and Prime Time. Mr. Kindt's tactics fostered an atmosphere of hostility and intimidation, and in our view endangered S&E personnel in the performance of their duties at LAX.

We also conclude that Prime Time has violated various other requirements of this Commission, for example, by using subcarriers that had not obtained charter-party permits, and in addition that Prime Time may not be exercising the requisite degree of control over its drivers pursuant to GO 158-A. However, we conclude that, consistent with statutory provisions, GO 158-A, and prior Commission precedent, a PSC can provide all [*4]  or a substantial part of its passenger stage service through the use of nonemployee drivers, so long as these subcarriers hold charter-party permits, as required under GO 158-A. We reject the contention of S&E that such use, under GO 158-A, must be limited to periods of peak demand or emergencies created by vehicle breakdowns.

Prime Time's CPCN will be revoked, and Prime Time will be fined $ 100,000 (in addition to the amount of the fine still owing pursuant to the settlement of the earlier investigation); however, such revocation will be stayed for 90 days. If, during the period of this stay, Prime Time submits a suitable plan, as described below, for bringing its operations into compliance with applicable LAX rules, the Commission will extend the stay for a probationary period.

During the probationary period, Prime Time must (1) train its senior management in dispute resolution techniques, (2) cooperate fully with S&E in clarifying and correcting apparent discrepancies in its annual reports for 1992, 1993, and 1994, (3) modify the language in its agreement with its charter-party subcarriers to ensure an appropriate degree of supervision and control pursuant to GO 158-A, and [*5]  (4) complete certain changes to its operations and procedures, all as further described below. The Commission will cancel the revocation upon Prime Time's satisfactory completion of probation. The revocation will take effect if Prime Time fails to submit a suitable plan or violates any of the terms of its probation.

## 2. Background

Prime Time and S&E each has stated on the record that it feels "hoodwinked" by the other. Prime Time's president, John Kindt, has used blunter language, especially in a letter-writing campaign he engaged in from the beginning of 1995 up to the issuance of the July 1995 Order Instituting Investigation (OII). Basically, in communications with Commissioners, State Senator Rosenthal, Los Angeles Mayor Riordan, and others, Mr. Kindt has accused S&E Director William R. Schulte and other individual staff members of lying and trying to put Prime Time out of business through harassment, threats, and innuendo.

There are two sides to this story. The two sides differ enormously. We give our impression of the two sides below, without any attempt to mask the degree of antipathy that has developed. Our impression derives mostly from evidence of record, although [*6]  in certain instances we draw our own inferences about the parties' respective states of mind. Our narrative tries to make clear where we rely on inferences.

### 2.1 The Story from S&E's Point of View

S&E has consistently argued, orally and in writing, that our general orders (principally the GO 157 and 158 series) allow only limited use of charter-party carriers by a PSC providing ride-share service to airports. Under S&E's interpretation, such use is permissible only in temporary overflow and emergency situations. S&E bases its interpretation on discussion in our decision adopting the original versions of GO 157-C and 158-A, and on statutory prohibitions on a PSC lending or brokering its certificate. .

Also, S&E believes subcarriage is permissible only where the overlying carrier has hired the subcarrier pursuant to PU Code § 5401, basically on a time or mileage basis. S&E has always maintained that an arrangement whereby the overlying carrier has the subcarrier collect individual fares, and then splits the gross revenues with the subcarrier, is a violation of the prohibition in PU Code § 5401 on charter-party carriers charging on an "individual-fare basis."

All of the above [*7]  issues, along with many others, were included in the Commission's 1993 OII. n3 It is true that for much of 1993, Prime Time's arrangement with its nonemployee drivers was different from the current arrangement. Specifically, Prime Time was using nonemployee drivers who leased their vans from Prime Time by the shift (much

like taxi drivers) and who did not have charter-party authority from the Commission; however, the settlement resolving the 1993 OII in no way endorsed Prime Time's current independent contractor arrangement (with licensed charter-party carriers). To the contrary, the settlement notified Prime Time that in restructuring its contractual relationship with its drivers, it would have to comply with *PU Code § 5401.*

> n3 For example, the 1993 OII also concerned the filing of tariffs with the Commission, the posting of Prime Time tariffs in its vans, the filing of annual reports with the Commission, the provision of workers' compensation insurance, and 5he use of drivers who hadn't registered in the "pull notice" program of the Department of Motor Vehicles (DMV).

The 1993 settlement did not give specific direction to Prime Time on the appropriate interpretation of GO  [*8] 157-C and 158-A vis-a-vis use of subcarriers. We infer that the reason for this omission was that Prime Time had a pending application (filed in March 1993) in which it asked the Commission to either (1) confirm that GO 158-A allowed a PSC to conduct all or the bulk of its operations through charter-party subcarriers, or (2) amend GO 158-A to allow such PSC operation. S&E had already filed its opposition to this application. Moreover, Prime Time was concurrently asking LAX to repeal its rule requiring PSCs serving LAX to use only bona fide employee drivers. S&E thus had a reasonable expectation that the Commission and LAX shortly would resolve the issues regarding the appropriate relationship between the PSC and its drivers in providing airport ride-share.

Contrary to expectation, Prime Time did not pursue the application. Instead, Prime Time dismissed the application in April 1994 but announced its intention to petition the Commission within 30 days to modify GO 158-A. Prime Time failed to do so. Prime Time also failed to get LAX to change its rule requiring use of bona fide employee drivers. Instead, Prime Time simply ignored the LAX rule while representing to LAX authorities that [*9] this Commission allows the routine use of nonemployee drivers.

We infer that S&E came to regard Prime Time as playing a calculated game With the Commission and LAX, viz., Prime Time did not pursue an authoritative interpretation of GO 158-A from the Commission because Prime Time feared the Commission would adopt S&E's view; but with LAX, Prime Time kept insisting on its own interpretation of GO 158-A, all the while knowing that S&E strongly disagreed with that interpretation.

Meanwhile, Prime Time's compliance with the terms of the 1993 settlement was spotty. For example, independent contractor drivers were put on the road in Prime Time vans before they had received charter-party permits from the Commission.

Moreover, S&E was increasingly troubled by Prime Time's incentives in its new arrangement with its nonemployee drivers. Prime Time collected its weekly fee regardless of the revenue achieved by the drivers. S&E noted a large increase in the number of vans registered to Prime Time and concluded that Prime Time's incentives were to increase the number of drivers under contract, regardless of whether there was a corresponding increase in passengers transported. Also, if there  [*10] were no increase in the number of passengers transported, S&E worried that drivers would work excessively long shifts and neglect van maintenance, just to cover their weekly fees to Prime Time. Some drivers and some passenger statistics seemed to confirm that the new Prime Time arrangement was leading to increased congestion, unlawful solicitation, longer shifts, and reckless driving.

We infer that S&E got fed up with Prime Time some time in 1994 and decided to take stronger measures. In August 1994, Director Schulte wrote to LAX, essentially laying out the above concerns and summarizing S&E's interpretations of the relevant provisions of the PU Code and GO 158-A. These interpretations were all consistent with repeated S&E remonstrances to Prime Time, dating to, and even before, the 1993 OII.

The Commission was not the only entity with concerns over Prime Time's operation. The National Labor Relations Board (NLRB), the Department of Corporations, the Los Angeles City Attorney all had enforcement actions of one kind or another directed against Prime Time. S&E feels it appropriately cooperated with enforcement efforts of these other agencies, and with CHP on van inspection.

The Prime [*11] Time response to S&E up to 1995 was somewhat cooperative in some areas (e.g., regulating driver shifts) but recalcitrant on the basic issue regarding Prime Time's use of subcarriers. Starting early in 1995, Mr. Kindt adopted what S&E saw as another calculated strategy to derail regulators.

Mr. Kindt portrayed himself in letters and in person as a sincere businessman unjustifiably harassed by "silly" bureaucrats with an ax to grind because he had "beaten" them. This notion that Kindt and Prime Time were winning ig-

nored the fact that Prime Time was under investigation, probation, or restraining orders issued by the Commission, Los Angeles Municipal Court, Department of Corporations, and NLRB. Mr. Kindt responded to the S&E letters with name-calling, labelling Mr. Schulte (among others) as a liar. We infer that S&E believes Mr. Kindt is putting on an act, simply running the clock while Kindt and Prime Time rake in about $ 4 million per year from the weekly fees of $ 600 or more paid by current drivers, plus thousands more from orientation fees collected upfront from prospective new drivers, who sign up on the strength of deceptive advertising.

In short, S&E sees Prime Time, and Mr. [*12] Kindt personally, as unfit to hold a certificate or to operate a public utility. It sees Prime Time, under the current driver arrangement, as a bad operator, confusing the public, victimizing its drivers, increasing congestion and other problems at airports, defying S&E's attempts to cooperate with CHP and airport authorities to effectively regulate the ride-share industry, and unfairly competing with other ride-share providers that play by the rules (as S&E sees them).

## 2.2 The Story from Prime Time's Point of View

Prime Time has always been honest with S&E regarding Prime Time's intention to use independent contractor drivers rather than employee drivers. Prime Time concedes that its early attempts to create such an arrangement were faulty, but the current arrangement. (using charter-party carriers who own or lease their own vans) is entirely proper under GO 158-A. In fact Prime Time showed S&E its current contract in October 1993 (there has been little change to the contract since then), and S&E made no objection, except with respect to compliance with *PU Code § 5401*.

Prime Time believes S&E is lying about the requirements of GO 158-A regarding the PSC-driver relationship. [*13] The emergency/overflow limitation on use of charter-party carriers simply does not exist.

The facts do not support S&E's fears regarding Prime Time's incentives in the use of "independent owner-operators" (as Prime Time likes to call its nonemployee drivers). For example, Prime Time has evidence showing that its safety performance is substantially better than the industry average, and that its owner-operator drivers earn 50% more, while working only slightly longer shifts, than its employee drivers did formerly. Furthermore, Prime Time's efficiency has improved under the new arrangement. For example, Prime Time's vans are now carrying more passengers per loop through the LAX central terminal area.

Prime Time believes it had a "gentleman's agreement" with S&E that would allow Prime Time a grace period to work things out with LAX, which in any case was not enforcing the rule requiring use of bona fide employee drivers. Prime Time asserts that it had nearly convinced LAX officials to change that rule, but Director Schulte's August 1994 letter to LAX "torpedoed" that effort and also made many unfounded allegations against Prime Time.

Mr. Kindt justifies ignoring the LAX rule on the [*14] grounds that Prime Time was trying to comply with conflicting state and local regulations. Also, Mr. Kindt does not consider the LAX rule to relate to safety or traffic concerns, so violation of that rule would not constitute a violation of GO 158-A.

Mr. Kindt also claims that S&E has maintained many mutually inconsistent theories regarding what Prime Time is doing wrong. When Prime Time tries to work with S&E, for example on the issue of what kind of division of revenues between Prime Time and its drivers would comply (in S&E's view) with *PU Code § 5401*, S&E refuses to give useful guidance or commit itself. Prime Time's negative experience with S&E in this regard contrasts with Prime Time's positive experience with the Department of Corporations. When the latter expressed a concern that Prime Time's arrangement with its drivers might constitute an unregistered franchise, the department's lawyer cooperated with Prime Time in developing amendatory language that satisfied the department's concern.

Prime Time is trying in good faith to comply with the terms of its probation under the 1993 settlement. Although at one point Prime Time allowed new drivers to work so long as they had insurance [*15] and at least a charter-party application pending at the Commission, Prime Time now waits for issuance of the permit. It is a mark of the harassment to which Prime Time is subject that these permits are often delayed for months, and S&E is now refusing to process such applications altogether because of S&E's objection to Prime Time's arrangement with its drivers.

Prime Time concedes that its annual reports improperly state its financial results on a fiscal year rather than a calendar-year basis. Prime Time will correct this error, which in any event does not appear to have resulted in any underpayment of Prime Time's regulatory fees.

Prime Time believes that S&E is harassing it by reporting suspected violations of things S&E knows nothing about (e.g., Labor Code provisions) to other regulatory authorities, by cooperating with private attorneys bringing lawsuits against Prime Time, by fomenting distrust and dissatisfaction among Prime Time drivers, and by intimidating drivers

Exhibit A-000004

loyal to Prime Time. Mr. Kindt also charges S&E with bad faith by virtue of S&E's cooperation with the Los Angeles City Attorney in an action against Prime Time dealing with matters similar to (but not the same [*16] as) those involved in the 1993 OII. This harassment is a huge financial drain for Prime Time and "chills" Prime Time's efforts to further innovate in the airport ride-share industry.

Mr. Kindt is defensive about his letter-writing and name-calling campaign against S&E. He sees that campaign as his only weapon against S&E harassment, and as actually necessary in order to save his company. Asked why Prime Time did not pursue its application or other means to get the Commission to formally approve Prime Time's arrangement with its drivers, Mr. Kindt responded that he thought his unwritten "gentleman s agreement" with S&E made it unnecessary to pursue such approval.

## 2.3 Some Observations About Fixing What Went Wrong

Prime Time and S&E are engaged in a war of words that is extreme even for an enforcement proceeding. Clearly, S&E thinks Prime Time lacks any credibility, and Mr. Kindt has said as much, publicly and on many occasions, about S&E.

Of necessity, this decision will address, in part, who is to blame. Much more important, however, is the question of what is to be done. The war of words must stop, immediately and unconditionally. On the basis of past performance. the [*17] party most in need of reform in this regard is Mr. Kindt.

We are not ordering Mr. Kindt to agree with S&E. Like any other person or regulated enterprise, he is free to express emphatic disagreement. He can, where appropriate, point out facts S&E has overlooked or misunderstood; he can produce studies to refute S[E] he can try to show that S&E is misconstruing relevant statutes, rules, or case law. What neither Mr. Kindt nor anyone else is entitled to do is to label someone a liar for disagreeing with him. n4

n4 Disagreement also does not justify threats or use of profane or obscene language, but Mr. Kindt, so far as we know, has not engaged in the latter tactics.

Prime Time has said in its opening brief that a proper working relationship between itself and S&E can be restored once the Commission has settled the various points of law in dispute. We are not so sure. Today's decision does not result in an unqualified victory for either Prime Time or S&E. The terms of Prime Time's probation are rigorous, and Prime Time and S&E will have to communicate with each other extensively and cooperatively if Prime Time is to complete its probation successfully. We cannot create such communication, [*18] much less mutual trust and respect, simply by ordering it. Communication might improve, and other things with it, if Prime Time and S&E work together to break down the probation into a series of precisely defined tasks and responsibilities, and then proceed to perform exactly and punctually as promised.

The communication problems between Prime Time and S&E can be summarized briefly. Prime Time complains that S&E does not provide constructive feedback on questions like compensating and supervising drivers. Where Prime Time is looking for something like a compliance checklist, S&E keeps saying it has to look at the "totality of circumstances" to see whether the law is satisfied in any particular situation. In the absence of general guidance, Prime Time feels it has an impossible compliance burden. There is some basis to Prime Time's frustration with S&E.

S&E complains that it has given plenty of guidance to Prime Time, but Prime Time either discounts or ignores anything that does not fit its latest business plan. S&E is also wary of becoming prescriptive; when it has ventured to be precise, Prime Time has been quick to accuse S&E of bureaucratic meddling and micromanagement. There [*19] is some basis to S&E's frustration with Prime Time.

We have no quick or easy solution, but the beginning of the way out of this hole is for both sides to acknowledge their responsibility for digging the hole in the first place.

## 3. State Law on PSC Use of Nonemployee Drivers

Clearing away the parties' rhetoric, we see that a single dispute between Prime Time and S&E dominates this case. The dispute concerns the legal standards applicable to the relationship between a PSC and its drivers.

Prime Time has made clear since at least 1992 that it wants to use nonemployee drivers as much as possible. Prime Time has experimented with various contract structures for nonemployee drivers. Its contractual arrangement at the time of the earlier investigation was to lease its own vans to drivers by the shift, similar to a widespread practice in the taxi

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

industry. Prime Time concedes this was an "imperfect" arrangement, in part because the independent contractor drivers it was then using held no authority (whether PSC or charter-party) from the Commission.

Under Prime Time's current contractual arrangement, the driver (in theory) is a fully independent entrepreneur. The driver holds [*20] a charter-party permit, participates in the DMV "pull-notice" program, carries insurance (with an appropriate certificate on file with the Commission), and owns or leases a van, albeit painted with Prime Time colors.

Prime Time insists that the current arrangement results in safe, reliable, efficient service. Prime Time admits that the independent contractor drivers assume greater business risks than do employee drivers, but Prime Time says that the division of revenues under the current arrangement results in commensurately greater compensation to the independent contractor drivers than its employee drivers received through wages.

S&E maintains that a PSC must use employee drivers exclusively, except where (1) it experiences an emergency, e.g., due to van breakdown, or (2) unexpected demand exceeds its capacity. Only in these latter instances may the PSC use charter-party carriers, and in such instances, says S&E, the PSC must charter the van and compensate the carrier on a vehicle mileage or time-of-use basis, consistent with *PU Code § 5401.*

S&E believes that these restrictions on "he use of nonemployee drivers are necessary to ensure safe, reliable, efficient service. In particular, [*21] S&E believes that Prime Time's mode of operation results in bad and unsafe service, and increases congestion on airport roads. S&E argues that Prime Time's use of nonemployee drivers is a device to shift risks and responsibilities that ought to be borne by the PSC. ·

We disagree with S&E regarding the circumstances under which, consistent with state law, a PSC can use nonemployee drivers. Specifically, we hold that a PSC, consistent with state statutes and Commission regulations, can legally serve its customers through the use of nonemployee drivers operating their own vans.

Although we reject S&E's substantive arguments, we note that the record does not support the accusations by Prime Time's president, John Kindt, that S&E "reneged" on any agreement or had any grudge against him or Prime Time in advancing these arguments. We discuss Mr. Kindt's accusations in Section 6.3 below. At this point, however, we deal with the various arguments S&E has advanced in support of its position.

### 3.1 Limitations on Subcarriage

GO 158-A, titled "Rules and Regulations Governing the Operations of [PSCs]", does not prohibit a PSC's use of nonemployee drivers. Indeed, GO 158-A expressly authorizes [*22] such use; however, the sections on PSC use of "sub-carriers" and on "driver status" contain certain relevant limitations:

> "3.03 SUB-CARRIERS. A carrier shall not use the services of another carrier (sub-carrier) that provides the vehicle and the driver, unless the second carrier holds Commission authority as a charter-party carrier. The agreement for the utilization of the second carrier's vehicle(s) and driver(s) by the operating carrier shall be evidenced by a written document, and shall contain the carrier's names, [Transportation Charter-Party] numbers, and the services to be provided."
>
>         * * *
>
> "5.03 DRIVER STATUS. Every driver of a vehicle shall be the permit/certificate holder or under the complete supervision, direction, and control of the operating carrier and shall be:
>
>     "A. An employee of the certificate holder; or,
>
>     "B. An employee of a sub-carrier; or,
>
>     "C. An independent owner-operator who holds charter-party carrier authority and is operating as a sub-carrier."

Prime Time argues that these paragraphs contain only two restrictions on PSC use of nonemployee drivers: (L) the requirement of a written document; and (2) the retention of the specified degree [*23] of control. S&E believes these paragraphs must be read in light of the Commission's discussion in D.89-10-028, *33 CPUC2d 5 (1989),* where the

Commission adopted GO 157 and GO 158 to address transportation of passengers in vans, especially at airports. *Id., 33 CPUC2d at 9.*

The discussion on which S&E relies relates to "subcarrier agreements." The original proposal for these GOs would have required the agreement between the overlying carrier and the sub-carrier to be evidenced by a written contract. The Commission decided to temper that proposal in consideration of the position of one commenter, who said that "charter-party arrangements are made by telephone or radio, that is an oral contract." This commenter urged that "a written memorandum or log that memorializes the oral agreement should meet enforcement needs of the Commission." *Id., 33 CPUC2d at 26.* The Commission agreed:

> "It is a common practice for a passenger stage or charter-party carrier to hire a second carrier to accommodate an unexpected capacity overflow. Sub-carrier requirements are needed to assure that these second carriers are properly licensed. Parties do not object to the requirement of having an [*24] agreement; they object to the form of the agreement proposed. . . ." Id., emphasis added.

To address the concern, the Commission approved a modification offered by Commission staff to the original proposal. Under the modification, a document subsequently memorializing an oral contract would suffice where a prior written contract did not exist. Id.

The quoted passage from D.89-10-028 speaks only to the means of documenting an agreement for subcarriage (para. 3.03). The passage does not purport to comment upon, or reflect an understanding of, the paragraph dealing with driver status (para. 5.03). The quoted passage gives an example where subcarriage is common practice. Neither this passage nor the rest of D.89-10-028 suggests we thought this example was the sole situation in which subcarriage was used in this industry. More important, we discern nothing in this passage to support S&E's contention that we thereby intended to prohibit subcarriage in any situation but the one described.

As to subcarriage, GO 158-A changed our prior regulation of PSC operations (GO 98-A) only regarding the requirement of a written agreement, and that change resulted in greater flexibility [*25] for the PSC, not less. Thus, we believe that GO 158-A was intended for the most part to continue our policies on subcarriage in this industry as they existed at that time. If GO 158-A contains any additional or implicit restrictions on the use of nonemployee drivers, such as those perceived by S&E, we would expect that our decisions would disclose such restrictions. To the contrary, however, we find that in D.81684, *75 CPUC 361 (1973),* a decision reasonably if not precisely on point, we expressly approved "substantial" reliance on nonemployee drivers by on-call limousine services in transporting passengers to and from airports.

D.81684 concerned several consolidated applications that involved the following "material issue": "May or should a [CPCN] to operate as a [PSC] be granted to an applicant who plans to conduct a substantial portion of its operations under the certificate with owner-operator vehicles?" *Id., 75 CPUC at 365.* We granted the certificates. In doing so, we noted that there was precedent for allowing a PSC to conduct operations with "driver-owners" in our earlier decisions. The only reservation we stated in this regard in D.81684 was that "where a [PSC] conducts [*26] operations using owner-operators, the certificate holder is responsible for the operations[,] which must be in accordance with applicable statutes and [GOs]. None of the responsibility can be shifted to the owner-operators." *Id., 75 CPUC at 366.*

S&E first tries to distinguish D.81684 on the basis that it addressed "licensing rather than other unlawful practices." S&E opening brief at 22. We find the distinction immaterial. We would not knowingly have issued a CPCN to an applicant that had disclosed in its application a plan of operation we considered illegal. S&E then suggests that D.89-10-028 "supersedes. . .and effectively overrules" D.81684. Id. We disagree. D.89-10-028 does not cite D.81684 and contains nothing inconsistent with it. In fact, GO 158-A, by requiring that the PSC in all instances have "complete supervision, direction, and control" of its drivers, seems to implement the principle of certificate-holder responsibility that we announced in D.81684.

In short, S&E would have us (1) construe GO 158-A as containing implicit restrictions on PSC use of nonemployee drivers, and (2) construe D.89-10-028 as implicitly overruling applicable precedent on PSC use of [*27] nonemployee drivers. Implicit restrictions and overrulings are a disfavored type of construction, particularly where we are asked, on the strength of such construction, to revoke a CPCN and put someone out of business. Moreover, as we discuss below, we are unconvinced by S&E's policy arguments that the implicit restrictions S&E advocates are either necessary or appropriate.

**3.2 Compensation Based on Individual Fares**

S&E also argues that a PSC's use of a charter-party subcarrier under GO 158-A must comply with *PU Code § 5401*, a portion of the Passenger Charter-party Carriers Act. *PU Code § 5401* says in relevant part:

> "Charges for the transportation to be offered or afforded by a charter-party carrier of passengers shall be computed and assessed on a vehicle mileage or time of use basis, or on a combination thereof. These charges may vary in accordance with the passenger capacity of the vehicle, or the size of the group to be transported. **However, no charter-party carrier of passengers shall, directly or through an agent or otherwise, nor shall any broker, contract, agree, or arrange to charge, or demand or receive compensation, for the transportation offered or afforded** [*28]  **that shall be computed, charged, or assessed on an individual-fare basis. . . .**" n5 Id., emphasis added.

*PU Code § 5401* states a clear prohibition, which Prime Time tries to get around chiefly by arguing the statute is inapplicable to service provided to a PSC, as distinguished from service to the public at large, by a charter-party carrier. However, the settlement that we approved in D.93-09-065, *51 CPUC2d 3 (1993)*, regarding our earlier investigation of Prime Time, expressly refers to that statute in the context of GO 158:

> "8. Compliance With General Order 158. Prime Time will comply with the provisions of [GO] 158, including the requirement that it utilize only bona fide employees or licensed charter party carriers in the performance of its [PSC] operations. **Prime Time is aware of the content of *Section 5401 of the Public Utilities Code.*** *Id., 51 CPUC2d at 6,* emphasis added.

This settlement provision does not set forth a particular interpretation on *PU Code § 5401*, but we hardly think S&E would have included the provision, or that we would have approved it, if *PU Code § 5401* had no bearing on subcarriage. Moreover, the statute on its face applies [*29] to all transportation "offered or afforded" by a charter-party carrier; the statute contains no exception for subcarriage or for charter-party service provided to a PSC.

n5 *PU Code § 5401* allows collection of individual fares by certain specialized charty-party carriers (e.g., "school bus contractors"). None of the exceptions applies here.

We conclude that *PU Code § 5401* applies no the relationship between a PSC and the charter-party carriers providing subcarriage to that PSC. However, we also conclude that Prime Time's current agreement does not offend *PU Code § 5401*. n6

n6 We note that Prime Time may have two or more versions of this agreement currently in effect. For purposes of this discussion, we refer to the version provided to S&E staff in October 1993, shortly after the settlement of the earlier investigation. (This version appears as Attachment H to Exhibit PT-3.) Our impression is that Prime Time's recent changes to the service fee schedule, and changes required by the Department of Corporations, would not affect our conclusions regarding compliance with *PU Code § 5401*, but we have not analyzed these other versions. Thus, Prime Time and S&E should analyze the latter versions and any newer versions to ensure they remain consistent with the requirements of *PU Code § 5401*, as we explain them in the body of today's decision.

[*30]

The fact that the charter-party carrier collects individual fares pursuant to Prime Time's tariffs in itself does not violate *PU Code § 5401*. In charter-party subcarriage, the driver and van are "hired" by and provide service no the PSC (here, Prime Time), not the passenger. The passenger's agreement is with Prime Time, which is responsible for providing the service to the passenger. Any driver for Prime Time, whether employee or nonemployee, must collect the tariffed fares and otherwise transport the passengers consistent with those tariffs. Any other interpretation of *PU Code § 5401* would convert than statute into an absolute prohibition on the use of charter-party subcarriers by PSCs. We necessarily concluded in approving GO 15-A that no such prohibition existed, and we affirm that conclusion.

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

The more difficult issue is whether Prime Time's current agreement constitutes a proper hiring, under *PU Code §* *5401,* of the charter-party subcarrier by the PSC. We conclude it is proper, i.e., the compensation provisions of *PU Code* *§ 5401* are sufficiently broad to allow a division of revenues between the overlying PSC and the charter-party subcarrier, such as the division that [*31] occurs under Prime Time's current agreement.

*PU Code § 5401* allows hiring of a charter-party carrier on a time-of-use or mileage basis, and the statute also allows consideration in the compensation formula of the passenger capacity of the vehicle and the size of group to be transported. These factors allow considerable latitude.

The only express statutory prohibition is on compensation on an "individual fare basis." Prime Time compensates each of its charter-party subcarriers by a division of the revenues that the subcarrier actually generates. Basically, under the current formula, Prime Time each month deducts a flat service fee and a variable fee depending on the subcarrier's utilization of Prime Time's maintenance facilities; the balance is the subcarrier's compensation. Prime Time may also be using an alternative formula under which the subcarrier receives 60% of the revenues as compensation. n7 Note that virtually any division of revenues would correlate to some extent with all of the factors mentioned in *PU Code § 5401* as appropriate in setting charter-party carrier compensation (van size, mileage and time in service, number of passengers transported).

n7 Under either formula, the driver keeps all tips.

[*32]

We lack an appropriate record, and this s not an appropriate proceeding (i.e., a rulemaking), to determine what division of revenues between a PSC and its charter-party subcarriers is or is not in the public interest. In fact, we are inclined to agree with Prime Time that, rather than our attempting such a determination, the public interest would be better served by our allowing experimentation in this still-developing industry.

In any event, *PU Code § 5401* is not as restrictive as Prime Time fears or S&E contends. For purposes of this proceeding, we hold that a division of revenues between a PSC and an underlying charter-party subcarrier does not offend *PU Code § 5401* merely because the division depends to some extent on the number of passengers transported, so long as that number is not the exclusive factor involved in calculating the subcarrier's compensation. Prime Time's current agreement passes muster.

Two further arguments advanced by the parties merit comment. First, the "term" of Prime Time's current agreement is 30 days, which renews automatically, absent timely written notice of nonrenewal by either party. Mr. Kindt seemed to suggest that this provision in itself might [*33] satisfy the "time of use" criterion for compensation under *PU Code §* *5401.* We disagree. The "term" does not affect the compensation to the subcarrier but only establishes the accounting period used in the division of revenues formula.

Second, we note that *PU Code § 5401* bars charter-party transport of passengers on an individual-fare basis even where such service is arranged through a broker. S&E has suggested that Prime Time, which owns few if any vans at this time and employs no drivers, is really nothing more than a broker. We do not agree that Prime Time has become a broker by virtue of these features of its operations. For example, unlike a broker, Prime Time has its own tariffs, which its charter-party subcarriers are obligated by contract to follow and to post in their vans. Moreover, as we discuss in the following section on vehicle ownership, Prime Time's dispatch of its subcarriers arguably constitutes passenger stage service.

### 3.3 Vehicle Ownership

Apart from its brokering theory, S&E argues that Prime Time in any event is not a PSC because "Prime Time has no passenger stage vehicles at all. . . ." S&E reply brief at 3, emphasis in original. The conclusion [*34] does not follow from the premise.

The PU Code defines "passenger stage" as "including every stage, auto stage, or other motor vehicle used in the transportation of persons, . . .or baggage or express when such baggage or express is transported incidental to the transportation of passengers." *PU Code § 225.* However, to satisfy the statute, a PSC need not own the "passenger stage" it utilizes. Rather, a PSC is defined as a "common carrier" that engages, "for compensation, in the ownership, control, operation, or management of any passenger stage over any public highway in this state. . . ." *PU Code § 226(a).* We find that Prime Time is involved in the control, operation, and management of "passenger stage" service, as defined in the statute. For purposes of Prime Time's PSC status, the fact that it provides this service mostly or exclusively through charter-party subcarriers driving their own vans is immaterial.

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

Furthermore, the statute is susceptible to a reading that a PSC's equipment (in public utility terminology, cf. *PU Code § 851*, its "line, plant, system" or other property necessary or useful to the performance of its common carrier function) might include more than the [*35] vehicles used for the transportation. Obvious examples in Prime Time's case would include the hardware and software used to make reservations and dispatch drivers.

Airport ride-share, as we understand the concept, consists of aggregating travellers who share both a close proximity (in terms of time and place of departure) and a common destination (an airport). n8 To accomplish such aggregation efficiently and reliably, Prime Time has developed various programs and capabilities: e.g., a computerized dispatch operation; radio communication with its subcarriers; training and counseling programs for current and prospective drivers; and its own vehicle maintenance department. The latter department performs periodic maintenance (for subcarriers that choose to utilize the department) and periodic inspections (for subcarriers that make other arrangements to maintain their vehicles). Further, Prime Time's staff for supporting these programs and capabilities numbers some 100 employees.

> n8 Other kinds of ride-share (e.g., to and from work) presumably would operate on the same principle.

S&E disputes the efficacy of these programs and capabilities. We will address S&E's criticisms of Prime [*36] Time's safety and service record later. For present purposes, however, the record demonstrates that Prime Time is much more than a rented room with a desk and a phone. Prime Time has a substantial infrastructure devoted to providing area-wide airport ride-sharing within the Los Angeles basin. In fact, we believe that computer and telecommunications capabilities may be integral to such area-wide operations (especially the dynamic scheduling crucial to efficient ride-sharing), much as are the vehicles used to transport passengers. We therefore reject the contention that Prime Time is not a PSC merely because it lacks vehicles.

We are puzzled by the S&E's vehemence in maintaining that Prime Time is not a PSC, particularly in light of our anticipation in D.81684 (see Section 3.1 above) of just such an extension of the use of subcarriage in passenger transportation. In fact, many of the traditional vertically integrated utility industries have been in the process of "unbundling" their services and relying on other companies to perform part of the utility operation. Thus, there are telecommunications carriers that do not own wires or switches, gas companies that have no firm pipeline capacity [*37] (r long-term supplies, and electric companies that own no power plants or bulk transmission. This transition away from the traditional model of the utility as vertically integrated monopoly has the potential for more responsiveness to consumers, lower-cost service, improved safety, and greater reliability. In some cases, this potential appears to be realized.

There is no basis in state law or policy for declaring that a PSC must own any vehicles or employ any drivers. The question, then, is whether Prime Time's methods of operation, whatever their theoretical merit, result in bad service. We now turn to S&E's contentions in that regard.

### 3.4 Supervision, Direction, and Control

In the preceding sections, we have concluded that Prime Time's reliance on charter-party subcarriers is generally consistent, at least in theory, with the letter of our decisions and general orders, and with relevant PU Code provisions. S&E insists, however, that Prime Time provides bad service, as a direct consequence of the perverse incentives created by such reliance. All of S&E's allegations about Prime Time's service have a common theme, namely, that Prime Time does not supervise, direct, [*38] or control its drivers as required by paragraph 5.03 of GO 158-A.

Prime Time is obligated to provide good service, consistent with its tariffs and all legal requirements, regardless of how it manages its operations. If we find a failure to provide good service, that finding would support further sanctions against Prime Time (possibly including certificate revocation) beyond those imposed in D.93-09-065. In addition, that finding might lead us to consider adopting rules to restrict PSC reliance on nonemployee drivers, if such reliance is demonstrated to be the main source of Prime Time's service problems.

We discuss below the record as it relates to Prime Time's service. We find that Prime Time has had some service problems, but we have no basis to conclude that Prime Time's service is consistently bad or that it falls below industry standards. Furthermore, the record suggests that Prime Time has substantially improved its safety and efficiency since shifting to its current reliance on charter-party subcarriers. Reliance on subcarriers may not have caused the apparent improvement, but S&E has not demonstrated that such reliance is responsible for or exacerbates whatever service problems [*39] have occurred.

Nevertheless, we share one concern voiced by S&E regarding Prime Time's current contractual arrangement. The first paragraph of Section 1 of the "Independent Contractor Agreement" provides in relevant part that the "Owner" (i.e.,

Exhibit A-000010

the charter-party subcarrier) is "(1) free from interference, authority and control by [Prime Time] in the manner and means of Owner's performance of work under this Agreement, and (2) free from interference, authority and control by [Prime Time] in the result Owner may seek to accomplish by his or her work, if any."

This provision seems calculated to ensure the nonemployee driver's independent contractor status, but it flies against the requirements of GO 158-A paragraph 5.03 as to the responsibility of the PSC. Prime Time concedes that this provision s inartful, and we will require it to be modified, consistent with GO 158-A. See Section 7.6 below. However, given the failure of S&E to prove this case regarding service deficiencies, we will not impose any other sanction on Prime Time relative to this improper provision.

### 3.4.1 Reliability

Undoubtedly, the PSC must conduct lawful operations. The PSC retains such responsibility whether [*40] it uses its own vans and drivers or contracts for both with charter-party subcarriers. S&E seems to believe that a PSC relying exclusively on subcarriers could not possibly provide reliable service: "If every one of [Prime Time's] independents decided that they did not want to drive on one particular day not one of them would be in violation of the independent contractor agreement. . . .Prime Time has no control over whether those drivers are going to perform their [charter-party] function or not." S&E reply brief at 4.

S&E does not explain why all or most of Prime Time's drivers would take the same day off. They do not make money if they do not work, but they still would owe their weekly fee to Prime Time. There is no need to theorize about this, however. If Prime Time were often unable to provide punctual service or to fulfill a reservation, passengers would complain. S&E apparently reviewed Prime Time's consumer complaints for 1994 and 1995 but did not introduce these documents or any related analysis.

The major support in the record for S&E's contentions regarding reliability is the testimony of Frank Quass, a former dispatcher for Prime Time. Mr. Quass's prepared testimony [*41] and his testimony under cross-examination is careful and objective, and we find him to be a credible witness. In summary, Mr. Quass made three general points. He criticized Prime Time for lacking what, in his view, would be an effective disciplinary program for drivers who draw a lot of complaints. He also said that with "owner-operator" drivers, Prime Time had less knowledge of van location than when it was using employee drivers. In the latter circumstance, each van was used by two drivers for a 12-hour shift each day, and the driver at the end of a shift had to return the van to Prime Time for the next driver to use. Finally, Mr. Quass said that dispatchers often had to scramble to find drivers for low-fare rides. Scrambling might occur when a driver would decline such a ride, preferring to wait at the airport holding lot for possible higher paying fares. n9

n9 See generally Chapter 5 of Exhibit S&E-8. On the other hand, Prime Time witness Johnston, in his rebuttal testimony, explained the benefits of dispatching a subcarrier at the beginning and end of the shift to a location near the subcarrier's home, as Prime Time tries to do. Mr. Johnston also attaches a "dispatch shift report" in which Mr. Quass extols these benefits in contrast to the prior method of shift change. See Exhibit PT-18 at 15 and Attachment I to that exhibit.

[*42]

We stress that in allowing a PSC to rely on nonemployee drivers, we are not saying that Prime Time's particular mode of operation is ideal, or even that it is necessarily better than reliance on employee drivers. Mr. Quass's criticisms raise many of the concerns that we would expect to arise when a PSC elects to rely on nonemployee drivers.

Prime Time responded to these criticisms. It believes that in many ways it has better control over nonemployee drivers than it did over employee drivers because, according to Prime Time, the incentives of the former are more entrepreneurial and more closely aligned with Prime Time's own incentives. Thus, in theory, the nonemployee driver strives to be in the right place at the right time in order to efficiently carry as many passengers as possible (thereby maximizing earnings), whereas an employee driver, whose principal compensation is an hourly wage, gains comparatively little benefit from outstanding performance and suffers little detriment from mediocre performance. n10

n10 Both employee and nonemployee drivers keep all tips received in the course of Prime Time operations, so to that extent even the employee driver has an incentive to carry as many satisfied passengers as possible.

[*43]

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

Prime Time's response is plausible, as are Mr. Quass's criticisms. In fact, Prime Time could have experienced both the benefits it claims and the problems Mr. Quass observed: Few businesses can make a major change in their mode of operation without running into some problems.

We would be presented with a close question if we had to decide on this record whether the benefits of Prime Time's change outweigh the problems, although even on that question the weight of the evidence is that Prime Time's service has improved overall. However, our function here is not to second-guess Prime Time's business strategies, so long as they are legal. The question before us is not whether the change has worked out well but whether it has resulted in an unacceptably low level of service reliability. The record before us does not sustain such an adverse finding.

### 3.4.2 Safety and Driver Compensation

S&E asserts that Prime Time's operations are unsafe. S&E bases this assertion mostly on the theory that Prime Time's current arrangement with its drivers is basically a device, not to carry more passengers or improve efficiency, but simply to grab more of the revenue pie for Prime Time [*44] at the expense of its drivers. S&E believes this arrangement creates perverse incentives and evades Prime Time's responsibility for supervising and controlling its drivers. Specifically, S&E suggests that Prime Tie wants to put as many drivers on the road as possible, thereby increasing its weekly fees; meanwhile, many or most drivers do not have enough passengers to generate a level of revenues adequate both to cover the weekly fees and the van expenses and still provide a decent living. These economic straits, S&E asserts, cause Prime Time drivers to work excessive hours and defer vehicle maintenance in a desperate attempt to keep their heads above water.

To support this theory, S&E sponsored prepared testimony and declarations by various former Prime Time drivers. Another important item is Exhibit S&E-10, which concerns Litigation over a traffic accident involving a Prime Time van.

We begin our own analysis by noting that this is not the occasion for a general debate over the relative merits of independent contractors versus employees. The issue is much narrower: Is there something about the way that Prime Time compensates independent contractor drivers that results in unsafe [*45] operations? We conclude there is not.

GO 158-A sets no standard regarding how much money a PSC should pay to its drivers, regardless of whether he PSC uses employees or independent contractors. Nevertheless, the parties devoted much time debating this topic. Prime Time says its drivers now net, on average, over $ 33,275 per year (calendar year 1995); in contrast, Prime Time's full-time employee drivers averaged $ 21,260 per year for calendar year 1991 (which Prime Time translates to $ 22,270 in 19955, although that figure appears to understate inflation). n11 S&E on the other hand, calculates "average driver's annual income (before taxes and other business payments)" of only $ 15,049 in 1994, which works out to about $ 4.80 per hour before expenses such as gas costs. S&E reply brief at 22-23. S&E also presented credible testimony that some independent contractor drivers, after all expenses, earned only $ 2.80 per hour. n12

> n11 See Rebuttal Testimony of Prime Time witness Stephen Johnston in Exhibit PT-18. Mr. Johnston concedes that Prime Time's nonemployee drivers work, on average, longer shifts than did its employee drivers (12.5 hours versus 11.5 hours). Id. at 5. The earnings calculations in both cases exclude tips. Based on testimony by Mr. Kindt that tips consistently run about 15% of the gross fare revenues, a full-time driver would probably realize about $ 5-10 thousand in tips in addition to the earnings discussed in the text.

[*46]

> n12 The record is not clear on why Prime Time and S&E reach different results regarding driver income. While this lack of clarity is frustrating, it would not be productive to expand the record on this point; the fact is that the level of driver income is not a material issue in this proceeding.

The record shows that driving a van in the airport ride-share business is a tough job by any standard. Drivers are on duty upwards of 60 hours a week, with passengers anxious to catch planes or get to homes or work. In the area served by Prime Time, drivers must move those passengers safely and comfortably through crowded airports and over the Los Angeles freeway system. To do such a job well requires training, skill, and dedication. Prime Time and S&E agree that drivers who perform their job well should be commensurately rewarded. Prime Time claims to have created its current arrangement with drivers in large part to ensure good drivers are rewarded; S&E, seconded by some who have driven

for Prime Time, believes the current arrangement is wildly unfair to drivers. Again, there seems to be some merit to both viewpoints.

For whatever reason, a substantial portion of Prime Time's [*47] drivers are struggling financially. n13 We can understand the bitterness that such drivers may feel, especially considering that Prime Time, in soliciting new drivers, holds out a potential (S&E would say a promise) for a $ 40,000/year income.

> n13 One former driver testified that 10% of Prime Time's drivers were "very, very happy," 40% were "up and down," and 50% were "on the ground" financially. See Reporter's Transcript (RT) at 699 (S&E witness Tawfik). Although this testimony is subjective and colored by the witness' bad experience as a Prime Time driver, we see no reason to doubt the basic contention that many Prime Time drivers are hard-pressed. Note that under Prime Time's current arrangement, a new driver undertakes not only a substantial fixed weekly payment to Prime Time but also other substantial fixed costs, such as payments to lease or purchase the van and to insure it. Meeting these payments while learning a new and challenging job must be difficult.

Nevertheless, the financial struggles of some of Prime Time's drivers do not alter the nature of our jurisdiction regarding service and safety. We regulate those matters directly. We do not regulate driver's incomes, [*48] or a PSC's preference for employee or nonemployee drivers, or the way that the PSC recruits new drivers. Prime Time may have committed improprieties, under laws that we do not administer, with respect to any or all of these other matters, but if such is the case, relief lies elsewhere. If and when Prime Time is found to have committed such improprieties, we may reconsider Prime Time's fitness to continue to hold a PSC certificate, but such reconsideration would come only after a court or agency with jurisdiction over the underlying subject matter has taken action.

However, the record also contains a direct showing of unsafe practices by Prime Time. Specifically, S&E presents evidence that Prime Time (1) lacks effective controls to ensure that its drivers do not work or drive in excess of the hours allowed under state law, and (2) allows drivers to use unsafe vans (e.g., vans with bald tires or brakes that should be relined). We find, however, that the record as a whole shows that Prime Time takes its safety responsibilities seriously, that it has significantly fewer accidents than the industry average, and that it has put in place reasonable precautions to ensure drivers do not work [*49] excessively long shifts.

### 3.4.3 Safety and Length of Shift

Vehicle Code (VC) § 21702(a) sets limits on drivers' hours with respect to compensated passenger transport. The statute reads as follows:

> "(a) No person shall drive upon any highway any vehicle designed or used for transporting persons for compensation for more than 10 consecutive hours nor for more than 10 hours spread over a total of 15 consecutive hours. Thereafter, such person shall not drive any such vehicle until eight consecutive hours have elapsed.

> "Regardless of aggregate driving time, no driver shall drive for more than 10 hours in any 24-hour period unless eight consecutive hours off duty have elapsed."

Prime Time and S&E agree that the statute creates certain limits with respect to time spent driving the vehicle used for the compensated service. The first paragraph caps at 10 hours the time spent driving on a "highway" either consecutively or within a period of 15 consecutive hours. The second paragraph appears to allow more than 10 hours of "aggregate driving time" in a 24-hour period, provided that the driver has had at least eight consecutive hours "off duty." The first paragraph has [*50] a similar requirement for time off, except that the eight consecutive hours are stated, not in terms of time "off duty," but rather as time during which the driver does not drive "any such vehicle," i.e., a vehicle "designed or used for transporting persons for compensation."

Understanding VC § 21702(a) is not easy. The statute's two paragraphs were drafted at different times and did not use parallel construction. Key terms such as "highway," "aggregate driving time," and "off duty" are not defined in VC § 21702(a). n14 Our general orders regarding passenger transport contain no provisions clarifying or setting forth our understanding of the statute. Thus, we are not surprised to hear that Prime Time and S&E disagree on how the statute applies to particular circumstances.

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

n14 However, VC § 360 defines highway as "a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel. Highway includes street."

S&E reads VC § 21702(a) as limiting not only driving time but also the total length of a driver's shift. Apparently, S&E construes "Thereafter" (starting the second sentence of the first paragraph) to refer to "over a [*51] total of 15 consecutive hours" (at the end of the preceding sentence). Under this reading, a driver's shift must not exceed 15 consecutive hours. Prime Time disagrees; it does not see in VC § 21702(a) any limit on length of shift.

We think the more logical reading is Prime Time's, i.e., "Thereafter" refers to driving 10 hours (either consecutive driving time or driving time spread over a total of 15 consecutive hours). Had the drafters of VC § 21702(a) wanted to separately address maximum length of shift (i.e., time on duty) in the first paragraph, they could have done so easily. The related concept "off duty" does appear in the statute, but only in the second paragraph, and even there only in the context of aggregate driving time. n15

n15 Even the second paragraph of VC § 21702(a) does not seem to preclude a driver working a shift exceeding 15 hours, provided that the driver does not exceed 10 hours of driving during any consecutive 15 hours within the shift.

Fortunately, we need not adopt a definitive view herein regarding length of shift under VC § 21702(a). The reason is that Prime Time, although adhering to its reading of the law, agrees that limiting the length [*52] of shift to not more than 15 hours is a sensible thing to do. Thus, Prime Time has developed a detailed protocol to ensure that both the drivers and the Prime Time dispatchers are notified, and dispatch decisions appropriately reflect, that a driver is nearing 15 hours on duty. The record indicates some drivers may have exceeded 15 hours in the past, but we are satisfied Prime Time now is capable of preventing such excessively long shifts and is committed to doing so.

There are two strong reasons why, in a future rulemaking proceeding, we should consider adopting a 15-hour shift limit in our general orders governing airport ride-share. First, the record of this proceeding shows that these drivers experience a high level of stress apart from the driving itself. Moreover, the driving is difficult; the driver must deal with urban streets and freeways and airport access roads, often under rush-hour conditions with passengers who are in a hurry.

Second, the record also shows that Prime Time has good information about a driver's beginning and ending times but only inexact information about how much time a driver spends actually driving. n16 Thus, Prime Time cannot determine positively [*53] that its drivers are observing the 10-hour driving limits that all parties agree are imposed by VC § 21702(a). We suspect the same is true of other ride-share providers, but the record does not establish this one way or the other.

n16 Note that for purposes of VC § 21702(a), time is spent "driving" whenever the driver operates the van, regardless of whether or not the driver is transporting paying passengers. Thus, the clock starts when a driver leaves home with the van and continues to run even when the driver uses the van, for example, to do a personal errand during the shift.

The fact that Prime Time does not know the exact time spent driving during a shift may be less significant than it sounds. Prime Time witnesses are confident that a driver could not drive 10 hours in a shift of 15 hours or less, because the driver would spend a substantial amount of time in the "holding lot" at LAX or other airports served by Prime Time. S&E, on the other hand, believes that drivers typically spend only two to four hours in holding lots. Thus, particularly if a driver were to take meals from a lunch box while sitting in the holding lot, S&E is concerned that any shift approaching the [*54] 15-hour mark could involve more than 10 hours of driving.

The record is inconclusive on driving hours, as both Prime Time and S&E are relying on subjective judgments. We stress, however, that the carrier is responsible for ensuring that the limits on driving hours are strictly observed. We conclude that any carrier that does not have exact knowledge of elapsed driving time during a shift should at least maintain strict control over the length of the shift itself to indirectly ensure driver compliance with the driving hour limits. This subject is appropriate for a rulemaking proceeding, as we shall discuss below.

3.4.4 Safety and Van Maintenance

S&E theorizes that Prime Time's drivers re so hard-pressed financially that they cannot afford the down time needed for proper vehicle maintenance. If that were so, we would expect that Prime Time's accident record since 1993

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

would show steady deterioration. Prime Time offers convincing evidence to the contrary. Three points are especially noteworthy.

First, Prime Time says it runs its own service department, which its subcarriers can use or not; subcarriers that arrange for maintenance or repair on their own must still bring their [*55] vans to Prime Time's service department for monthly inspections. This practice certainly is consistent with the "supervision, direction, and control" provision of 50 158-A.

Second, Prime Time's employee drivers formerly picked up and dropped off the vans at Prime Time's office, so a van that was in service did "double duty" each day with two different drivers. In contrast, Prime Time's nonemployee drivers generally park their vans at home. We believe that, other things being equal, the latter arrangement is more conducive to regular maintenance and less wear-and-tear on the vans, since in general they would be driven only a single shift per day, and also would be driven by the same driver instead of different drivers each day. n17

> n17 Prime Time says that some vans are owned and operated in partnership. Such vans would probably see harder usage, but no harder than the usage of vans under employee drivers.

Third and most impressive, Prime Time's safety program actually seems to be working. According to Mr. Kindt,

> "In 1992, with employee drivers, Prime Time averaged 12.74 accidents per million miles, with a total of 9.7 million miles driven. In 1993, reflecting the move to [*56] owner-operator drivers, Prime Time averaged 6.7 accidents per million miles, with a total of 11.1 million miles driven. In 1994, we experienced 7.8 accidents per million miles, with a total of 9.4 million miles driven; in real numbers this is one less accident in 1994 compared to 1993 -- we were driving fewer miles due to significant gains in efficiency. In dollar terms, insured losses in 1992 of $ 819,815.77 were significantly reduced by 1994, to $ 144,623.14. The National Safety Council, which supplies the standard for our industry, reports an average in 1993 for [the] passenger transit for-hire category of 31.51 accidents per million miles driven." Exhibit PT-1 at 33.

S&E does not dispute Prime Time's data. S&E also does not offer safety data of its own, such as how Prime Time's safety performance compares to that of other California PSCs, as distinct from what appears to be national data cited by Prime Time.

Instead, S&E offers anecdotal evidence of safety problems at Prime Time. In a case, such as this proceeding, in which S&E seeks a severe sanction against a carrier, we would prefer to have a record reflecting both individual incidents and statistical measures of bad performance. [*57] Nevertheless, individual incidents may be so troubling in themselves as to prompt strict remedial action. The incidents here are not of such a character. We will discuss two of these incidents.

### 3.4.4.1 Deferred Maintenance

S&E witness Taylor, a former Prime Time driver who had also worked as a cab driver, testified that he would bring his van in to the Prime Time garage for routine service every 5,000 miles. Among other things, "they take the tires off and the drums off and they check the brake pads as part of the service." RT at 1479.

On one of these occasions, Taylor was told that he "was down to 10% and...needed new brake pads." RT at 1480. At the time, however, Taylor's revenues from driving were inadequate to cover his fees to Prime Time, so that he needed to keep working. He decided to defer the maintenance on the brakes, which the Prime Time garage allowed him to do. Responding to questions by Prime Time's counsel, Taylor said he was unsure whether the condition of his brake pads that day posed a safety problem; Taylor also said, "I don't think [the van] was performing in any way unsafe, no, not that I'm aware of." RT 1481-82. The record does not indicate when or [*58] whether the brake work was ultimately performed.

Neither Prime Time nor S&E has provided evidence or cited regulations from which we could determine the urgency of the brake repair that Prime Time allowed this driver to defer. We know from the record that these vans log upwards of 100,000 miles per year, from which we infer that the repair would have to be performed soon. On the other hand, we see no reason to doubt S&E witness Taylor's own assessment that the van was performing acceptably, at least on the day that it was checked.

The key question this incident raises for us is not that Prime Time's garage released the van for duty but rather that in releasing the van the garage mechanic should have set some prudent deadline for performing the work. Unfortunately, no one (including the ALJ) had the presence of mind to ask this question during the hearing. Thus, we do not know how or whether Prime Time's mechanics follow up to ensure timely attention to problems that they observe but that they conclude do not require immediate repair.

This incident, while provocative, does not demonstrate faulty maintenance practices on the part of Prime Time. As part of the various tasks we are [*59] setting for Prime Time during its probationary period, we will require Prime Time management to address the question of follow-up on deferred maintenance.

### 3.4.4.2 Injury Accident

On July 4, 1993, a Prime Time van was involved in a terrible traffic accident. The following summary of the accident derives from the "Traffic Collision Report" prepared by the investigating officer and contained in Exhibit S&E-10.

A passenger car struck a Prime Time van broadside in the middle of an intersection. The driver of the car either failed to stop at a stop sign, or did stop but somehow missed seeing the van's approach on the street with the right-of-way. The streets were dry, and both drivers were operating their vehicles within the speed limit, but the force of the impact nevertheless was sufficient to cause the van to overturn.

Four people were in the van, which had operable seatbelts at all seating positions. The Prime Time driver and two of the passengers wore their seatbelts. These three people walked away from the accident unhurt or with minor abrasions. The other passenger was not wearing her seatbelt. The impact threw her against, and partially through, the right rear window. [*60] The overturning van crushed her head and chest. She died instantly.

Unquestionably, the chief causes of this tragedy were, first, the car driver's error in failing to yield the right-of-way, and second, the decedent's failure to wear her seatbelt despite a posted notice in the van and the Prime Time driver's oral request that the passengers fasten their seatbelts. "Additional factors" noted in the report include (1) shrubbery in the vicinity of the intersection that could have obscured the approach of the van from the car driver's vantage point at the intersection, and (2) a parking permit hanging from the car driver's rear-view mirror (in violation of the Vehicle Code) that also could have obstructed the car driver's view.

There are, however, two "related factors" noted in the report that properly concern S&E and this Commission. n18 The investigating officer considered the tread depth on the van's right front and rear tires to be insufficient; nevertheless, the report contains no indication that the officer considered the condition of the tires to be a factor either in the van's failing to avoid the collision or in its overturning after impact. The officer also observed "a 2" [*61] x 4" opaque black and yellow decal reading 'watch your top' on the upper left corner of the windshield, which could possibly have been within the driver's critical field of view in this accident." The officer considered the placement of this decal to be a Vehicle Code violation. The conclusion of the report was that, "Based on the totality of the circumstances and the numerous contributing factors, no further action is recommended."

> n18 There is another aspect of this incident that concerns S&E. Exhibit S&E-10 is Prime Time's response to requests for admissions in a suit brought against Prime Time and the van driver regarding the death of the passenger. The response asserts, in part, that the driver "was an independent contractor...and therefore not the 'agent' of [Prime Time] as it pertains to this litigation." S&E argues that this response somehow constitutes acknowledgment that Prime Time disclaims liability for the actions of its nonemployee drivers, and is therefore relevant to the issue in this proceeding of appropriate "supervision, direction, and control" by the PSC of its drivers. We disagree that the quoted language, or anything else in the response, constitutes such an acknowledgment. We also note that Prime Time's president, Mr. Kindt, vigorously affirmed that, "when it comes to liability, I think we ought to be liable for everything they [the subcarriers] do... It's our logo, it's our system. We should be liable." RT at 1036-37.

[*62]

What are the implications of this accident for Prime Time and for us as regulator?

Clearly, Prime Time is required to ensure that the vans used to transport Prime Time's customers have good tires and windshields free of anything obscuring the driver's field of vision. Mr. Kindt disputed the report, at least as to tire condition. Mr. Kindt testified that he was notified of the accident and came to the scene himself shortly after the accident occurred. His assessment was "I saw the tire, and I think it was acceptable. And I also saw...the pavement, and there was no skid marks. So that would indicate to me that the tire--see, these brakes are equipped with antilock me-

chanisms. And if the tires were bad, it would have skidded, and there were no skid marks, although the driver testified that he braked hard... I would say the tire did its job[,] as well as the brakes." RT at 820.

Without in any way minimizing the importance of proper tires and windshields, we believe that van condition, under the facts presented in this accident, pales to insignificance in comparison to the plain fact that the decedent was not wearing her seatbelt. We discuss these two points in order.

First, the [*63] passenger car was coming on a narrow, flat street from the van's left, and the van driver, from his elevated position relative to the car, probably would have seen the car through the middle or lower half of the windshield. We are skeptical that a decal in the upper corner of the windshield could have mattered. Furthermore, given the distances and vehicle speeds noted in the report, the van driver would have had less than a half-second within which to react and to bring the van to a stop short of the point of impact. n19

> n19 No one will ever know for certain, but it is conceivable that the van driver's only chance for avoiding this collision was to hit the accelerator, not the brake. (Note that the car made contact only with the left rear of the van.) In any case, the van driver had virtually no time to consider his options, and we imply absolutely no fault on his part in deciding to brake.

Second, the record indicates that this collision should not have resulted in serious injury to any of the van occupants. This point is demonstrated both by the lack of serious injury to the occupants who were wearing their seatbelts and by the fact that the interior of the van [*64] came through intact except for the right rear armrest, which was bent down and to the right as the decedent catapulted through the window.

We reach the following conclusions. The possibility that the Prime Time van had poor tires and an improperly placed decal is disturbing. These are significant safety concerns and we expect that Prime Time has taken steps since this 1993 accident to correct any such problems; however, we see no evidence either of a pattern of safety violations by Prime Time, or that improper van condition played any significant part in this fatality.

More disturbing to us is the decedent's violation of the seatbelt law. The facts make all too clear that any person disregarding that law is a danger both to himself or herself and to other persons in the vehicle. We need to consider the extent of noncompliance and ways to secure better compliance. We return to this subject in Section 7.8 below.

In short, we will impose no sanctions on Prime Time on the basis of this accident.

## 3.4.5 Miscellaneous Control Issues

S&E Director Schulte recommended that Prime Time's charter-party carriers discontinue their current practice of using a Prime Time logo on their [*65] vans and painting the vans with Prime Time colors. The rationale for this recommendation is that the practice is confusing to the public. Both the ALJ and Prime Time's counsel had many questions on this point, but the gist of Director Schulte's view seems to be that the public would conclude under the circumstances that it was dealing with Prime Time and not an independent entity with which Prime Time had contracted.

We believe the public is dealing with Prime Time, and whether Prime Time uses employee or nonemployee drivers does not affect that basic relationship. From our standpoint, the fact that the charter-party subcarriers paint their vans with Prime Time's colors helps convey a correct understanding. The public would be far more likely to be confused if Prime Time reservations were fulfilled by vans bearing no obvious indication that they were hired by Prime Time. n20 Furthermore, if the driver is to be under Prime Time's "complete supervision, direction, and control" as required by GO 158-A, we think the fact that the driver is operating a van visibly identified to Prime Time would actually be helpful to the public.

> n20 We also note the possibility that unscrupulous operators who became aware of the practice of using unmarked subcarrier vans would be encouraged to solicit passengers and, if queried by the passenger, claim that they were providing subcarriage to the PSC with whom the passenger had made a reservation.

[*66]

Correct information to the public in this case must convey that in Prime Time's operation, there is both an independent owner-operator and an overlying carrier, both of whom hold operating authority from this Commission. Prime Time's subcarriers drive vans that (1) list both Prime Time's PSC number and the subcarriers' respective charter-party

Exhibit A-000017

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

(TCP) numbers, and (2) announce that the driver is an independent owner-operator. This information seems generally satisfactory.

Director Schulte conceded in his testimony that neither the statute nor our general orders prescribe what is proper or improper in terms of information conveyed by a subcarrier to a passenger. We believe that prescribing the form or content of such information is inappropriate, but we certainly agree with the underlying policy advanced by Director Schulte, and apparently concurred in by Prime Time, viz., that the passenger is entitled to good information about the nature of the service the passenger is getting. While the level of detail might vary among different service providers, the information should include guidance about the passenger's recourse if something goes wrong.

In Section 7.8 below, we discuss [*67] several topics to address in a possible rulemaking proceeding. General guidelines for passenger information may well be appropriate in our regulation of the evolving ride-share industry. Absent such guidelines, we are reluctant to adopt sanctions against a carrier, such as Prime Time, that seems to be making a good faith effort to provide reasonable information.

## 3.5 Traffic Congestion

S&E believes Prime Time's use of nonemployee drivers increases traffic congestion problems. Even if this belief proved accurate, it would not suffice to show a violation by Prime Time of GO 158-A. Of course, any industry practice that aggravated traffic congestion would concern us, since one of the fundamental policy underpinnings in our adoption of GO 158-A for regulating the airport ride-share industry was to reduce such congestion, not increase it. However, as we discuss in greater detail in Section 4.3 below, S&E has failed to demonstrate that Prime Time's use of nonemployee drivers increases congestion. Moreover, Prime Time has produced substantial evidence that its efficiency in transporting passengers has improved with the use of nonemployee drivers, in effect reducing congestion.

S&E [*68] bases its belief on (1) the alleged incentive that Prime Time has to increase the number of drivers irrespective of the number of passengers transported, and (2) a study by LAX regarding Prime Time's carriage of outbound passengers during the 1993-94 time frame (before, during, and after the change to Prime Time's current arrangement for subcarriage). The incentive argument and Prime Time's rebuttal to that argument are discussed in Sections 3.4.1 and 3.4.2 above; we will not repeat that discussion here. The LAX study merits further attention. We will discuss that study in the context of the LAX rules, to which we now turn.

## 4. LAX Rules on Use of Nonemployee Drivers

We have agreed with Prime Time that state law allows a PSC to rely substantially or entirely on nonemployee drivers operating their own vans, so long as the PSC ensures that the service provided meets all applicable standards. In contrast, the LAX rules clearly do not permit such use of nonemployee drivers to provide ride-share service at that airport.

LAX's Ground Transportation Permit Program Rule III.B.15, adopted December 5, 1990, says in relevant part, "Each driver must be a bona fide employee of the [*69] company for which he or she drives. Each driver must be paid by commission, salary or combination thereof."

S&E sponsored testimony by Judy K. Bindrup, LAX's Ground Transportation Manager for Landside Operations. Ms. Bindrup said that LAX management had recommended this rule "after negotiations with the van industry because of problems both parties were experiencing due to the use of owner-operators. Our records indicate this change was strongly supported by the larger, reservation based companies who were using employee drivers." Exhibit S&E-2, chapter 1 at 1. Prime Time was among those companies that supported adoption of Rule III.B.15.

Prime Time does not dispute that it is in violation of Rule III.B.15. Prime Time also admits that it is under a Municipal Court probation order to stop violating the rule; that it has received notice of violation of that order; and that in settlement of those violations, it stipulated to pay a $ 500 fine and to extend the term of its Municipal Court probation for another year (to June 6, 1997). Prime Time insists, however, that these violations should be no concern of this Commission.

## 4.1 Intent of Rule III.B.15

Prime Time bases its [*70] argument on the following provision of GO 158-A:

> "3.01 OPERATIONS AT AIRPORTS. No carrier shall conduct any operations on the property of or into any airport unless such operations are authorized by both this Commission and the airport authority involved. Consistent failure to comply with safety or traffic rules and regulations of an airport authority may result in suspension or revocation of Commission operating authority." Emphasis added.

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

Prime Time believes that the LAX rule does not relate to "safety or traffic." Consequently, Prime Time's violations of that rule would not constitute grounds for Commission sanctions against Prime Time under GO 158-A or under the settlement of the 1993 OII. n21

> n21 The settlement agreement says in relevant part, "Prime Time will comply with the provisions of [GO] 158, including the requirement that it utilize only bona fide employees or licensed charter party carriers in the performance of its [PSC] operations." Appendix A, paragraph 8, of D.93-09-065, *51 CPUC2d at 6,* emphasis added.

Two S&E witnesses testified regarding LDJ's rationale for requiring the use of employee drivers and disallowing owner-operators. Both Ms. Bindrup [*71] and Breton K. Lobner (Supervising Attorney in charge of the Airport Division of the Los Angeles City Attorney) said that LAX was addressing safety and traffic concerns, among others, in adopting Rule III.B.15.

Ms. Bindrup indicated the rule was prompted by general concerns over driver economics and supervision. She cited the following perceived problems with the use of owner-operators: "unfair economic disadvantage for those companies that used employee drivers and had to cover...workers compensation and insurance; inability of companies to control owner-operators; [and] service problems...concerning soliciting, circuitous routing and overcharging, all related to the owner-operator making sufficient revenue to recover fees paid to the company...." Exhibit S&E-2, chapter 1 at 1. n22

> n22 These problems and concerns are similar to those voiced by S&E in pressing its restrictive interpretation of GO 158-A. See Section 3.4.2 above.

Mr. Lobner attended a meeting on December 21, 1993, to discuss Rule III.B.15. Prime Time had requested the meeting, which was attended by Prime Time's counsel (Mr. Anderson. and staff from LAX and S&E. Mr. Lobner testified as follows:

> "I informed Mr. [*72] Anderson that Prime Time's proposed business scheme...deprives the airport of any effective regulation or control over the various independent drivers and that in effect Prime Time would attain the status as an airport concessionaire but would no longer be in the business of actually transporting passengers from LAX... Prime Time's attempt to place LAX into a position of responsibility over literally hundreds of carriers was an unacceptable regulatory burden. I further stated that the purpose of the airport's requirement that its concessionaires use bona fide employees was to control traffic congestion and to contain the concessionaires' use of independents. I believe I underscored...that the policy purposes of the rule had not changed since its adoption and...there was no reason to believe the regulation would be rescinded..." Exhibit S&E-30 at 2, emphasis added.

Ms. Bindrup's and Mr. Lobner's testimony establishes that, as to the restriction on use of nonemployees, Rule III.B.15 is a "safety or traffic" regulation within the meaning of Paragraph 3.01 of GO 158-A. The fact that the rule may have other or additional purposes does not change our conclusion regarding that [*73] restriction. Accordingly, Prime Time's persistent operation in violation of Rule III.B.15 violates both GO 158-A and the settlement of the 1993 OII.

Neither Ms. Bindrup nor Mr. Lobner specifically commented on the purpose of that portion of Rule III.B.15 requiring driver compensation by salary, commission, or both. We see no connection between that requirement and "safety or traffic" regulation. Indeed, a driver operating on commission could be as hard-pressed financially, and just as inclined to cut corners to the detriment of service, as an owner-operator. Thus, although Prime Time's division of revenues may violate the driver compensation provision of Rule III.B.15, the latter violation does not offend GO 158-A. In so holding, we express no view regarding the merits of the driver compensation provision; we simply give effect to the policy of GO 158-A that the airport authorities are wholly responsible for enforcement of their rules, except as to traffic safety and congestion, where the airports and this Commission exercise joint enforcement authority. See D.89-10-028, *33 CPUC2d at 10, 17-18.*

**4.2 Enforcement Role of the Commission**

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

Prime Time argues, in reliance on D.89-10-028, [*74] that the Commission should take no action here, because there is no indication that LAX cannot deal with congestion problems on its own. In that decision, we announced our policy that, in essence, we would await the results of enforcement action by the local airport jurisdiction, but would involve ourselves when "internal enforcement procedures" had been unsuccessful in stopping the violations. *Id., 33 CPUC2d at 17-18.* With regard to Prime Time, the Los Angeles City Attorney has gone to court, obtained a probation order, and had the order extended with a fine levied against Prime Time, without achieving any impact on Prime Time's use of nonemployee drivers. We are satisfied that our current involvement in this enforcement matter is timely and appropriate.

Prime Time and other ride-share operators at LAX have been trying for years to get Rule III.B.15 rescinded. Prime Time would like to have the GO 158-A rule on use of nonemployee drivers (as Prime Time interprets that rule) apply statewide. n23 Mr. Kindt suggested that Prime Time's noncompliance with Rule III.B.15 was due to what he saw as a conflict between that rule and GO 158-A. This conflict, according to Mr. Kindt, has put [*75] Prime Time and other PSCs in the predicament of having one foot in the boat and one foot on the dock. We disagree. No such predicament exists.

> n23 It appears that LAX may be the only California airport to require exclusive use of bona fide employee drivers. The record on this point contains little beyond conflicting representations of counsel. Prime Time asserts that the LAX rule is virtually unique, not only in California but in the United States. Prime Time relies on a two-year-old letter from the executive director of the Airport Ground Transportation Association (in Knoxville, Tennessee), who wrote, "I know of no U.S. airport other than LAX that requires drivers of ground transportation vans to be employees." See Attachment V to Exhibit PT-3. However, S&E claims (in its reply brief at 12) that Phoenix and Dallas-Fort Worth similarly prohibit the use of nonemployee drivers. In any event, we find that taking a nose count with regard to approaches for regulating ride-share drivers would shed no light on the question of whether LAX's approach is enforceable under GO 158-A.

Prime Time could easily comply with both the LAX rule and GO 158-A regarding use of nonemployee drivers. [*76] Prime Time could do so by complying with the more restrictive rule, i.e., Rule III.B.15. In short, Prime Time has no compliance problem that it could not solve itself. The problem is that Prime Time rejects this obvious and fair solution to achieving compliance with state and local regulations, a solution that will be needed so long as Rule III.B.15 continues in effect with its current provisions.

Although it previously supported Rule III.B.15, Prime Time now thinks that the rule is wrong, and that changes in conformity with state rules on use of nonemployee drivers would actually help address the traffic safety and congestion problems of concern here. We are aware that LAX is considering changes to its van management program (see Section 4.3 below), but we cannot be sure when or how LAX will choose to modify Rule III.B.15. In the meantime, we agree with S&E witness Formino (the owner of Inland Express Services, Inc., a competitor of Prime Time) that all the ride-share providers at LAX should compete under the same rules.

### 4.3 Efficacy of Rule III.B.15

This brings us to the heart of the matter. Does Rule III.B.15 alleviate traffic safety and congestion problems? Prime Time [*77] presents substantial argument and analysis that it does not. Specifically, Prime Time claims, in part on the basis of data collected by LAX, that Prime Time's use of nonemployee drivers correlates with improved safety performance (see, e.g., Section 3.4.4 above), and that Prime Time's efficiency in transporting passengers has increased. "Efficiency" in this context can be measured over various parameters, but what it translates to is less traffic congestion because more passengers are travelling to and from the airport in ride-share vehicles rather than by themselves in cars or taxis. Prime Time's argument and analysis is primarily for LAX to assess, but it will be useful in terms of our own fact-finding to review some of the data, including the LAX study.

The rebuttal testimony of Prime Time witness Johnston provided the statistical basis for Prime Time's assertions that its efficiency has improved. Mr. Johnston said:

> "Prime Time has experienced a significant increase in the revenue per mile as it has converted to the use of licensed charter party subcarriers.... From 1993 to 1995, Prime Time experienced an increase in revenue per mile of approximately 18%...

Exhibit A-000020

"These efficiencies [*78] can be expressed in a slightly different format. In 1991, Prime Time utilized employees. Those employees worked 42,316 shifts, transported 419,800 passengers and generated total fare revenue of approximately $ 7,473,000. By contrast, 1995, Prime Time's subcarriers worked only 37,871 (4,445 fewer) shifts, transported 516,733 (96,933 more) passengers and generated fare revenues of $ 9.785,000 (an increase of $ 2,312,000). In 1995 Prime Time transported 13.6 passengers per shift compared to passengers per shift in 1991, a 37.5% increase." Exhibit PT-18 at 9-10.

We think a lot more explanation is needed to assess these statistics. For example, Prime Time does not show year-by-year results, it does not show passengers per hour worked or per vehicle mile, and it does not show what portion of the increase in revenues is attributable to fare hikes. We also cannot tell from these statistics how Prime Time's performance compares with other ride-share providers in general, or in particular with ride-share providers that rely on employee drivers. Most important, even accepting the claimed performance improvements at face value, we cannot conclude that these improvements are solely or primarily [*79] due to the use of nonemployee drivers.

Nevertheless, we find these statistics provocative, particularly in light of the paucity of factual study by S&E in support of its views. The only factual study other than Mr. Johnston's is one conducted by LAX. The latter study deals only with Prime Time's movement of passengers outbound from LAX. n24 Mr. Johnston claimed that study actually supported his own conclusions regarding Prime Time's efficiency. He argued as follows:

"LAX's study compares Prime Time's out-bound passenger service rendered at LAX during he first six months of 1993 with the same service rendered during the first six months of" 1994. The test periods are noteworthy because during the former Prime Time utilized its own vans driven by employee/shift-lease drivers, while during the latter most service was provided by licensed charter party subcarriers....

"On its face, [LAX's study] reports" that Prime Time's vehicles operated fewer 'trips' from the LAX holding lot in 1994 and that fewer total passengers were transported from that facility. Each such trip indicates the release of a single vehicle to the passenger arrival area.

"My analysis of LAX's statistics [shows]  [*80]  Prime Time was more efficient in 1994 than in 1993, that is to say, it transported more passengers per vehicle with licensed charter party carriers, with less travel (i.e., fewer circuits) on LAX property.

"LAX's report correctly notes that more Prime Time vehicles, albeit owned by Prime Time's' subcarriers, were available for service in 1994 than in 1993. The reported 1994 fleet size of 177 is overstated, likely resulting from counting a single vehicle more than once, as where LAX counted both a retired vehicle and its replacement. The actual number of vans was approximately 140. The fact remains that although the number of vehicles increased, the vehicles in service at any one time did not increase, and in fact went down.

"In 1993 Prime Time utilized each vehicle for two shifts [per day]. By contrast, in 1994 each vehicle operated by a subcarrier was generally utilized for a single shift. Thus, in 1994, in order to put the same number of vehicles on the road [on a given day], twice the number of vehicles [was] required. This does not result in a greater number of vehicles on the road at any one time [as] demonstrated by the fact reported by LAX...that the number of [*81] times a vehicle was released from the [holding lot] decreased.

"Review of LAX's statistics reveals...that each vehicle released from the holding lot transported more out-bound passengers in 1994 than in 1993....The real measure of overall rideshare efficiency is the total number of passengers per vehicle which are taken out at one time. This passenger density is reflected in the passengers captured per circuit, which improved by more than 17.6% from 1993 to 1994 and 21.6% from 1993 to 1995.

"Put in simple terms, each of Prime Time's subcarriers made fewer circuits but transported more passengers in 1994 than in 1993. These efficiencies improve as Prime Time's subcarrier operations matured. The efficiencies lead to less congestion [and] fewer miles traveled per passenger...." Exhibit PT-18 at 12-14.

Exhibit A-000021

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

n24 As such, the study contains a fairly limited representation of Prime Time's operations. Among other limitations, the study does not deal with Prime Time's inbound operations at LAX, nor does it deal with Prime Time's transportation of passengers to or from other airports.

On the following pages, we reproduce Exhibit PT-10 (which contains the statistics compiled by LAX) [*82] and Attachment G to Exhibit PT-18 (which contains Mr. Johnston's charts and graphs depicting Prime Time's outbound performance from LAX over the 1993-95 time-frame).

Exhibit "B"

Exhibit PT-10

CPUC Proceeding I.95-07-001/I.93-05-004

Sponsor/Witness Prime Time/Bindrup (S&D)

Date Ident. 20 Feb. '96 Recd. 20 Feb. '96

Steven Kotz

Administrative Law Judge

City of Los Angeles
Department of Airports
Landside Operations Bureau

Prime Time Shuttle International, Inc

| 1993 | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|
| Total Lot Dispatches (Trips) | 5,045 | 3,630 | 4,159 | 4,596 | 4,736 | 4,799 |
| Total Airport Circuits Outbound | 10,686 | 7,664 | 8,917 | 9,646 | 10,128 | 10,700 |
| Total Passengers Outbound | 16,566 | 10,607 | 12,266 | 13,301 | 14,963 | 16,316 |
| | | | | | | |
| Passenger/Trip Ratio | 3.28 | 2.92 | 2.95 | 2.89 | 3.16 | 3.40 |
| Passenger/Circuit Ratio | 1.55 | 1.38 | 1.38 | 1.38 | 1.48 | 1.52 |
| Circuit/Trip Ratio | 2.12 | 2.11 | 2.14 | 2.10 | 2.14 | 2.23 |

Prime Time Shuttle International, Inc

| | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|
| Total Lot Dispatches (Trips | 5,144 | 5,549 | 5,057 | 5,326 | 4,911 | 4,805 |
| Total Airport Circuits Outbound | 10,711 | 9,702 | 10,731 | 11,547 | 10,022 | 9,051 |
| Total Passengers Outbound | 17,392 | 20,087 | 16,281 | 17,159 | 14,815 | 13,679 |
| | | | | | | |
| Passenger/Trip Ratio | 3.38 | 3.62 | 3.22 | 3.22 | 3.02 | 2.85 |
| Passenger/Circuit Ratio | 1.62 | 2.07 | 1.52 | 1.49 | 1.48 | 1.51 |
| Circuit/Trip Ratio | 2.08 | 1.75 | 2.12 | 2.17 | 2.04 | 1.88 |

[*83]

Prime Time Shuttle International, Inc

| 1994 | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|
| Total Lot Dispatches (Trips) | 4,915 | 3,823 | 4,381 | 4,464 | 4,747 | 4,949 |
| Total Airport Circuits Outbound | 9,348 | 6,469 | 7,880 | 8,230 | 8,867 | 8,700 |
| Total Passengers Outbound | 14,866 | 10,348 | 12,055 | 13,642 | 14,738 | 15,499 |
| | | | | | | |
| Passenger/Trip Ratio | 3.02 | 2.71 | 2.75 | 3.06 | 3.10 | 3.13 |

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

Prime Time Shuttle International, Inc

| 1994 | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|
| Passenger/Circuit Ratio | 1.59 | 1.60 | 1.53 | 1.66 | 1.66 | 1.78 |
| Circuit/Trip Ratio | 1.90 | 1.69 | 1.80 | 1.84 | 1.87 | 1.76 |

Prime Time Shuttle International, Inc

Comparative Analysis: January - June 1994
to January - June 1993

| | | | | | | |
|---|---|---|---|---|---|---|
| Difference in Trips | 0.97 | 1.05 | 1.05 | 0.97 | 1.00 | 1.03 |
| Difference in Circuits | 0.87 | 0.84 | 0.88 | 0.85 | 0.88 | 0.81 |
| Difference in Passengers | 0.90 | 0.98 | 0.98 | 1.03 | 0.98 | 0.95 |

Fleet Size of 80 Vehicles

| | | | | | | |
|---|---|---|---|---|---|---|
| Avg. Pax/Vehicle/Day | 6.0 | 4.6 | 4.9 | 5.7 | 5.9 | 6.5 |
| Avg. Trips/Vehicle/Day | 2.0 | 1.7 | 1.8 | 1.9 | 1.9 | 2.1 |

Fleet Size of 171 Vehicles

| | | | | | | |
|---|---|---|---|---|---|---|
| Avg. Pax/Vehicle/Day | 2.8 | 2.2 | 2.3 | 2.7 | 2.8 | 3.0 |
| Avg. Trips/Vehicle/Day | 0.9 | 0.8 | 0.8 | 0.9 | 0.9 | 1.0 |

Attachment G to Exhibit PT-18
PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS - SUMMARY

| 1993 COMPARED TO 1994 | 1993 JAN - JUN | 1994 JAN - JUN | % CHANGE 1993 TO 1994 |
|---|---|---|---|
| Total Lot Dispatches (Trips) | 26,965 | 27,279 | 1.2% |
| Total Airport Circuits Outbound | 57,721 | 49,494 | -14.3% |
| Total Passengers Outbound | 84,019 | 81,148 | -3.4% |
| | | | |
| Passenger/Trip Ratio | 3.12 | 2.97 | -4.5% |
| Passenger/Circuit Ratio | 1.46 | 1.64 | 12.6% |
| Circuit/Trip Ratio | 2.14 | 1.81 | -15.2% |

[*84]
PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS - SUMMARY

| 1993 COMPARED TO 1994 | 1993 JUL - DEC | 1994 JUL - DEC | % CHANGE 1993 TO 1994 |
|---|---|---|---|
| Total Lot Dispatches (Trips) | | | |
| Total Airport Circuits Outbound | 63,678 | 58,034 | -8.9% |
| Total Passengers Outbound | 99,413 | 109,966 | 10.6% |
| | | | |
| Passenger/Trip Ratio | | | |
| Passenger/Circuit Ratio | 1.56 | 1.89 | 21.4% |
| Circuit/Trip Ratio | | | |

PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS - SUMMARY

| 1993 COMPARED TO 1994 | 1993 ANNUAL | 1994 ANNUAL | % CHANGE 1993 TO 1994 |
|---|---|---|---|
| Total Lot Dispatches (Trips) | | | |
| Total Airport Circuits Outbound | 121,399 | 107,528 | -11.4% |
| Total Passengers Outbound | 183,432 | 191,114 | 4.2% |

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS - SUMMARY

| 1993 COMPARED TO 1994 | 1993 ANNUAL | 1994 ANNUAL | % CHANGE 1993 TO 1994 |
|---|---|---|---|
| Passenger/Trip Ratio | | | |
| Passenger/Circuit Ratio | 1.51 | 1.78 | 17.6% |
| Circuit/Trip Ratio | | | |

PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS - SUMMARY

| 1994 COMPARED TO 1995 | 1994 ANNUAL | 1995 ANNUAL | % CHANGE 1994 TO 1995 |
|---|---|---|---|
| Total Lot Dispatches (Trips) | | | |
| Total Airport Circuits Outbound | 107,528 | 102,981 | -4.2% |
| Total Passengers Outbound | 191,114 | 189,139 | -1.0% |
| | | | |
| Passenger/Trip Ratio | | | |
| Passenger/Circuit Ratio | 1.78 | 1.84 | 3.3% |
| Circuit/Trip Ratio | | | |

PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS - SUMMARY

| 1993 COMPARED TO 1995 | 1993 ANNUAL | 1995 ANNUAL | % CHANGE 1993 TO 1995 |
|---|---|---|---|
| Total Lot Dispatches (Trips) | | | |
| Total Airport Circuits Outbound | 121,399 | 102,981 | -15.2% |
| Total Passengers Outbound | 183,432 | 189,139 | 3.1% |
| | | | |
| Passenger/Trip Ratio | | | |
| Passenger/Circuit Ratio | 1.51 | 1.84 | 21.6% |
| Circuit/Trip Ratio | | | |

[*85]
PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS

| 1993 | JAN | FEB | MAR | APR | MAY | JUN |
|---|---|---|---|---|---|---|
| Total Lot Dispatches (Trips) | 5,045 | 3,630 | 4,159 | 4,598 | 4,736 | 4,799 |
| Total Airport Circuits Outbound | 10,686 | 7,644 | 8,917 | 9,646 | 10,128 | 10,700 |
| Total Passengers Outbound | 16,566 | 10,607 | 12,266 | 13,301 | 14,963 | 16,316 |
| | | | | | | |
| Passenger/Trip Ratio | 3.28 | 2.92 | 2.95 | 2.89 | 3.16 | 3.40 |
| Passenger/Circuit Ratio | 1.55 | 1.39 | 1.38 | 1.38 | 1.48 | 1.52 |
| Circuit/Trip Ratio | 2.12 | 2.11 | 2.14 | 2.10 | 2.14 | 2.23 |

PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS

| 1993 | 6 MONTH SUB-TOTAL | JUL | AUG | SEP | OCT | NOV |
|---|---|---|---|---|---|---|
| Total Lot Dispatches (Trips) | 26,965 | 5,144 | 5,549 | 5,057 | 5,326 | 4,911 |
| Total Airport Circuits | 57,721 | 10,711 | 9,702 | 10,421 | 13,771 | 10,022 |

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS

| 1993 | 6 MONTH SUB-TOTAL | JUL | AUG | SEP | OCT | NOV |
|---|---|---|---|---|---|---|
| Outbound | | | | | | |
| Total Passengers Outbound | 84,019 | 17,392 | 20,087 | 16,281 | 17,159 | 14,815 |
| Passenger/Trip Ratio | 3.12 | 3.38 | 3.62 | 3.22 | 3.22 | 3.02 |
| Passenger/Circuit Ratio | 1.46 | 1.62 | 2.07 | 1.56 | 1.25 | 1.48 |
| Circuit/Trip Ratio | 2.14 | 2.06 | 1.75 | 2.06 | 2.59 | 2.04 |

PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS

| 1993 | DEC | 6 MONTH SUB-TOTAL | ANNUAL TOTAL |
|---|---|---|---|
| Total Lot Dispatches (Trips) | 4,805 | 30,792 | 57,757 |
| Total Airport Circuits Outbound | 9,051 | 63,676 | 121,399 |
| Total Passengers Outbound | 13,679 | 99,413 | 183,432 |
| Passenger/Trip Ratio | 2.85 | 3.23 | 3.18 |
| Passenger/Circuit Ratio | 1.51 | 1.56 | 1.51 |
| Circuit/Trip Ratio | 1.88 | 2.07 | 2.10 |

[*86]
PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS

| 1994 | JAN | FEB | MAR | APR | MAY | JUN |
|---|---|---|---|---|---|---|
| Total Lot Dispatches (Trips) | 4,915 | 3,823 | 4,381 | 4,484 | 4,747 | 4,949 |
| Total Airport Circuits Outbound | 9,348 | 6,469 | 7,880 | 8,290 | 8,867 | 6,700 |
| Total Passengers Outbound | 14,866 | 10,348 | 12,055 | 13,642 | 14,738 | 15,499 |
| Passenger/Trip Ratio | 3.02 | 2.71 | 2.75 | 3.06 | 3.10 | 3.13 |
| Passenger/Circuit Ratio | 1.59 | 1.60 | 1.53 | 1.66 | 1.66 | 1.78 |
| Circuit/Trip Ratio | 1.90 | 1.69 | 1.80 | 1.84 | 1.87 | 1.76 |

PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS

| 1994 | 6 MONTH SUB-TOTAL | JUL | AUG | SEP | OCT | NOV |
|---|---|---|---|---|---|---|
| Total Lot Dispatches (Trips) | 27,279 | | | | | |
| Total Airport Circuits Outbound | 49,494 | 9,801 | 10,332 | 9,557 | 10,288 | 9,499 |
| Total Passengers Outbound | 81,146 | 18,611 | 21,227 | 17,940 | 19,848 | 17,346 |
| Passenger/Trip Ratio | 2.97 | | | | | |
| Passenger/Circuit Ratio | 1.64 | 1.90 | 2.05 | 1.88 | 1.93 | 1.83 |
| Circuit/Trip Ratio | 1.81 | | | | | |

PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS

6 MONTH        ANNUAL

Exhibit A-000025

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

| 1994 | DEC | SUB-TOTAL | TOTAL |
|---|---|---|---|
| Total Lot Dispatches (Trips) | | | |
| Total Airport Circuits Outbound | 8,557 | 58,034 | 107,528 |
| Total Passengers Outbound | 14,994 | 109,966 | 191,114 |
| Passenger/Trip Ratio | | | |
| Passenger/Circuit Ratio | 1.75 | 1.69 | 1.78 |
| Circuit/Trip Ratio | | | |

[*87]
PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS

| 1995 | JAN | FEB | MAR | APR | MAY | JUN |
|---|---|---|---|---|---|---|
| Total Lot Dispatches (Trips) | | | | | | |
| Total Airport Circuits Outbound | 7,463 | 6,712 | 7,546 | 8,129 | 8,887 | 9,102 |
| Total Passengers Outbound | 15,983 | 10,329 | 12,073 | 13,677 | 15,616 | 15,864 |
| Passenger/Trip Ratio | | | | | | |
| Passenger/Circuit Ratio | 2.14 | 1.54 | 1.60 | 1.68 | 1.76 | 1.74 |
| Circuit/Trip Ratio | | | | | | |

PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS

| 1995 | 6 MONTH SUB-TOTAL | JUL | AUG | SEP | OCT | NOV |
|---|---|---|---|---|---|---|
| Total Lot Dispatches (Trips) | | | | | | |
| Total Airport Circuits Outbound | 47,839 | 9,681 | 9,344 | 9,236 | 9,739 | 8,887 |
| Total Passengers Outbound | 83,536 | 19,102 | 19,140 | 17,226 | 17,671 | 17,666 |
| Passenger/Trip Ratio | | | | | | |
| Passenger/Circuit Ratio | 1.75 | 1.97 | 2.05 | 1.87 | 1.81 | 1.99 |
| Circuit/Trip Ratio | | | | | | |

PRIME TIME SHUTTLE
LAX OUTBOUND STATISTICS

| 1995 | DEC | 6 MONTH SUB-TOTAL | ANNUAL TOTAL |
|---|---|---|---|
| Total Lot Dispatches (Trips) | | | |
| Total Airport Circuits Outbound | 8,255 | 55,142 | 102,981 |
| Total Passengers Outbound | 14,798 | 105,803 | 189,139 |
| Passenger/Trip Ratio | | | |
| Passenger/Circuit Ratio | 1.79 | 1.92 | 1.84 |
| Circuit/Trip Ratio | | | |

[SEE ILLUSTRATIONS IN ORIGINAL]

Exhibit A-000026

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

We view Mr. Johnston's conclusions with much caution. As we observed [*88] above regarding his data on revenue per mile and passengers per shift, closer scrutiny is required and more factors must be taken into account before we would accept either his conclusions or his causal inferences.

Nevertheless, we are in an awkward predicament. We are asked to enforce a local airport rule that is intended in large part to address traffic safety and congestion problems. The effect of the rule, however, is to prohibit use of non-employee drivers by ride-share operators, a practice that, as far as we can see from this record, does not create traffic safety or congestion problems, and may even alleviate them.

Fortunately, we know from Ms. Bindrup's testimony that LAX has had its van management program under study by a consultant for over a year. There is a good chance that LAX will adopt a new van management program in the near future. That program will either have a new rule to address traffic safety and congestion, or it will affirm the existing rule. In either case, however, LAX will have had the benefit of a broader and more thorough analysis than exists in this record.

Based on this expectation, we require Prime Time, within 90 days of the effective date of [*89] this decision, to submit a plan for bringing its operations into compliance with LAX's safety and traffic rules. n25 Prime Time should consult with LAX staff, and we respectfully request that LAX provide guidance to Prime Time and also to us regarding the plan. Ideally, we would like some type of formal action by LAX or its designee, indicating whether the Prime Time compliance plan is satisfactory.

> n25 We would include among the "traffic and safety" rules LAX's vehicle registration program. For discussion of vehicle registration issues generally, see Section 5 below.

To summarize, we are not convinced that prohibiting PSC reliance on nonemployee drivers is appropriate as a matter of state law; however, we are prepared to complement the enforcement efforts of a local airport authority that has decided to adopt such a prohibition as part of its safety and traffic program. Here, we complement LAX's enforcement efforts by imposing sanctions on Prime Time but suspending those sanctions if Prime Time produces a satisfactory compliance plan. We will cancel the sanctions if Prime Time produces and follows such a plan and otherwise complies with the terms of its probation, as described [*90] in today's decision. If Prime Time fails any of these conditions, the sanctions will take effect.

## 4.4 Double Jeopardy

Prime Time makes a constitutional argument against this Commission's imposition of civil sanctions based on Prime Time's violations of Rule III.B.15. The gist of the argument is that by virtue of the Los Angeles City Attorney's misdemeanor prosecution, Prime Time has already been punished for such violations. For this Commission to impose sanctions on top of the misdemeanor fine levied by the Municipal Court would offend the double jeopardy clause of the Fifth Amendment of the U.S. Constitution, according to Prime Time.

S&E considers Prime Time's double jeopardy claim "preposterous." According to S&E, "It's comparable to arguing that the DMV has no authority to revoke the driver's license of a person convicted of driving while intoxicated." S&E reply brief at 25. S&E has a good point. We also note that Prime Time continues to violate both the 1993 settlement agreement and Rule III.B.15 with every day and shift that it operates ride-share service to LAX in nonconformity with that rule. These new offenses are not the "same offense" for which Prime Time previously [*91] paid a fine in the Municipal Court. n26

> n26 The double jeopardy clause reads: "Nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb...." U.S. Constitution, Amendment 5, emphasis added.

These flaws in Prime Time's argument are sufficient basis to reject it. However, we also discuss in detail the U.S. Supreme Court case on which Prime Time relies, since the case reveals much about the philosophy and means of civil enforcement. In that case, the Court unanimously held that a "civil" penalty, following a criminal trial and conviction for the identical activity, could constitute a second punishment violative of the double jeopardy clause. *U.S. v. Halper, 490 U.S. 435 (1989)*.

Halper involved a medical service provider's false claims for reimbursement of services to patients under the federal Medicare program. Essentially, a service that should have been billed and reimbursed under Code "9019" at a rate of $ 3 per claim was fraudulently billed at $ 12 per claim under Code "9018." There were 65 false claims for reimburse-

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

ment, so the federal government was defrauded of $ 585. Halper was convicted on 65 counts of violating the criminal [*92] false-claims statute and on 16 counts of mail fraud. He was fined $ 5,000 and sentenced to imprisonment for two years.

The government then brought an action against Halper under the civil False Claims Act. The remedial section of that act, at the time the action was brought, provided that a person in violation was liable to the federal government for a civil penalty of $ 2,000 for each offense, plus double the government's actual damages, plus the government's costs in bringing the action. Since Halper violated the act 65 times, he was subject to a statutory penalty (beyond the criminal sanctions already imposed) of more than $ 130,000.

The district court found this penalty so grossly excessive in relation to the government's actual loss ($ 585 plus the cost of investigating and prosecuting the false claims) as to constitute a second punishment. The U.S. Supreme Court agreed, holding that "a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent r retribution." *490 U.S. at 448-49.*

The instant enforcement proceeding [*93] against Prime Time differs starkly from that in the Halper case. Our purpose here is not retribution; rather, we are trying to prevent further offenses and give the offender a fair and reasonable opportunity to rehabilitate itself. The sanctions we impose (a $ 100,000 fine and certificate revocation) are severe, but Prime Time can avoid revocation by operating henceforth in conformity with the probation program we authorize. The severity of the sanctions is necessary in light of Prime Time's continued flouting of the terms of the Municipal Court's probation order.

There is no indication that Prime Time has ever complied with that order, or that it intends to do so in the future. To the contrary, in written communications referring to the fine Prime Time paid for violation of its probation, Mr. Kindt has characterized the Municipal Court action in ways that indicate he does not take seriously either the probation or the fine.

For example, on May 30, 1995, Mr. Kindt wrote Commissioner Conlon asserting that Prime Time had "settled" the Municipal Court case for "a whopping $ 500 fine." Mr. Kindt did not mention that the "settlement" included a one-year extension of Prime [*94] Time's probation and a commitment by Prime Time to abide by the terms of the original sentencing order, which (among other things) was conditioned on Prime Time's compliance with Rule III.B.15. Mr. Kindt wrote in a similar vein in an "e-mail" memorandum to Prime Time's owner-operators on June 2, 1995:

> "It all ended up as a $ 500 ticket. That's right, a $ 500 ticket. Quite a bit different from the threats. of total annihilation that these PUC bureaucrats gleefully and incessantly heralded for Prime Time. Sure makes them look silly, doesn't it? There's a good reason for this...they are silly. They're silly bureaucrats." Emphasis in original.

Again, Mr. Kindt did not mention that the probation was extended or that it was conditioned on compliance with Rule III.B.15. n27

     n27 Both the May 30 letter and the June 2 memorandum are among the Kindt correspondence collected in Attachment A to Exhibit PT-1.

In short, the steps we are taking today are carefully crafted to secure compliance. This is true of our enforcement proceedings in general. We prefer wherever possible to rehabilitate the offender, so long as the offender is willing to undertake such rehabilitation and [*95] the safety and welfare of the public would not be jeopardized.

At some point, however, a carrier is so recalcitrant that compliance can be secured only by shutting down that carrier's operations. Prime Time is near that point. We will not hesitate to execute the sanctions that we approve today, should Prime Time persist in its present course. The sanctions are within our authority and fully consistent with statutory and constitutional dictates.

## 5. Vehicle Registration

Prime Time at one time owned the vans used by its drivers. Under the current arrangement, however, the charter-party subcarriers own or lease their own vans. n28 Except possibly for a small number of vans that Prime Time itself

has leased to its drivers, Prime Time no longer owns any vans engaged in passenger transport. Nevertheless, Prime Time's name continues to show up on a large number of van registration forms filed with LAX and DMV.

n28 In many cases, the lessor is Bush Leasing, which according to Mr. Kindt is a company unconnected to Prime Time.

S&E accuses Prime Time of perjury in connection with van registration. Mr. Kindt is not sure in what capacity Prime Time appears on these registration [*96] forms, but he insists Prime Time has committed no impropriety. Given this Commission's limited involvement with van registration, we are not convinced this issue is properly before us.

Our general orders require regulated carriers to register their vehicles with S&E. This requirement serves several purposes, such as tracking compliance with our insurance and safety regulations. Other governmental entities also have vehicle registration requirements, and S&E appropriately coordinates with those entities. Such coordination includes calling their attention to possible violations. (See also Sections 6.4 to 6.4.2 below.)

The record does not disclose exactly what Prime Time is doing with respect to the DMV and LAX registration forms. Moreover, those agencies are best situated to interpret their own registrations, determine compliance questions, and impose sanctions for violations.

With respect to LAX, the compliance plan we are directing Prime Time to develop should address vehicle registration as well as driver status. With respect to DMV, Prime Time should explain to S&E the capacity in which Prime Time's name appears on the registration forms. If S&E is still not satisfied, it should [*97] refer the matter to DMV. To the extent that DMV finds a violation, S&E should report that fact to us, as well as all corrective action taken by DMV. We expect Prime Time, as a condition of its probation, to comply promptly and fully with the vehicle registration programs of DMV and LAX.

## 6. The War of Words

In Sections 2 to 2.3 above, we summarized the background to the ongoing war of words between Prime Time and S&E. The war began after some months of attempted cooperation between Prime Time and S&E following the settlement of the 1993 OII in October of that year. Cooperation crumbled in 1994, as both parties came to believe the other was acting in bad faith. What caused this result?

## 6.1 The Opening Shot

With the wisdom of hindsight, it is easy to see that the settlement. was, in important ways, an agreement to disagree. The settlement did not resolve the vital differences of opinion between S&E and Prime Time over interpretation of GO 158-A and *PU Code § 5401*. Instead, the settlement gave Prime Time the opportunity to fix the things (such as filing and posting tariffs, getting charter-party permits for the drivers) that it and S&E agreed needed fixing, until LAX [*98] and this Commission could address the paramount policy and legal issues around the use of nonemployee drivers.

Was S&E wrong to enter into such a settlement? We think not. The settlement was sensible, pragmatic, and accommodating. Moreover, S&E had a reasonable expectation that LAX and this Commission would shortly resolve the issues left outstanding by the settlement. That expectation proved wrong.

First, Prime Time withdrew its application for clarification of GO 158-A and did not file the promised petition for modification. Thus, the GO 158-A issues remained unresolved. Second, LAX seemed uncertain about what to do regarding the whole ride-share program, not just the nonemployee driver issue. In the meantime, Prime Time appeared to be operating as if Rule III.B.15 did not exist, and S&E discovered various things that seemed to confirm its concerns regarding Prime Time's use of nonemployee drivers. Finally, in August 1994, Director Schulte, at the invitation of the Executive Director of LAX, wrote to LAX explaining S&E's position on the use of nonemployee drivers and expressing concerns about how such use (and Prime Time's operations in general) might have negative consequences. [*99]

Prime Time regarded Director Schulte's letter as making irresponsible accusations and as violating a "gentleman's agreement" that accompanied the settlement of the 1993 OII. We suspect there was some sort of informal understanding, but Prime Time was the first to violate that understanding by unilaterally abandoning its efforts to obtain a Commission decision on the use of nonemployee drivers. While S&E had made known its narrow interpretation of GO 158-A since at least 1992, we note that Director Schulte wrote to LAX only after Prime Time had withdrawn its application for clarification, and some three months after Prime Time's promised petition for modification had failed to materialize.

Nevertheless, Director Schulte's letter was clearly inflammatory in associating Prime Time with virtually every evil known to the ride-share industry, and in referring repeatedly to Prime Time but to no. other ride-share service provider. To this extent, S&E started the war of words and must shoulder some of the responsibility.

## 6.2 The "Smear Campaign"

Prime Time thus became aware that S&E was determined not to let the GO 158-A issue go away. S&E also showed its willingness to [*100] call other regulators' attention to Prime Time's operations. By the end of 1994, Mr. Kindt was convinced that S&E was on a crusade against Prime Time and against Kindt himself.

Starting early in 1995, Mr. Kindt began soliciting the help of members of this Commission and various people outside the Commission to resist what he perceived as S&E's harassment. From the first, Mr. Kindt's letters discounted the underlying policy differences between Prime Time and S&E, and focused instead on personal attacks on Director Schulte.

These letters, a selection of which appears in Attachment A to Exhibit PT-17, make horrific reading. They accuse Director Schulte and, to a lesser extent, S&E in general of "blatant" falsehoods, of vilifying Prime Time and disparaging Kindt personally, of depriving Prime Time of due process, of making "groundless," "capricious,", and "preposterous" accusations, of inventing stories about Kindt. They assert that S&E has slandered Prime Time, that S&E rants and raves, that S&E made secret accusations against Prime Time, that S&E was "not bound by the parameters of truth or fairness." They claim S&E has ignored the interests of Prime Time's passengers, employees, and [*101] owner-operators because "Schulte's ego is bigger than all of this. What used to be just oppressive and absurd, now is utterly shameful and immoral." S&E has used "the power, prestige and trust the public has bestowed on them and, in the form of Schulte, reduced this to a smear campaign of lies, innuendo, half-truths and accusations in order to illegitimately manipulate our regulatory environment elsewhere." n29

> n29 The quotations, which are representative and by no means exhaustive, come primarily from Mr. Kindt's letters of February 26, March 8, and April 2, 1995, to Commissioner Conlon, and March 20, 1995, to Senator Rosenthal. These and other letters, with voluminous attachments, are reproduced in Attachment A to Exhibit PT-17.

## 6.3 The Casualties

Any fair-minded person would have to conclude from the record of this proceeding that there was a "smear campaign," and that Mr. Kindt conducted it personally. As such, we hesitate to dignify it with a response, but given the nature of the charges, we feel some comment is in order.

We have studied the record closely and objectively. In many instances, we have differed from S&E's views on what the facts show and what the [*102] law is. In a few cases, S&E may have been guilty of intemperate language or lapses of judgment. We have discovered no evidence, however, of the gross improprieties with which S&E has been charged. We find deep but sincerely held differences of opinion between the parties on matters of law and policy. Beyond that, S&E clearly has a profound distrust of Prime Time's motivations and a profound skepticism over the extent to which Prime Time is to be trusted. Prime Time has given S&E cause for both distrust and skepticism.

On the other hand, Mr. Kindt's opinion of S&E's methods cannot justify his own use of half-truths and innuendo. We give four significant examples below. (All quotations are from documents reproduced in Attachment A to Exhibit PT-17.)

> . The proceeding brought by the Los Angeles City Attorney was "Schulte's attempt to enforce a LAX regulation that he inappropriately lobbied into being." Letter of April 30, 1995, to Commissioner Conlon.

We know of no basis for the assertion that Director Schulte "lobbied into being" Rule III.B.15. However, the record confirms at several points that Prime Time, among other large PSCs, was an original proponent of Rule III.B.15. [*103] n30 To imply that Rule III.B.15 is solely the result of some bureaucratic connivance is at best irresponsible.

> n30 "We recognize that, several years ago, [LAX] agreed to prohibit the use of licensed charter party carriers as shuttle drivers at the request of Prime Time and Super Shuttle." Letter of March 17, 1994, to J. Driscoll, LAX Executive Director, from L. Specht on behalf of Prime Time (included in Attachment U to Exhibit PT-3).

. Prime Time is "in effect deprived of due process, and the industry is excluded from what is an industry issue, statewide." Letter of April 2, 1995, to Commissioner Conlon.

The record shows that Prime Time has repeatedly settled or withdrawn from proceedings rather than have the issues adjudicated on the merits. Specifically, Prime Time could have litigated GO 158-A and other state law issues in the 1993 OII but chose instead to settle the case. It could have had those issues addressed, on a statewide basis, in its 1993 application or in a petition for modification, but it withdrew the application at a prehearing conference and it did not file the promised petition for modification until after we issued the 1995 OII. It could have litigated [*104] Rule III.B.15 in Municipal Court rather than accepting a probation order. The fact is that Prime Time has been offered its day in court many times, but it has chosen not to show up.

. "Immediately after negotiating and signing a settlement agreement with us in August of 1993, Schulte took the exact same 'case' against [Prime Time] to the Los Angeles City Attorney." Letter of February 26, 1995, to Commissioner Conlon.

Prime Time has engaged drivers on an independent contractor basis, but with various terms, both before and after the 1993 settlement. Changing the drivers from a "shift lease" arrangement (pre-settlement) to licensed charter-party sub-carriage [post-settlement] was immaterial from LAX's standpoint, since Rule III.B.15 requires ride-share providers to use bona fide employee drivers. Thus, the Municipal Court action, compared to our 1993 OII, involved many of the same facts but different law. (We discuss in Section 6.4 below our policies regarding our staff's cooperation with other agencies and participation in other forums.) The Los Angeles City Attorney does not take orders from S[E] the implication that S&E somehow directed the Municipal Court action has [*105] no more basis than the implication that S&E was responsible for Rule III.B.15.

. The Municipal Court action "all ended up as a $ 500 ticket... The law is on our side and it's good law... This episode's over with." Memorandum of June 2, 1995, to Owner-Operators from John E. Kindt, Jr.

The Municipal Court action did not end. As a result of the violation of Prime Time's probation, Prime Time agreed to a $ 500 fine and to a one-year extension of the term of probation. No other modification was made to the original (June 6, 1994 sentencing order, which reads in relevant part:

"Upon entry of a plea of guilty or nolo contendere to Counts I, II, and III of the Complaint, alleging violations of...LAX Rules and Regulations Section III.B.15, defendant [Prime Time] shall be placed on summary probation...on the following terms and conditions:"

* * *

"5. Defendant must come into compliance with all LAX Rules and Regulations...within six months from the date of this sentence. Defendant understands that the City Attorney's Office may initiate a probation violation hearing against the corporate defendant and file any new charges that are appropriate against both the corporate defendant [*106] and its President, John E. Kindt, Jr. if full compliance is not achieved within six months from the date of this sentence."

The sentencing order includes a signature block for acceptance "as to Form and Content." The block contains Mr. Kindt's signature.

No fair-minded person could square the reality of the sentencing order and subsequent fine with the account that Mr. Kindt has given to Prime Time's employees and owner-operators. Furthermore, the record makes clear that Mr. Kindt knows what he is doing.

In short, Mr. Kindt has resorted to tactics that he attributes to S&E and whose use he condemns. The primary casualty in this war of words is Mr. Kindt's character and credibility. Moreover, as Mr. Kindt's conduct is an aggravating

factor in the violations we have found, he has succeeded in damaging his own company's cause. Restoration of the proper relationship between S&E and this regulatee is the single most challenging aspect of Prime Time's rehabilitation.

**6.4 Supervision and Scope of S&E Investigations**

Prime Time has sought at various times to involve Commissioners directly when Prime Time disagreed with S&E's investigatory methods. Most of these direct contacts [*107] with Commissioners occurred before the issuance of the 11995 OII. However, since then, Prime Time has also written to the assigned Commissioner regarding letters S&E sent to certain applicants for charter-party authority whose applications were forwarded by Prime Time about the time that hearings began herein. Mr. Kindt's testimony indicated that he thought President (then-Commissioner) Conlon actually took action early in 1995 to rein in S&E's investigatory activities. President Conlon subsequently wrote to the parties to explain that he had not taken any such action.

Following submission of the proceeding, Prime Time moved for a protective order directing S&E, pending the outcome herein, not to participate in "private litigation or other matters" to which Prime Time was a party. In a joint ruling, the assigned Commissioner and ALJ denied the motion as to this request, but referred to the full Commission the policy questions regarding (1) day-to-day supervision of S&E investigatory activity, and (2) the scope of S&E activity outside of Commission proceedings. We affirm the joint ruling and address the policy questions raised therein.

**6.4.1 Supervision**

The long-standing [*108] policy of this Commission is to encourage meetings between Commissioners and anyone who seeks access to Commissioners (including both regulatees and consumers). This policy of ready access is qualified only by restrictions placed on ex parte communications at certain times and in certain proceedings. Prime Time apparently mistakes such accessibility as connoting a disregard on the part of the Commission. for the separation of prosecutorial and quasi-judicial functions within the agency. On the contrary, we scrupulously observe that separation, which is one important reason why Commissioners, who will have to decide enforcement cases, do not involve themselves in the day-to-day supervision of enforcement staff.

One of the hallmarks of Anglo-American jurisprudence is that different persons play the roles of judge and prosecutor in a given matter. This separation of roles acts to ensure impartiality and to prevent prosecutorial abuses. Were we to interfere routinely with our enforcement staff, as Prime Time invites us to do, we likely would find ourselves prejudging cases or reviewing our own decisions. The likely result would be erratic, unfair and ineffective enforcement. Such a result [*109] would suit no one, not even the long-time best interests of Prime Time.

Nevertheless, Prime Time has both formal and informal means for having its grievances with S&E addressed within the Commission. These means do not depend on waiting for S&E to bring an enforcement action. For example, Prime Time could have applied to the Commission asking that we find either that Prime Time should get an exemption from GO 158-A in order to use nonemployee drivers or that Prime Time's use of nonemployee drivers is consistent with that general order. As we discussed earlier, Prime Time filed such an application (which S&E vigorously protested) in early 1993, but then withdrew the application in March 1994. Prime Time stated at that time that it would shortly petition for modification of D.89-10-028 (adopting the original version of GO 15B-A). Prime Time failed to file such a petition until after we issued the current OII.

Either the application or the petition cold have formally resolved the key matters in dispute herein, with far less expenditure of time and effort, and we suspect at less cost than the $ 200,000 Prime Time claims to have spent in this enforcement proceeding. Prime Time was aware [*110] of these procedural alternatives but chose not to pursue them.

In addition to review of S&E activities through formal Commission action, Prime Time could have sought an opinion from the advisory section of our General Counsel's office regarding the legal issues in dispute. The advisory section is independent of enforcement staff, and its services are available to our own staff, to other governmental entities, and to the public at large. While such advisory opinions are not binding on the Commission, an opinion in this case might have been useful to both. Prime Time and S&E in resolving their dispute short of litigation. At a minimum, an advisory opinion that we later rejected would be a substantial mitigating factor in any sanction we might adopt against a party that had operated in conformity with that opinion.

Finally, S&E answers ultimately to our Executive Director. While the Executive Director, like the Commissioners, is not routinely involved in S&E operational decisions, allegations of unfairness or violation of fundamental enforcement principles are within the Executive Director's purview.

**6.4.2 Scope of S&E Investigations**

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

The thrust of Prime Time's motion for [*111] protective order (see Section 6.4 above) is that S&E has exceeded its investigative authority by virtue of activity ramifying beyond the Commission's hearing room. Examples of such activity that Prime Time finds objectionable include coordinating with other agencies' enforcement efforts, providing information to other agencies that might concern those agencies, and cooperating with private attorneys in litigation against Prime Time. The assigned ALJ properly declined to assume direction of S&E's activities but requested assurance from S&E that it was accurately representing (1) its authority to speak for the Commission in other forums, and (2) the status of any factual or legal issue at bar in this proceeding.

In response, S&E submitted a verified declaration by Director Schulte. We reproduce below all matter of substance from the declaration:

> "I manage staff engaged in the ongoing task of assuring compliance by passenger carriers with applicable statutes, rules and Commission regulations. In the course of monitoring carrier compliance my staff uses many sources to secure information, including contacts with other agencies and law enforcement organizations. In the course of all [*112] our contacts with other agencies, various carriers and other utilities and related businesses, or the public, we strive always to be clear that S&E's role is to gather information to assist the Commission in securing carrier compliance. Information which we receive from many other agencies cannot be divulged (*Evidence Code Section 1040*). Sometimes other agencies contact my staff for information about a carrier's conduct or operations, and we cooperate to the degree we can, again noting that it is the Safety and Enforcement Division which is extending information (we never release information supplied in confidence by carriers under Section 583 unless we have approval from the Commission itself).

> "Sometimes my staff monitors proceedings in other forums as a means of gathering information to assist in evaluating carrier compliance and fitness to operate. On occasion my staff may be subpoenaed to testify in other proceedings to present either percipient testimony or to explain Commission requirements -- if subpoenaed and there is no reasonable bias to quash the subpoena or to contest appearing, staff attends.

> "Also, sometimes we receive requests to provide information about the [*113] status of Commission proceedings or actions, or to transmit copies of pleadings, etc. Instructions to staff are to never, in the course of explaining S&E Division activity, represent a staff position being advanced in an enforcement or other Commission proceeding as being a formal position of the Commission.

> "If enforcement staff suddenly ceased interacting with other agencies and law enforcement entities, denied requests to transmit information to members of the public or others, and ceased honoring subpoenas or other demands to provide information in other forums' proceedings, the Commission and the public interest would be very ill served."

This declaration describes a set of polices and procedures that we find appropriate for S&E and other Commission staff. Management should ensure adherence to these policies and procedures, and supervisors should immediately address any question of interpretation or applicability to particular circumstances.

We are aware that Prime Time considers S&E to have gone beyond its proper role with regard to a particular private lawsuit now pending. Under the policies and procedures we have just endorsed, S&E should have little role in such lawsuits [*114] beyond responding to subpoenas. Regarding the lawsuit in question, S&E may have given some Prime Time drivers, at their request, the name of the attorney litigating against Prime Time. We are not comfortable with that practice, and if it in fact occurred, it should not be repeated. On the other hand, S&E can and should provide information on request regarding any public enforcement matter pending against a Commission regulatee, whether the matter is before the Commission or another forum.

**7. Repairing the Damage**

Consistent with our philosophy of compliance and enforcement, and recognizing that today's decision finally resolves certain key legal questions that the settlement of the 1993 OII left open, we give Prime Time one last opportunity to bring its operations into conformity with state law and LAX rules on traffic safety and congestion. That opportunity takes the form of an extended period of probation, to September 30, 2000. In large part we are charging Prime Time itself with the task of developing the compliance plan to see it through and beyond the probation. The compliance plan

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

will be subject to input and review by S&E and LAX; will contain a schedule and milestones, [*115] periodic reports, and/or other means to determine Prime Time's progress; and will address, at a minimum, the problem areas discussed in Sections 7.1 to 7.6.

**7.1 Compliance with LAX Traffic Safety and Congestion Rules**

Within 90 days of the effective date of today's decision, Prime Time shall submit to this Commission a plan for bringing its operations into compliance with LAX rules governing traffic safety and congestion. At a minimum, the plan shall address Prime Time's relationship with its drivers and vehicle registration. We ask LAX to provide Prime Time with help and guidance in preparing the compliance plan, in any way and to the extent that LAX procedures allow such assistance.

We understand that LAX is considering changes to its van management program, and that these changes could affect Rule III.B.15 among others. LAX may or may not have taken final action on these changes within the 90 days we authorize for submission of the compliance plan. Thus, the compliance plan could take one of three basic forms:

. If LAX adopts changes that allow the use of nonemployee drivers, Prime Time's plan will have to show only such changes as are necessary to conform its operations [*116] to any condition LAX may place on use of nonemployee drivers (assuming the new LAX rule contains conditions).

. If LAX does not materially change its present requirements regarding bona fide employee drivers, Prime Time's plan will have to show how it will reform its operations in the shortest possible time to comply with those requirements.

. If LAX has not taken final action within 90 days, Prime Time's plan nevertheless will have to show compliance with LAX's present requirements regarding bona fide employee drivers, unless LAX grants Prime Time a waiver or exemption pending final action on changes to LAX's van management program.

We urge LAX to act expeditiously. Regardless of how or whether LAX chooses to change its van management program, it is important to get closure on these issues, so that he ride-share industry knows where it is going and no competitor can take unfair advantage, as Prime Time has, of continued regulatory uncertainty.

**7.2 Dispute Resolution Techniques and Relations with Regulators**

Disagreement can be a positive, creative force. As such, it is one of the cornerstones of a democratic society. The war of words between Prime Time [*117] and S&E had entirely negative results because of the abusive way it was fought. We therefore require Prime Time's compliance plan to include a substantial training program in dispute resolution techniques for its senior management.

Improved regulatory relations should be a concern throughout Prime Time's organization. In that regard, one of the most alarming aspects of this proceeding is the threats attributed to "these PUC...bureaucrats" by Mr. Kindt in his June 2, 1995, memorandum broadcast, via e-mail, to all of Prime Time's owner-operators and employees: "You know all these threats that were thrown our way, [such as] 'you're going to be shut out of LAX, we're going to put you out of business, you're all going to lose your investments and careers, go find another job'..." What the June 2 memorandum construes as "threats" is apparently information provided by S&E to Prime Time drivers regarding the Municipal Court probation violation.

As we explained in Section 6.4.2, S&E can and should provide accurate information regarding public enforcement matters pending against a Commission regulatee. Prime Time's drivers are certainly entitled to such information since they hold charter-party [*118] carrier permits from the Commission and thereby have regulatory rights and duties quite apart from their relationship with Prime Time. To the extent that the June 2 memorandum suggests Prime Time's drivers should not ask questions of S&E, the suggestion must be corrected.

More important, the June 2 memorandum imputes hostile motives to S&E and instigates suspicion and fear of S&E in general and of S&E personnel named in the memorandum. We are perplexed that Prime Time, which is on record repeatedly as supporting strict safety standards and vigorous enforcement of those standards, would expect S&E to perform its duties at LAX in such an atmosphere. Frankly, we fear for the physical safety of our employees.

We have examined the copies of Prime Time's driver training materials provided in Attachments I and J to Exhibit PT-3. The voluminous materials include copies of local airport rules, extracts from the PU Code, and GO 158. They

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

also include advice on driving etiquette and dealing with passengers. We are uncertain, however, whether Prime Time instructs its driver candidates about the function of the various regulators and about relations with regulatory personnel. Some Prime Time [*119] drivers seem not to understand that as charter-party carriers, they are directly regulated by this Commission.

In light of the hostilities of the past two years, it is more than ever necessary that Prime Time's drivers understand the role of regulators and enforcement in their activities. Prime Time's driver training program should have a substantial segment devoted to this subject. The compliance plan should generally describe how Prime Time intends to enhance its training program in this regard, and we encourage S&E to provide review and input to Prime Time if so requested.

### 7.3 Use of Employee Drivers

Despite Prime Time's desire to use only nonemployee drivers, Prime Time may have to be ready to hire employee drivers in certain circumstances. For example, LAX (or for that matter, other airports) may require ride-share providers to use bona fide employee drivers, or Prime Time may need additional drivers whose applications for charter-party carrier authority are still in process. In the latter circumstance, Prime Time must either defer using the new drivers during the pendency of their applications, or else must use them as employees, at least temporarily until they receive [*120] their authority.

Accordingly, Prime Time's compliance plan should indicate in what circumstances Prime Time will use employee drivers. If Prime Time contemplates moving drivers from employee to nonemployee status, the plan should describe how such movement will be accomplished in an orderly fashion. We emphasize that under GO 158-A, there is no "grace period" during which Prime Time can use nonemployee drivers who are awaiting charter-party carrier authority.

### 7.4 Monitoring

The record indicates that Prime Time has improved its performance since 1993 in seeing that its drivers have their charter-party carrier authority, carry the requisite insurance, and are registered in DMV's "pull-notice" program, before they take the road for Prime Time. Such problems as have occurred recently concern getting drivers off the road promptly if any of these requirements is allowed to lapse. Prime Time's compliance plan should propose enhanced monitoring and coordination with regulators to ensure that, for example, drivers whose insurance has lapsed do not continue to provide service to Prime Time, at least until the insurance is reinstated. The plan should also address the maintenance [*121] problem discussed in Section 3.4.4.1 above.

### 7.5 Financial Reporting

Prime Time is now in the process of providing explanations to our staff of inconsistencies or discrepancies between its quarterly and annual reports to the Commission. This process may disclose areas where further explanation or reconciliation is appropriate, for example, between Prime Time's tax returns and these reports. We direct Prime Time to promptly and cooperatively complete the "financial filings reconciliation audit" commenced by the Accounting and Auditing Branch of the Commission Advisory and Compliance Division (CACD). To the extent CACD and Prime Time identify areas in these filings that are likely to require reconciliation in the future, Prime Time's compliance plan should propose a procedure whereby such reconciliation can be generated and submitted routinely, so as to minimize the need for future audits.

### 7.6 Revisions to Agreement with Owner-Operators

Prime Time shall review its current contractual arrangement with its owner-operators in light of today's decision. Prime Time's compliance plan shall describe any provisions that should be revised, and shall propose such revisions, [*122] in order to conform to the holdings herein. We discussed one such provision in Section 3.4 above, regarding the degree of "supervision, direction, and control" required under GO 158-A. There may be other such provisions, and Prime Time should consult with S&E in this regard.

### 7.7 Fines

Under the settlement of the 1993 OII, Prime Time agreed to pay a fine of $ 80,000 in five annual installments. The fourth installment ($ 15,000) is due on June 30, 1997. The fifth installment ($ 20,000) is due on June 30, 1998. We also authorized Prime Time to apply to be excused from the fourth and fifth installments if it has complied fully with the terms of the settlement. See D.93-09-065, 51 CPUC2d at 4. We withdraw that authorization. Prime Time has not complied with the 1993 settlement, so it is not entitled to seek relief regarding the fine.

We impose an additional fine of $ 100,000 for Prime Time's misconduct since settlement of the 1993 OII. n31 The fine shall be paid in four equal annual installments, commencing September 30, 1997.

n31 This fine, while substantial, is still far less than the amount authorized under *PU Code §§ 2107-2108.* These sections provide in relevant part that a public utility violating an order or rule of this Commission is subject to a penalty of $ 500 to $ 20,000 for each offense, and that in the case of a "continuing violation" each day's continuance is a separate offense. Prime Time's daily violation of the settlement of the 1993 OII is such a continuing violation.

[*123]

## 7.8 Rulemaking

Several of the interpretations and concerns in today's decision prompt us to consider a new rulemaking to revise GO 158-A and GO 157-C. Four subjects should be addressed, and there may be others. First, the traffic fatality we discussed in Section 3.4.4.2 above suggests that we look at whether we are doing everything reasonable to secure compliance with California's seatbelt law. Second, there probably should be some guidelines for information given to passengers where the PSC is providing service through a charter-party subcarrier. We would like input on whether there should be a shift limit (e.g., 15 hours and a specified minimum amount of time between shifts) in our general orders governing airport ride-share. Finally, the language of portions of GO 158-A and GO 157-C should probably be clarified in light of the interpretations made in today's decision. S&E should consult with interested persons and prepare such proposed changes as are deemed appropriate. Following such consultation, S&E and the Legal Division should prepare an Order Instituting Rulemaking for our consideration at a meeting in January 1997.

## 8. Comments and Reply Comments on   [*124]   Proposed Decision

The ALJ's Proposed Decision (PD) herein was mailed to the parties on July 3, 1996. As provided in Article 19 (Rule 77 et seq.) of the Commission's Rules of Practice and Procedure, S&E and Prime Time filed timely comments and reply comments on the PD. We have reviewed these filings and find that they raise no "factual, legal, or technical errors in the [PD]." Rule 77.3. Moreover, we have fully considered all of the determinations in the PD. We have decided to change the PD by requiring that Prime Time pay at least half the additional fine we impose in Section 7.7. We adopt the PD as our own decision in all substantive respects, modifying the PD only to correct typographical errors, inconsistent citation forms, and the like. Our specific response to the comments and reply comments follows.

### 8.1 Response to Prime Time

Prime Time does not challenge the PD's holding on the central point, viz., that Prime Time's use of licensed charter-party subcarriers is consistent with statute and prior Commission precedent. Further, "under the unique circumstances" of the case, Prime Time does not challenge the probation in the PD. However, Prime Time requests clarification [*125] of the probation and modifications to the discussion and proposed sanctions.

### 8.1.1 Requested Clarification

"Prime Time commits that its operations will be consistent with the letter and spirit of the [PD]." Prime Time comments at 5. However, according to Prime Time "absolute compliance" may be impossible:

> "For example, before utilizing any subcarrier, Prime Time determines that the subcarrier (a) holds charter party authority from the Commission, (b) participates in the DMV's Pull Notice Program, (c) holds insurance required by the Commission, (d) owns and operates a van which is safe in all particulars, and (e) otherwise is fit, willing and able to provide services as a subcarrier. If the Commission subsequently suspends or revokes a subcarrier's license, it is possible that the subcarrier may be used after its license from this Commission has been suspended. There is currently no notice by the Commission to Prime Time or other overlying carriers when subscarriers encounter regulatory difficulties. Other instances of technical non-compliance over which Prime Time has little or no control may arise." *Id. at 5,* emphasis in original.

Accordingly, Prime Time [*126] proposes that the probation include provision for notice and opportunity to correct before suspended penalties take effect. We have reviewed Prime Time's proposed new conclusion of law and ordering paragraph. We find them similar in concept to what is already set forth in the PD at Conclusion of Law 30 and Ordering Paragraph 4. We have clarified those provisions to better reflect this concept. We stress, however, that the opportunity to correct is intended to cover situations of inadvertent noncompliance, such as the example in the above quote. Where we find willful noncompliance, such as Prime Time has shown with respect to its Municipal Court probation, there will be no further opportunities to correct.

### 8.1.2 Requested Modifications

Prime Time requests three modifications, all of which we reject.

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

First, Prime Time recommends that we eliminate most of the discussion addressing the history of acrimony between the parties and allocating responsibility. Prime Time believe the discussion is unfair and unnecessary. In particular, "blaming S&E undermines S&E's role in administering and interpreting Commission regulations [while] blaming Prime Time ignores the extreme [*127] frustration experienced by a single regulated entity which advanced a position consistent with prior Commission precedent...." Prime Time comments at 2. We too dislike "blaming." On the other hand, we must adjudicate the case before us, and both parties here made sweeping allegations of unfitness and unprofessional conduct against each other. Moreover, everyone (including the Commission) must understand what happened and take appropriate responsibility if we are to have some hope of not repeating past mistakes. The discussion of responsibility should stand as set forth in the PD.

Second, Prime Time asks that we allow it to petition to be excused from payment of the last two installments of the fine assessed under the 1993 settlement. Prime Time argues that it is now operating at a loss, that it incurred huge costs in defending this proceeding, and that substantial public benefit is derived from the clarifications of law resulting from this proceeding. We are not persuaded. Prime Time's expenditures result principally from its withdrawal in 1994 of its application to resolve the very issues we address today. Furthermore, as the U.S. Supreme Court noted in the Halper decision discussed [*128] at length in Section 4.4 above, fines are intended in part to recover enforcement costs. The fines (totalling $ 35,000) still owing under the 1993 settlement, as well as the additional fine imposed today, are reasonable in light of our compliance efforts and the vast expenditure of Commission resources that has gone into sorting out Prime Time's LAX operations.

Third, Prime Time urges us to direct S&E to process without delay pending and future charter-party carrier applications. We understand that there are currently pending several applications from drivers who intend to become charter-party subcarriers for Prime Time. S&E is looking into these applications, at least in part owing to uncertainties relating to this proceeding. However, we do not know whether such uncertainties account for all such delay. S&E should process these applications consistent with the holdings in today's decision, but we decline to set a deadline as Prime Time requests.

## 8.2 Response to S&E

S&E's comments, for the most part, "merely reargue positions taken in briefs" and therefore "will be accorded no weight...." See Rule 77.3. However, we address bellow certain of S&E's assertions.

At pages  [*129] 4-5 of its comments, S&E cites various statutes and GO provisions that the PD allegedly ignores. S&E is mistaken. In some instances, such as VC § 21702(a), the PD expressly addresses the statute. See Section 3.4.3 above and Conclusion of Law 13. In other instances, the statutes become relevant only if we accept S&E's interpretations of GO 158-A and *PU Code § 5401*. For example, S&E continues to assert that the Commission somehow has limited the use of subcarriers to "unexpected overflow situations." S&E comments at 10, n. 24. Further, S&E asserts that *PU Code § 5401* absolutely forbids "a division of individual fare revenues" between a PSC and charter-party subcarriers. *Id. at 11*. We reject these assertions for reasons stated in Sections 3 to 3.2 above. Since we have concluded that Prime Time is properly hiring and compensating charter-party subcarriers, we need not discuss every statute or rule Prime Time would have violated had we concluded otherwise.

Lest there be any doubt, we find that Prime Time's principal malfeasance is its violations of LAX Rule III.B.15. This malfeasance also underlies most of Prime Time's violations of state law, notably, this Commission's orders and [*130] rules requiring compliance with regulations of the local airport authority. Prime Time's other violations of state law, such as the provision in its current arrangement with its drivers that we criticize in Section 3.4 above, do not appear to have harmed the public, so we allow Prime Time a reasonable opportunity to correct them. Were it not for Mr. Kindt's egregious conduct, the sanctions imposed on Prime Time in today's decision would have been much lighter.

S&E also complains that the PD reaches results that are inconsistent with various pending or previously approved settlements, including the 1993 settlement with Prime Time. However, under Rule 51.8 of our Rules of Practice and Procedure, "adoption of a stipulation or settlement [unless the Commission expressly provides otherwise,] does not constitute approval of, or precedent regarding, any principle or issue in the proceeding or in any future proceeding." We refuse to hold that a prior settlement should prevail over a fully litigated determination on the merits. Our refusal is particularly appropriate here, where the 1993 settlement between S&E and Prime Time, as we discussed in Section 6.1 above, actually failed to resolve [*131] some of the key issues in dispute.

S&E also argues that the California Department of Corporations (DOC) has determined that Prime Time's arrangement with its independent contractor drivers constitutes a franchise, and for this reason (among others) the arrangement cannot constitute proper subcarriage under Commission rules. We disagree.

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

S&E witness Judy L. Hartley, a DOC attorney, explained that Prime Time's current arrangement seemed to DOC to violate the Franchise Investment Law, and specifically *Corporations Code § 31110*, which prohibits the offer or sale of any unregistered, non-exempt franchise. DOC entered into discussions with Prime Time, and as a result of these discussions Prime Time agreed to modify the arrangement so that, in lieu of assessing drivers a flat weekly fee, Prime Time will use "a commission methodology" of driver compensation, creating a 40/60 percentage split between Prime Time and each independent contractor of the revenues generated by the latter. According to Ms. Hartley, the new independent contractor agreement is still a franchise agreement but it is exempt from the statutory registration requirements pursuant to the "nominal franchise fee exemptions" [*132] in DOC regulations. Prime Time also agreed to (1) a "Desist and Refrain Order" and (2) payment to DOC of its costs of investigation (about $ 1,700). DOC imposed no other sanction on Prime Time. See Exhibit S&E-27 at 2-3.

Regarding the DOC action, we find nothing in today's decision that runs contrary to that action. In particular, we have concluded that a division of revenues between a PSC and its charter-party subcarriers may be proper. DOC reaches the same result, although requiring Prime Time to modify the basis on which the revenues are divided. Further, we hope that in the future, where a concern arises regarding a PSC's arrangement with its drivers, the concern can be worked out through cooperative discussions between S&E and the PSC, much like the process DOC followed with Prime Time.

Turning to the specifics of the "franchise" issue, we note that DOC is interpreting the Corporations Code, not the PU Code. A "franchise" for purposes of securities law is not the same thing as a "franchise" for purposes of public utilities regulation. So far as Ms. Hartley's testimony discloses, it seems possible that what we consider a subcarriage agreement, DOC might consider a franchise. [*133] In any event, we have concluded that Prime Time's arrangements with its drivers contain all elements necessary and proper to a subcarriage agreement under our GOs. Prime Time's change, at DOC's direction, from a flat weekly fee to a percentage of the gross revenues does not affect our conclusion.

It is obvious from the tone and tenor of S&E's comments and reply comments that S&E continues to adhere strongly to all of the arguments it has made throughout this proceeding. S&E has both the right and the duty to advocate the law and the public interest to the best of its ability. But the Commission has now spoken and has rejected S&E's views in some important respects. We now expect S&E to devote itself single-mindedly and without equivocation to implementing today's decision and the various policies and interpretations we announce herein.

**Findings of Fact**

1. Prime Time wants to use nonemployee drivers as much as possible.

2. Under Prime Time's current contractual arrangement, the driver holds a charter-party permit, participates in the "pull-notice" program of the Department of Motor Vehicles, carries insurance (with an appropriate certificate on file with the Commission), [*134] and owns or leases a van, albeit painted with Prime Time colors.

3. We lack an appropriate record to determine what division of revenues between a PSC and its charter-party subcarriers is or is not in the public interest. Rather than our attempting such a determination,. the public interest would be better served by our allowing experimentation in this still-developing industry.

4. Prime Time has not become a broker by virtue of the features of its current operations.

5. Airport ride-share consists of aggregating travellers who share both a close proximity (in terms of time and place of departure) and a common destination (an airport).

6. Prime Time has a substantial infrastructure devoted to providing area-wide airport ride-sharing within the Los Angeles basin.

7. The record suggests that Prime Time has substantially improved its safety and efficiency since shifting to its current reliance on charter-party subcarriers. Reliance on subcarriers may not have caused the apparent improvement, but S&E has not demonstrated that such reliance is responsible for or exacerbates whatever service problems have occurred.

8. Driving a van in the airport ride-share business is a tough job [*135] by any standard. To do such a job well requires training, skill, and dedication.

9. A substantial portion of Prime Time's drivers are struggling financially. Nevertheless, the financial struggles of some of Prime Time's drivers do not alter the nature. of our jurisdiction regarding service and safety.

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

10. The record as a whole shows that Prime Time takes its safety responsibilities seriously, that it has significantly fewer accidents than the industry average, and that it has put in place reasonable precautions to ensure drivers do not work excessively long shifts.

11. In a case, such as this proceeding, in which S&E seeks a severe sanction against a carrier, we would prefer to have a record reflecting both individual incidents and statistical measures of bad performance. Nevertheless, individual incidents may be so troubling in themselves as to prompt strict remedial action.

12. In dealing with deferred maintenance, Prime Time's garage mechanic should set some prudent deadline for performing the work.

13. Any person disregarding the seatbelt law is a danger both to himself or herself and to other persons in the vehicle.

14. The fact that the charter-party subcarriers paint [*136] their vans with Prime Time's colors helps convey a correct understanding. The public would be far more likely to be confused if Prime Time reservations were fulfilled by vans bearing no obvious indication that they were hired by Prime Time.

15. Correct information to the public in this case must convey that in Prime Time's operation, there is both an independent owner-operator and an overlying carrier, both of whom hold operating authority from this Commission. Prime Time's subcarriers drive vans that (1) list both Prime Time's PSC number and the subcarriers' respective charter-party (TCP) numbers, and (2) announce that the driver is an independent owner-operator. This information seems generally satisfactory.

16. Prime Time has produced substantial evidence that its efficiency in transporting passengers has improved with the use of nonemployee drivers, in effect reducing congestion.

17. LAX is considering changes to its van management program, but we cannot be sure when or how LAX will choose to modify Rule III.B.15. In the meantime, all the ride-share providers at LAX should compete under the same rules.

18. We prefer wherever possible to rehabilitate an offender, so long as [*137] the offender is willing to undertake such rehabilitation and the safety and welfare of the public would not be jeopardized. At some point, however, a carrier is so recalcitrant that compliance can be secured only by shutting down that carrier's operations.

19. Except possibly for a small number of vans that Prime Time itself has leased to its drivers, Prime Time no longer owns any vans engaged in passenger transport. Nevertheless, Prime Time's name continues to show up on a large number of van registration forms filed with LAX and DMV.

20. The record does not disclose exactly what Prime Time is doing with respect to the DMV and LAX registration forms. Moreover, those agencies are best situated to interpret their own registrations, determine compliance questions, and impose sanctions for violations.

21. We have discovered no evidence of the gross improprieties with which S&E has been charged by Prime Time. We find deep but sincerely held differences of opinion between the parties on matters of law and policy. Beyond that, S&E clearly has a profound distrust of Prime Time's motivations and a profound skepticism over the extent to which Prime Time is to be trusted. Prime Time has [*138] given S&E cause for both distrust and skepticism.

22. Mr. Kindt's opinion of S&E's methods cannot justify his own use of half-truths and innuendo.

23. The record shows that Prime Time has repeatedly settled or withdrawn from proceedings rather than have the issues adjudicated on the merits.

24. Restoration of the proper relationship between S&E and this regulatee is the single most challenging aspect of Prime Time's rehabilitation.

25 One of the hallmarks of Anglo-American jurisprudence is that different persons play the roles of judge and prosecutor in a given matter. This separation of roles acts to ensure impartiality and to prevent prosecutorial abuses.

26. S&E Director Schulte's declaration describes a set of polices and procedures for staff investigatory activity that we find appropriate for S&E and other Commission staff. Management should ensure adherence to these policies and procedures, and supervisors should immediately address any question of interpretation or applicability to particular circumstances.

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

27. We are charging Prime Time itself with the task of developing the compliance plan to see it through and beyond the probation. The compliance plan will be subject [*139] to input and review by S&E and LAX; will contain a schedule and milestones, periodic reports, and/or other means to determine Prime Time's progress and performance; and will address, at a minimum, the problem areas discussed in Sections 7.1 to 7.6 of the foregoing opinion.

**Conclusions of Law**

1. A PSC, consistent with state statutes and Commission regulations, can serve its customers through the use of nonemployee drivers operating their own vans.

2. D.81684 expressly approved "substantial" reliance on nonemployee drivers by on-call limousine services in transporting passengers to and from airports.

3. Implicit restrictions and overrulings are a disfavored type of construction, particularly where we are asked, on the strength of such construction, to revoke a CPCN.

4. *PU Code § 5401* on its face applies to all transportation "offered or afforded" by a charter-party carrier; the statute contains no exception for subcarriage or for charter-party service provided to a PSC.

5. The fact that the charter-party subcarrier collects individual fares pursuant to Prime Time's tariffs in itself does not violate *PU Code § 5401*.

6. In charter-party subcarriage, the driver and van are [*140] "hired" by and provide service to the PSC (here, Prime Time), not the passenger. The passenger's agreement is with Prime Time, which is responsible for providing the service to the passenger.

7. Prime Time's current agreement constitutes a proper hiring, under *PU Code § 5401*, of the charter-party subcarrier by the PSC.

8. A division of revenues between a PSC and an underlying charter-party subcarrier does not offend *PU Code § 5401* merely because the division depends to some extent on the number of passengers transported, so long as that number is not the exclusive factor involved in calculating the subcarrier's compensation.

9. Prime Time is involved in the control, operation, and management of "passenger stage" service, as defined in the statute.

10. There is no basis in the state law or policy for declaring that a PSC must own any vehicles or employ any drivers.

11. The PSC must conduct lawful operations. The PSC retains such responsibility whether it uses its own vans and drivers or contracts for both with charter-party subcarriers.

12. Our function here is not to second-guess Prime Time's business strategies, so long as they are legal.

13. Any carrier that does not have [*141] exact knowledge of elapsed driving time during a shift should at least maintain strict control over the length of the shift itself to indirectly ensure driver compliance with the driving hour limits.

14. LAX Rule III.B.15 does not permit use of nonemployee drivers to provide ride-share service at that airport.

15. As to the restriction on use of nonemployees, Rule III.B.15 is a "safety or traffic" regulation within the meaning of GO 158-A.

16. Prime Time's persistent operation in violation of Rule III.B.15 violates both GO 158-A and the settlement of the 1993 OII.

17. Although Prime Time's division of revenues may violate the driver compensation provision of Rule III.B.15, the latter violation does not offend GO 158-A. In so holding, we give effect to the policy of GO 158-A that the airport authorities are wholly responsible for enforcement of their rules, except as to traffic safety and congestion, where the airports and this Commission exercise joint enforcement authority.

18. With regard to Prime Time, the Los Angeles City Attorney has gone to court, obtained a probation order, and had the order extended with a fine levied against Prime Time, without achieving any impact on [*142] Prime Time's use of nonemployee drivers. We are satisfied that our current involvement in this enforcement matter is timely and appropriate.

34. We should impose an additional fine of $ 100,000 for Prime Time's misconduct since settlement of the 1993 OII. The fine shall be paid in four equal annual installments, commencing September 30, 1997.

35. Several of the interpretations and concerns in today's decision prompt us to consider a new rulemaking to revise GO 158-A and GO 157-C. S&E, in coordination with our Legal Division, should consult with interested persons and prepare such proposed changes as are deemed appropriate.

36. This order should be effective immediately so as to resolve long-standing uncertainties regarding interpretation of GO 158-A and *PU Code § 5401.*

**ORDER**

**IT IS ORDERED** that:

1. Prime Time Shuttle International, Inc. (Prime Time) shall pay all remaining installments of the fine included in the settlement of Investigation 93-05-004, pursuant to Decision 93-09-065.

2. Prime Time's certificate of public convenience and necessity (CPCN) is revoked, but such revocation is suspended and may be cancelled if Prime Time successfully completes the period of probation, as described in Ordering Paragraphs 3, 4, 5, 6, and 7.

3. Prime Time is assessed a further fine [*147] of $ 100,000, payable in four equal annual installments beginning September 30, 1997.

4. Prime Time shall be on probation until September 30, 2000, except that the Safety and Enforcement Division (S&E) may bring a motion at any time to end the probation and allow the revocation of Prime Time's CPCN to take effect. Such motion shall be supported by appropriate sworn declarations demonstrating material noncompliance by Prime Time with the terms of its probation. Prime Time shall have notice and the opportunity to be heard in response. In the event the Commission grants such motion, Prime Time shall cease operations, and any remaining unpaid balance of the fine assessed in Ordering Paragraph 3 shall become immediately due and payable.

5. Prime Time shall develop, file, and serve a preliminary compliance plan within 90 days of the effective date of this order. The preliminary compliance plan shall describe how Prime Time intends to bring its operations into compliance with the rules of the Los Angeles International Airport (LAX) governing traffic safety and congestion. In preparing the preliminary compliance plan, Prime Time shall seek input from LAX, which we ask to provide help and [*148] guidance to Prime Time to the extent that LAX procedures allow such assistance. Absent protest by LAX or S&E, the preliminary compliance plan will become part of the final compliance plan for the duration of the probationary period. Authority is delegated to the assigned Commissioner to rule on any protests to the preliminary compliance plan and to direct such modifications as the assigned Commissioner deems appropriate.

6. Within 90 days of the effective date of this order, Prime Time shall:

a. Develop a substantial training program in dispute resolution techniques. All senior management at Prime Time (including all officers and persons exercising substantial supervisory functions) shall be required to succesfully complete the program no later than 180 days after the effective date of this order. Prime Time may make the program available to any additional persons within the organization, as Prime Time deems appropriate; however, the program shall be maintained throughout the probationary period, and any person becoming an officer or assuming a position involving substantial supervisory functions shall successfully complete the program within 90 days of becoming an officer or [*149] assuming the position. Prime Time shall promptly send a certificate of completion, as to each person required to successfully complete the program, to the Director of S&E or the Director's designee.

b. Develop a plan delineating the circumstances in which Prime Time would use employee drivers. If Prime Time contemplates moving drivers from employee to nonemployee status, the plan shall describe how such movement will be accomplished in an orderly fashion.

c. Institute a program, as described in Conclusion of Law 30, for monitoring and for coordination with regulators to ensure that (1) drivers who, for example, have had moving violations or who have allowed their insurance to lapse, do not continue to provide service to Prime Time, at least until the problem is

1996 Cal. PUC LEXIS 854, *; 67 CPUC2d 437

corrected; and (2) any deferred van maintenance or repair is performed within a reasonable time after the problem is observed.

d. Complete the "financial filings reconciliation audit" and develop reconciliation procedures, as described in Conclusion of Law 31.

e. Identify and draft needed modifications to its current contractual arrangement with its owner-operators, as described in Conclusion of Law 32.

f. Devote [*150] a substantial segment of its driver training program to understanding the functions of the various regulatory agencies and to working cooperatively with regulatory personnel.

The elements described in a. to f. above shall constitute Prime Time's draft final compliance plan. The draft should also specify a schedule and milestones, periodic progress reports, and/or other means to determine Prime Time's progress and performance. Prime Time may consult with S&E at any point in preparing the draft and shall file and serve the complete draft no later than 90 days after the effective date of this order. The draft shall be subject to protest by S&E as in the case of the preliminary compliance plan, and authority is delegated to the assigned Commissioner to rule on any such protest.

7. Prime Time's final compliance plan shall contain its approved preliminary compliance plan, and the various elements described in Ordering Paragraph 6, with such modifications as the assigned Commissioner may direct. Prime Time shall file and serve its final compliance plan within 150 days of the effective date of this order.

8. The assigned Commissioner is authorized, on motion and for good cause shown, [*151] to modify the due dates and schedule set forth in Ordering Paragraphs 3 to 7.

9. S&E shall consult with interested persons regarding the need for changes to General Orders 157-C and 158-A, including without limitation the four specific subjects described in Conclusion of Law 35. Following such consultation, S&E and the Legal Division shall prepare an Order Instituting Rulemaking for our consideration at a meeting in January 1997.

This order is effective today.

Dated August 2, 1996, at San Francisco, California.

I will file a partial dissent.

/s/ P. GREGORY CONLON, President

**DISSENTBY:** CONLON

P. Gregory Conlon, Commission President, Partially Dissenting

I dissent in part because I believe that the fine should have been set at $ 50,000. I believe that the Administrative Law Judge's recommendation was a reasonable compromise for both parties.

P. Gregory Conlon, Commission President

San Francisco, California
August 2, 1996

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Energy & Utilities LawAdministrative ProceedingsPublic Utility CommissionsGeneral OverviewEnergy & Utilities LawUtility CompaniesGeneral OverviewTransportation LawAir TransportationTariffs

Exhibit A-000043

**EXHIBIT B**

**GENERAL ORDER 158-A**
(Supersedes General Order 158)

# PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

### RULES AND REGULATIONS GOVERNING THE OPERATIONS OF PASSENGER STAGE CORPORATIONS AND THE CONSTRUCTION AND FILING OF TARIFFS AND TIMETABLES

Adopted December 20, 1995. Effective January 1, 1996.
Resolution TL-18716
Amended September 4, 1996. Effective September 4, 1996.
Resolution TL-18760

## PASSENGER STAGE CORPORATIONS

### TABLE OF CONTENTS

**PART 1—GENERAL PROVISIONS**

1.01—Short Title
1.02—References to Statutes and Rules and Regulations
1.03—Construction of Singular and Plural
1.04—"Shall" and "May"
1.05—Liability Insurance Requirements
1.06—Applicability of Vehicle Code
1.07—Commission May Order Deviations
1.08—Availability of General Order Series 158, Vehicle Code, and Title 13
1.09—Effective Date and Application of Tariffs and Timetables

**PART 2—DEFINITIONS**

2.01—"Commission"
2.02—"Passenger Stage Corporation", "PSC", "Carrier"
2.03—"Vehicle"
2.04—"Tariff", "Timetables"
2.05—"Scheduled Service"
2.06—"Driver-applicant"

**PART 3—GENERAL REQUIREMENTS AND RESTRICTIONS**

3.01—Operations at Airports
3.02—Taxi Transportation Service Not Authorized
3.03—Sub-carriers
3.04—Fictitious Names
3.05—Advertisements Shall Include PSC Number

**PART 4—VEHICLES**

4.01—Equipment Statement to be Current
4.02—Safety Requirement Before Operation
4.03—Name of Carrier and Vehicle Number to be Displayed on Vehicle

Exhibit B-000044

— 2 —

4.04—PSC Number to be Displayed on Vehicle
4.05—Damage to Identification Symbols
4.06—Illegal Display of P.U.C. Identification
4.07—Unauthorized Use of Operating Authority
4.08—Sale or Transfer of Vehicle

**PART 5—DRIVERS**

5.01—Driver to be Licensed
5.02—Driver Record
5.03—Driver Status
5.04—Alcoholic Beverages and Drugs—Use by Driver For-
bidden

**PART 6—RECORDS AND INSPECTIONS**

6.01—Records
6.02—Inspections

**PART 7—COMPLAINTS**

7.01—Carrier Required to Answer Complaints

**PART 8—TARIFF AND TIMETABLES**

8.01—Applicability
8.02—Purpose
8.03—Filing Requirements
8.04—Posting
8.05—Content
8.06—Form
8.07—Size
8.08—Uniform Symbols
8.09—Loose-Leaf Tariffs
8.10—Amendments to Book Tariffs
8.11—Adoption of Tariffs
8.12—Change of Name

**PART 9—EXEMPTIONS**

9.01—By Written Request

**PART 10—CONTROLLED SUBSTANCE AND ALCOHOL TESTING
CERTIFICATION PROGRAM**

10.01—Who Must Comply
10.02—Controlled Substance and Alcohol Testing Program
Required
10.03—Requirements for Pre-employment Testing
10.04—Testing Costs
10.05—Confidentiality of Tests
10.06—Driver-applicant Test Results to be Reported to the
Commission

G O 158-A

— 3 —

## PART 1—GENERAL PROVISIONS

**1.01—SHORT TITLE.** These rules and regulations shall be known as "General Order Series 158".

**1.02—REFERENCES TO STATUTES AND RULES AND REGULATIONS.** For convenience, reference to some of the principal pertinent provisions of the Public Utilities Code are Sections 1031–1040 "Passenger Stage Corporations" and Sections 486–496 "Tariff Schedules". Whenever reference is made to any portion of any law, such reference shall apply to all amendments and additions heretofore or hereafter made; and whenever reference is made to any portion of these rules and regulations, such reference shall apply to all amendments and additions hereafter made.

**1.03—CONSTRUCTION OF SINGULAR AND PLURAL.** The singular number includes the plural, and the plural the singular.

**1.04—"SHALL" and "MAY".** "Shall" is mandatory and "may" is permissive.

**1.05—LIABILITY INSURANCE REQUIREMENTS.** Every passenger stage corporation shall comply with all provisions of General Order 101 Series.

**1.06—APPLICABILITY OF VEHICLE CODE.** Every passenger stage corporation and their drivers shall comply with the provisions of the California Vehicle Code.

**1.07—COMMISSION MAY ORDER DEVIATIONS.** The Commission may authorize deviations from these rules and regulations or prescribe or require the observance of additional or different rules by special order.

**1.08—AVAILABILITY OF GENERAL ORDER SERIES 158, VEHICLE CODE AND TITLE 13.** Every passenger stage corporation shall have a current copy of General Order Series 158 and a current copy of the California Vehicle Code and the Motor Carrier Safety Sections (Subchapter 4, Articles 12 and 14, and Subchapter 6.5, Articles 1, 3, 6, and 8) of Title 13 of the California Code of Regulations in a place available to all drivers.

## PART 2—DEFINITIONS

**2.01—"COMMISSION".** "Commission" means the Public Utilities Commission of the State of California.

**2.02—"PASSENGER STAGE CORPORATION", "PSC", "CARRIER".** The definition of "passenger stage corporation" shall be that set forth in Section 226 of the Public Utilities Code. The initials "PSC" mean passenger stage corporation. Within this General Order the word "carrier" means passenger stage corporation carrier unless specific reference includes charter-party carriers.

G O 158-A

Exhibit B-000046

— 4 —

2.03—"VEHICLE".  Within this General Order the word "vehicle" means a motor vehicle operated in passenger stage service.

2.04—"TARIFF", TIMETABLE".  The definition of "tariff" and "timetable" means an original publication, a supplement, amendment, or revised page thereto, or a reissue thereof.

2.05—"SCHEDULED SERVICE".  Within this General Order the term "scheduled service" means service to be provided to specific places at specific times.

2.06—"DRIVER-APPLICANT".  A driver-applicant is any applicant for passenger stage operating authority who will also be a driver of any vehicle authorized to be operated under the authority.

**PART 3—GENERAL REQUIREMENTS AND RESTRICTIONS**

3.01—OPERATIONS AT AIRPORTS.  No carrier shall conduct any operations on the property of or into any airport unless such operations are authorized by both this Commission and the airport authority involved. Consistent failure to comply with safety or traffic rules and regulations of an airport authority may result in suspension or revocation of Commission operating authority.

3.02—TAXI TRANSPORTATION SERVICE NOT AUTHORIZED.  A carrier is not authorized to engage in taxicab transportation service licensed and regulated by a city or county. Carriers are prohibited from using vehicles which have top lights and/or taxi meters.

3.03—SUB-CARRIERS.  A carrier shall not use the services of another carrier (sub-carrier) that provides the vehicle and the driver, unless the second carrier holds Commission authority as a charter-party carrier. The agreement for the utilization of the second carrier's vehicle(s) and driver(s) by the operating carrier shall be evidenced by a written document, and shall contain the carrier's names, TCP numbers, and the services to be provided.

3.04—FICTITIOUS NAMES.  A carrier shall not use any trade, business, or fictitious names, which are not on file with the Commission.

3.05—ADVERTISEMENTS SHALL INCLUDE PSC NUMBER.  Carriers shall state the number of their certificate in every written or oral advertisement, broadcast, or other holding out to the public for services. The number shall be preceded by the letters "PSC".

**PART 4—VEHICLES**

4.01—EQUIPMENT STATEMENT TO BE CURRENT.  Every carrier shall maintain, on file with the Commission, an equipment list of all vehicles (owned or leased) in use under each

G O 156-A

Exhibit B-000047

— 5 —

certificate. The information for each vehicle shall include the manufacturer, model year, vehicle identification number (V.I.N.), seating capacity (including driver), description of body type or model designation, whether the vehicle is leased or owned, handicap accessible status, and its license plate number. Additions and deletions to the equipment list shall be filed within ten days of the date the vehicle is put into or pulled out of service.

4.02—SAFETY REQUIREMENT BEFORE OPERATION.   All vehicles operated under each certificate shall comply with the requirements of the California Highway Patrol and the Motor Carrier Safety Sections of Title 13 of the California Code of Regulations. Every carrier must inspect all vehicles and maintain proper documentation of such inspections.

4.03—NAME OF CARRIER AND VEHICLE NUMBER TO BE DISPLAYED ON VEHICLE.   A vehicle shall not be operated in service unless there is painted or displayed, on each side of the vehicle, the name or trade name of the carrier. Every carrier shall assign an identifying number to each vehicle. Such number shall be painted on or otherwise permanently attached to the rear and each side of the exterior of each vehicle. The carrier's name and vehicle numbers shall be sufficiently large and color contrasted as to be readable, during daylight hours, at a distance of 50 feet. However, the provisions of this section shall not apply to vehicles temporarily leased by carriers for a period of less than 30 days.

4.04—PSC NUMBER TO BE DISPLAYED ON VEHICLE.   The number assigned by the Commission to the carrier's authority shall be shown in full on all vehicles, including the prefix "PSC", and the authority number. The letter and numeral symbol size and placement shall be as follows:

The identification symbol shall be in sharp color contrast to the background and such size and shape and so located as to be readily legible during daylight hours at a distance of 50 feet. The symbols shall be displayed on each side of the vehicle.

The identifying symbol displayed by a carrier subject to the jurisdiction of the Interstate Commerce Commission (ICC) shall serve in lieu of the above requirements, provided such ICC operating authority is registered with this Commission in accordance with the Interstate and Foreign Highway Carrier's Registration Act (commencing with PU Code Section 3901).

4.05—DAMAGE TO IDENTIFICATION SYMBOLS.   It shall be the carrier's responsibility to make immediate restoration or replacement of any damage caused to the identification names and numbers on vehicles.

G O 158-A

Exhibit B-000048

— 6 —

4.06—ILLEGAL DISPLAY OF P.U.C. IDENTIFICATION.   Immediately upon revocation or termination of any certificate the PSC number for the certificate shall be removed from all vehicles. If new operating authority is later granted, it shall be the responsibility of the carrier to make the appropriate identification.

4.07—UNAUTHORIZED USE OF OPERATING AUTHORITY. A carrier shall not knowingly permit its operating authority or its PSC number(s) to be used by others.

4.08—SALE OR TRANSFER OF VEHICLE.   It shall be the carrier's responsibility to remove all certificate numbers and identification symbols when a vehicle is sold or transferred.

### PART 5—DRIVERS

5.01—DRIVER TO BE LICENSED.   Every driver of a vehicle shall be licensed as required under the California Vehicle Code and shall comply with the driver provisions of the Motor Carrier Safety Sections of Title 13 of the California Code of Regulations.

5.02—DRIVER RECORD.   Every carrier shall enroll in the "Pull Notice Program" of the Department of Motor Vehicles as defined in Vehicle Code Section 1808.1. A vehicle shall not be operated by any driver who is presumed to be a negligent operator under Vehicle Code Section 12810.5.

5.03—DRIVER STATUS.   Every driver of a vehicle shall be the certificate holder or under the complete supervision, direction and control of the operating carrier and shall be:

A. An employee of the certificate holder; or,
B. An employee of a sub-carrier; or,
C. An independent owner-driver who holds charter-party carrier authority and is operating as a sub-carrier.

5.04—ALCOHOLIC BEVERAGES AND DRUGS: USE BY DRIVER FORBIDDEN.   All drivers shall comply with the rules in the Code of Federal Regulations Title 49, Parts 392.4 and 392.5. This rule, in part, prohibits drivers from consuming or being under the influence of a drug or alcoholic beverage while on duty, and prohibits carriers from allowing drivers to consume or be under the influence of a drug or alcoholic beverage while on duty.

### PART 6—RECORDS AND INSPECTIONS

6.01—RECORDS.   Every carrier shall institute and maintain in its offices, a set of records on the services it performs. These records shall include tariffs, timetables, and the number of passengers transported. Every carrier shall also maintain copies of all lease and sub-carrier agreements, and shall maintain maintenance and safety records (including, but not limited to, the records required in Sections 4.01 and 4.02), driver records (including, but not limited to, the records required in Section

G O 158-A

Exhibit B-000049

— 7 —

5.02), and consumer complaint records (including, but not limited to, the records required in Section 7.01). All records shall be maintained for a minimum period of three years.

6.02—INSPECTIONS.   Commission staff shall have the right to enter any vehicle or facility to inspect a carrier's accounts, books, papers, and documents, or to ascertain if Commission rules and State laws are being complied with and observed. Every owner, operator, or driver of any vehicle shall afford the Commission staff all reasonable opportunity and facilities to make such an inspection.

## PART 7—COMPLAINTS

7.01—CARRIER REQUIRED TO ANSWER COMPLAINTS.   Every carrier shall respond within 15 days to any written complaint concerning transportation service provided or arranged by the carrier. A carrier shall, within 15 days, respond to Commission staff inquiries regarding complaints and provide copies of any requested correspondence and records.

## PART 8—TARIFFS AND TIMETABLES

8.01—APPLICABILITY.   All carriers shall file tariffs and all scheduled carriers shall file timetables in compliance with the Public Utilities Code, Commission directives, and the following rules. Commission staff may reject a tariff or timetable for noncompliance with the rules any time before it becomes effective. A tariff or timetable currently in effect may be rejected or canceled for noncompliance on 30 days' notice.

8.02—PURPOSE.   Tariffs and timetables are for the information and use of the general public. They shall be published in a manner that ensures they are readable and that their terms and conditions are easy to understand and apply.

8.03—FILING REQUIREMENTS.   Three copies of each tariff and timetable shall be delivered to the Commission with a signed transmittal letter clearly explaining the purpose of the filing, the notice provisions followed, and the statutory authority for the filing. Where the filing affects an airport, an additional copy with attached mailing label, for each affected airport authority, shall be provided. Separate filings can be made for distinct services and/or service territories. A carrier may receive a receipt by filing an additional copy of the transmittal letter and a self-addressed stamped envelope. A copy of the transmittal letter will be dated by the Commission and returned to acknowledge receipt of a filing. The Commission may direct the reissue of any tariff and/or timetable.

8.04—POSTING.   All carriers shall follow the posting rules set forth in General Order 122 Series. In addition, all carriers serving an airport shall conspicuously display tariff and timetable informa-

G O 158-A

Exhibit B-000050

tion in each vehicle used in airport service, in each location where airport tickets are sold, and shall have copies available for public distribution. The required airport service information shall include, but not be limited to:

a) All airport service fares, or if the carrier has more than 10 fares, at least 10 fares representative of the service performed.

b) All other charges (e.g. baggage, waiting).

c) Complete complaint procedures including reference to the Commission's regulatory role and passenger complaint line.

For purposes of this section, vehicles serving airports as part of through intercity service shall not be deemed carriers serving an airport and shall be exempt from the posting requirements contained herein.

8.05—CONTENT. Each tariff shall contain the complete terms and conditions under which the carrier will provide service, including:

A. A title or cover page containing the legal name and Commission-issued PSC number(s) of the carrier, all trade names, a business address and telephone number, the territory or points to and from which the tariff applies (briefly stated), the date effective on the bottom right side of the page, and the authority under which the tariff is filed (e.g., decision number, order number).

B. All fares, additional charges, and discount provisions.

C. An attached timetable including specific route points and times for all scheduled services.

D. A service definition, hours of service, and specified territory by name and postal ZIP code for nonscheduled services.

E. Any service restrictions or limitations, including policies for: guarantee of service; ticket sale, use, refund, and exchange; and baggage provisions.

F. If applicable, procedures for the handling of claims for loss or damage of express shipments consistent with General Order 139.

G. A consumer complaint procedure that includes the address and telephone number of the Safety and Enforcement Division's Consumer Affairs Unit.

8.06—FORM. Tariffs and timetables shall be filed in book (pamphlet) or loose-leaf form. Tariffs shall be machine-printed on paper of good quality.

GO 158-A

— 9 —

**8.07—SIZE.**  Tariffs and timetables shall be filed on paper of good quality that is no larger than 8-1/2 inches by 11 inches and no smaller than 8 inches by 10-1/2 inches.

**8.08—UNIFORM SYMBOLS.**  Uniform symbols shall be used to indicate changes in tariffs as follows:

Letter (A), (a) or ◆ to indicate increases.

Letter (R), (r) or ♣ to indicate reductions.

Letter (C), (c) or ▲ to indicate a change resulting in neither an increase nor a reduction.

The following symbols shall be used only for the purposes indicated:

* to show new material added to the tariff.

+ to show "Applicable to intrastate traffic only."

⊙ to indicate "Applicable to interstate traffic only."

□ to indicate reissued matter.

**8.09—LOOSE-LEAF TARIFFS.**  Each page or supplement of a loose-leaf tariff shall show:

A. The name, PSC number, address, and telephone number of the issuing carrier.

B. The page number (e.g. "Original Page 4," "Third Revised Page 10," etc.).

C. The date the page will become effective in the lower right corner.

D. The authority under which the amendment is filed.

E. Amendments shall be made by filing new pages. Amended pages shall be new pages or consecutively numbered revisions of previous pages (e.g. "First Revised Page 10 cancels Original Page 10"). A loose-leaf tariff may be canceled by supplement or by filing a new tariff.

F. A one-inch margin on the left-hand side of each page.

**8.10—AMENDMENTS TO BOOK TARIFFS.**  Book (pamphlet) tariffs shall be amended by filing supplements constructed generally in the same manner and arranged in the same order as the tariff being amended. Each supplement shall refer to the page, item, or index of the tariff or supplement it amends. Every supplement, excluding suspensions and cancellations, shall contain a cumulative index of changes in the tariff. No tariff shall have more than 2 supplements in effect at any one time. When a tariff with 2 supplements requires amendment, the entire tariff shall be reissued.

G O 158-A

Exhibit B-000052

**8.11—ADOPTION OF TARIFFS.** When operative rights of a carrier are transferred from the operating control of one company to that of another, the succeeding carrier shall issue its own tariff canceling the tariff of the preceding company or issue an adoption notice accepting as its own the tariffs of the preceding company. The adoption notice shall state the Commission order authorizing the transfer. The carrier shall also immediately inform, in writing, all agents or other carriers issuing tariffs in which it participates, of the change in ownership.

**8.12—CHANGE OF NAME.** When a carrier changes its legal or trade name, without the transfer of control, it shall, within 10 days, amend its tariff to show the new name of the carrier. The carrier shall also, within 10 days, inform in writing, all agents or other carriers issuing tariffs in which it participates of the change in name. Said agents and carriers shall promptly amend the affected tariffs to reflect the change in name. The tariff amendments shall show the new name of the carrier and its former name, for example, "ABC Limo (formerly XYZ Limo)."

### PART 9—EXEMPTIONS

**9.01—BY WRITTEN REQUEST.** If, in a particular case, exemption from any of these rules and regulations is desired, a written request may be made to the Commission for such exemption. Such a request shall be accompanied by a full statement of the conditions existing and the reasons relied on to justify the exemption. It is to be understood that any exemption so granted shall be limited to the particular case covered by the request.

### PART 10—CONTROLLED SUBSTANCE AND ALCOHOL TESTING CERTIFICATION PROGRAM

**10.01—WHO MUST COMPLY.** All passenger stage corporation applicants who propose to employ any driver who will operate a vehicle having a seating capacity of 15 persons or less, including the driver, must provide for a mandatory controlled substance and alcohol testing certification program for those drivers as required by this General Order unless all such drivers are covered by the federal testing regulations. Passenger stage corporations who employ any driver who operates a vehicle with a seating capacity of 16 persons or more, including the driver, must comply with the federal regulations concerning controlled substance and alcohol testing for those drivers.

**10.02—CONTROLLED SUBSTANCE AND ALCOHOL TESTING PROGRAM REQUIRED.** Every applicant who must comply with this General Order shall provide for a testing program as required in Parts 40 and 382 of Title 49 of the Code of Federal Regulations (CFR), except as modified herein.

G O 158-A

Exhibit B-000053

— 11 —

For the purposes of this Commission's program, vehicles with a seating capacity of 15 persons or less, including the driver, shall be considered commercial vehicles. This affects, for example, the determination of what are "safety sensitive functions" for purposes of this Commission's program.

A negative test for alcohol shall show a breath alcohol concentration of less than 0.02 percent and drivers must show a valid California driver's license at the time and place of testing.

Every such applicant must conduct pre-employment testing (Part 382.301), post-accident testing (Part 382.303), random testing (Part 382.305), testing due to reasonable suspicion (Part 382.307), followup testing (Part 382.311), and return-to-duty testing (Part 382.309), except that pre-employment testing for alcohol is not required.

Each such applicant must provide educational materials (Part 382.601) that explain the requirements of Part 382 of Title 49 of the CFR and this General Order as well as the employer's policies and procedures with respect to meeting the testing requirements.

Such applicants must advise employees (Part 382.605) of the resources available to them to resolve problems associated with the misuse of alcohol and use of controlled substances.

Such applicants must ensure that supervisors undergo the appropriate training to determine whether reasonable suspicion exists to require a driver to undergo testing (Part 382.603).

Such applicants must use a custody and control form that is substantially similar to, but distinct from, the "Federal Drug Testing Custody and Control Form" and the "DOT Breath Alcohol Testing Form" to identify employees who are being tested and to request specific kinds of tests (49 CFR Parts 40.23 and 40.59).

10.03—REQUIREMENTS FOR PRE-EMPLOYMENT TESTING. An earlier negative result for a driver shall not be accepted as meeting the pre-employment testing requirement for any subsequent employment, or any testing requirements under the program other than periodic testing. (Any negative test result shall be accepted for one year as meeting any requirement for periodic testing if the driver has not tested positive subsequent to a negative result.)

10.04—TESTING COSTS.   Applicants shall be responsible for being in compliance with the testing program and shall pay all costs of the testing program, except that an employer may require employees who test positive to pay the costs of rehabilitation and return-to-duty and followup testing.

G O. 158-A

Exhibit B-000054

— 12 —

**10.05—CONFIDENTIALITY OF TESTS.** All test results are confidential and may not be released without the consent of the driver, except as authorized or required by law. 49 CFR Parts 40.35, 40.81, 382.405 and 382.413 detail rules concerning disclosure and confidentiality of employee test records. The results of tests required under the Commission's testing program may be released under the same circumstances as those detailed in 49 CFR Parts 40 and 382. The Commission may require laboratories to make copies of test results available to it on request. No evidence from a positive test shall be admissible in a criminal prosecution concerning unlawful possession, sale or distribution of controlled substances.

**10.06—DRIVER-APPLICANT TEST RESULTS TO BE REPORTED TO THE COMMISSION.** Test results for applicants who are also drivers must be reported directly to the Commission consistent with the requirements of 49 CFR Part 382.407. Therefore, a driver-applicant applying for new operating authority must cause a copy of its pre-employment controlled substance test results to be sent directly to the Commission by the attending medical review officer or by the administrator of the consortium in which the driver-applicant is enrolled. A driver-applicant applying for renewal of operating authority must cause a copy of its most recent controlled substance and alcohol test results to be sent directly to the Commission by the attending medical review officer or by the administrator of the consortium in which the driver-applicant is enrolled.

Approved and dated September 4, 1996, at San Francisco, California.

PUBLIC UTILITIES COMMISSION
STATE OF CALIFORNIA

By Wesley M. Franklin
*Executive Director*

*Photoelectronic composition by*
CALIFORNIA OFFICE OF STATE PRINTING

96  77079

C O. 156-A

Exhibit B-000055

# EXHIBIT C

Exhibit C



**Employment Development Department**
State of California

# INFORMATION SHEET

## TAXICAB INDUSTRY

Taxicab drivers typically operate taxicabs under one of three business arrangements:

1. The taxicab company acknowledges the driver as an employee.
2. The driver owns and operates the taxicab, independently arranges fares, and personally pays for required licenses, permits, and insurance.
3. The driver performs services as a lease driver on either a *fixed-fee* or *percentage-of-receipts* basis.

Under the first arrangement, the taxicab driver is subject to the direction and control of the taxicab company and would be considered a common law employee (refer to Information Sheet: Employment, DE 231). Under the second arrangement, the taxicab driver independently makes business decisions related to the taxicab service. Since the driver is not subject to the direction and control of the taxicab company, the driver would be considered self-employed. Under the third arrangement, determining whether a driver is an employee or self-employed person requires a detailed analysis of the business arrangement. How the industry-specific details of the arrangement impact the employment status of drivers who lease a taxicab on a fixed-fee or percentage-of-receipts basis is discussed below.

### FIXED-FEE DRIVERS AS EMPLOYEES IN THE TAXI-CAB INDUSTRY

There is a strong indication that taxicab drivers who lease taxicabs on a fixed-fee basis under all of the following circumstances are employees. Therefore, there is a high probability that drivers classified as independent contractors are incorrectly classified when the drivers:

- Lease the taxicab on a daily basis or pay the lease fee at the end of every shift.
- Do not have a financial interest in a business and are not subject to a financial risk of loss.
- Are not involved in a separate and distinct business of their own.
- Perform work that is a regular part of the taxicab company's business.
- Can be terminated by the taxicab company without liability by termination or nonrenewal of the lease agreement.

### FIXED-FEE DRIVERS AS INDEPENDENT CONTRACTORS IN THE TAXICAB INDUSTRY

There is a strong indication that taxicab drivers who lease their taxicab on a fixed-fee basis are independent contractors when they:

- Do not perform services under the direction and control of the taxicab company. They are free to conduct their business however they choose.

- Do not rely on the company for their customers. They secure their customers on their own with only an occasional referral from the company. They are not required to accept any referral.
- Prepay to lease a taxicab for a period of at least 28 days.
- Choose their shifts to drive the taxicab.
- Must be provided advance notice of termination or nonrenewal of the lease agreement by the taxicab company or the company may be liable for damages under the terms of the agreement. Drivers are liable for unpaid lease fees when they withdraw from the agreement early, and lease agreements provide provisions for arbitration of disputes.

### DRIVERS WHO LEASE TAXICABS BASED ON A PERCENTAGE OF THEIR RECEIPTS

The California Unemployment Insurance Appeals Board (CUIAB) has held taxicab drivers to be employees when the following circumstances apply:

- The drivers pay a percentage of what they earn to the taxicab company in order to lease a taxicab.
- Since the taxicab company's income depends on how much revenue is generated by the driver, the company may attempt to increase that income by placing controls and requirements on the drivers, such as assigning shifts, requiring the maintenance of trip sheets, and paying for all advertising.
- The drivers do not have a substantial investment in the business, are not subject to an entrepreneurial risk of loss, and do not have a distinct business of their own.
- The work performed by the drivers is a regular part of the taxicab company's business, and drivers can terminate or be terminated without any liability.

### IMPACT OF GOVERNMENTAL REQUIREMENTS

Local governments commonly mandate that a taxicab company exercise certain controls over taxicab drivers and the company's operation of vehicles. Depending on the jurisdiction, such controls may include, but are not limited to, driver dress codes, maintenance of trip records, restrictions on and requirements for the driver's use of the vehicle, response time goals and handling of dispatches, required color schemes, driver and company licensing, driver training, and a variety of requirements to ensure transportation accessibility and public safety. Such mandates are not viewed as being evidence of control and are given no weight in making the ultimate determination.

However, if the company expands upon or exceeds the government mandates, then the requirements are considered in determining the amount of control exercised over the drivers.

Exhibit C-000056

**MAJOR COURT CASE**

In Santa Cruz Transportation, Inc. v. Unemployment Insurance Appeals Board (1991) 235 CA 3d 1363; 1 Cal Rptr 2d 641], the Appeals Court held that the drivers who paid the taxicab company a fixed-fee to lease a taxicab were employees of the company.  Therefore, any fixed-fee lease driver who operates in a manner similar to the drivers described in the Santa Cruz Transportation decision would be an employee.  Refer to the chart below that lists the elements cited in the court decision and the weight the CUIAB and the courts will give to each.

| KEY ELEMENTS IN THE SANTA CRUZ TRANSPORTATION CASE | WEIGHT GIVEN TO ELEMENTS IN THE SANTA CRUZ TRANSPORTATION CASE |
|---|---|
| The terms of the lease allowed the company to terminate the drivers. | The right to terminate at will is strong evidence of employment.  The right to terminate conveys an inherent power of the company over the driver.  The company could choose not to renew the lease of a driver without advance notice or liability.  This would be strong evidence of an employment relationship and would be given **high** weight. |
| The drivers could be terminated under the lease agreement if they did not maintain good relations with the public. | The company exercised control over the actions and behavior of the drivers by requiring them to always have a good relationship with the public.  Failure to do so would result in the termination of the driver.  With this right, the company can demand many things of the driver, and the driver, fearing loss of his or her job, would be obliged to follow such demands.  **High** weight would be given to this element. |
| The lease agreement designated the time period when the shift began and ended. | When the drivers are not allowed to set their own hours of work, the company is directing and controlling their services.  This element is given **medium to high** weight.<br><br>When shift drivers lease a taxicab for 12 hours a day or 12-hour shifts over a period of a week and leases are allowed only when they are available for the shift requested, drivers cannot set their own hours and are not free to work when they choose. |
| The drivers were required to schedule their meal breaks with the dispatcher. | If the dispatcher has control over when breaks are taken, this is strong evidence of control over the drivers and would be given **high** weight as an employment element.  If the drivers are only required to give notice of breaks to the dispatcher, the element would be given **low** weight. |
| The drivers were prohibited from using the taxicab for personal use. | The company controlled the use of the taxicabs by the drivers.  This element would be given **medium** weight. |
| The drivers were required to accept charge slips from certain customers. | The company exercised control over the services by requiring the acceptance of alternative methods of payment.  This was evidence that the company had the right to control the  services, and that right was complete and authoritative.  This alone is strong evidence of an employer-employee relationship and is given **high** weight. |
| The drivers were required to conform to a company dress code. | A specific dress code, such as the wearing of uniforms, is given **high** weight and is strong evidence of employment.  A general dress code, (for example, "neat appearance") would be given **low** weight. |
| The drivers were required by the company to account for fares they received by a daily trip sheet and there was no evidence that the city required the drivers to maintain trip sheets. | Required reports are viewed as "review of work" which is strong evidence of the taxicab company's right to control the drivers.  This element is weighted **high** as an indicator of employment.  Having drivers complete city or agency required reports is an element given **no** weight. |

Table continued on next page.

Exhibit C-000057

| KEY ELEMENTS IN THE SANTA CRUZ TRANSPORTATION CASE (CONT.) | WEIGHT GIVEN TO ELEMENTS IN THE SANTA CRUZ TRANSPORTATION CASE (CONT.) |
|---|---|
| The work did not require the expertise of a skilled professional. | Operating a taxicab does not require a high level of technical skill and this element would be given **high** weight. A lower level of technical skill is strong evidence of employment. |
| The drivers did not advertise their services. | If the company holds itself out as a taxicab service and does all advertising, this would be strong evidence that the drivers are working in the furtherance of the company's business and would be given **medium to high** weight. |
| The taxicab company operated a fleet of cabs for public carriage. | The taxicab company was in the business of providing taxicab services, not leasing taxicabs. This element would be given **high** weight. |
| The taxicab company's name was on the taxicab. | The company's name on the taxicab was an indication that the driver represented the taxicab company and the driver performed services in the furtherance of the company's business. This element would be given **medium to low** weight. |
| The drivers' work was part of the regular business of the taxicab company. | The drivers' services were performed as an integral part of and in direct furtherance of the company's business, which indicates employment. This element would be given **high** weight. |
| The taxicab company owned the taxicab. | The drivers did not have a significant investment in providing their services (for example, own their cab, own medallions or the permits necessary to operate a taxicab, etc.). This was strong evidence of employment and is given **high** weight. A daily lease is not considered a significant investment and does not create an entrepreneurial risk of loss associated with an independent contractor. |
| The taxicab company owned the municipal taxicab license. | The drivers operated under the company's license. This is an element receiving **high** weight as evidence of employment. |
| The drivers depended on the company's dispatcher for their livelihood. | If the drivers are required to use the company's dispatcher in order to secure business, this is strong evidence that the company is controlling the services performed by the drivers. This element would be given **high** weight. |
| The customers called the taxicab company for taxicab services; the taxicab company arranged for the performance of the services. | If the customers generally secure the services of the drivers through the company, this would be an employment element as the drivers depend on the taxicab company for business. If the drivers secure business on their own and could accept or reject referrals from the company dispatcher, this would be an indication of independent contractor status. This element would receive **high** weight. |

**ADDITIONAL INFORMATION**

This information sheet describes the most common circumstances in the taxicab industry and how those circumstances affect whether a taxicab driver's services are performed as an employee or independent contractor. Questions regarding employment status determinations in the taxicab industry should be directed to:

Field Audit and Compliance Division—Central Operations, MIC 94
P.O. Box 826880
Sacramento, CA 94280-0001
(916) 464-0331

Speech and hearing impaired persons can reach us at 1-800-547-9565.

Equal Opportunity Employer/Program. Auxiliary services and assistance available to persons with disabilities.

Exhibit C-000058

**EXHIBIT D**

Exhibit D

CALIFOR. UNEMPLOYMENT INSURANCE PEALS BOARD



### SAN FRANCISCO OFFICE OF APPEALS (415) 357-3801
### 185 Berry St. Lobby 5, Ste 200
### SAN FRANCISCO CA 94107

| | |
|---|---|
| M. & M. LUXURY SHUTTLE INC<br>c/o LAW OFFICES OF DAVID B. GREEN<br>Account No: 409-9002-0<br>  Petitioner<br><br>EMPLOYMENT DEVELOPMENT DEPARTMENT<br>  Respondent | Case Nos. 2056607 (T) 2056608 (T) 2056611 (T<br><br>Issue(s): 1179.5, 1127, 601, 621(b), 926<br><br>Date Petition Filed: 03/01/2007 |

**Date and Place of Hearing(s):**
(1)  10/22/2007    San Francisco

**Parties Appearing:**
Petitioner, Department

## DECISION

The decision in the above-captioned case appears on the following page(s).

This decision is final unless appealed within 30 calendar days from the date of mailing shown below. See the attached "Notice to Parties" for further information on how to file an appeal.

**D. J. Soviero**, Administrative Law Judge

Date Mailed:   JAN 1 1 2008

Exhibit D-000059

**Case No.: 2056607, 2056608 & 2056611   San Francisco Office of Appeals**
CLT/PET: M & M Luxury Shuttle, Incorporated    ALJ: D. J. Soviero
Parties Appearing: Petitioner, Department
Parties Appearing by Written Statement: None

## ISSUE STATEMENT

The petitioner filed a timely petition for reassessment of an assessment of $85,606.34 plus penalties and interest issued by the department on March 9, 2007 for the period January 1, 2004 to June 30, 2006. The issues in this matter are:

(1) Whether services were performed for the petitioner in employment;

(2) Whether individuals were performing services for the petitioner as employees; and,

(3) Whether the petitioner is liable for the contributions, withholding and penalties.

## FINDINGS OF FACT

The petitioner operates an airport shuttle service and charter transportation service in the San Francisco Bay Area. The business model is a bifurcated structure where the petitioner has, on one side, acknowledged employees who have no investment or risk in the petitioner's business. These employees are paid an hourly wage plus tips. They work on a petitioner/employer-determined schedule in shifts assigned by the petitioner/employer. The petitioner/employer is liable for payroll contributions and withholding and issues federal W-2 statements to the employees for each calendar year.

On the other side, the petitioner operates what is essentially an airport access service based on a permit, one of 14, issued by the City and County of San Francisco Airport Commission. All commercial, casual ground transportation shuttles at the San Francisco International Airport (SFO) must operate through one of these 14 permittees.

The petitioner's chief asset is this airport permit which is fixed in number with a moratorium on further issuances. Therefore, if any owner of a commercial van wishing to pick up casual fares at SFO pick up spots or use the services of the airport person who assigns the vans at the airport is required to work under the auspices of one of these permittees.

2056607-3                                       2

Exhibit D-000060

It is the relationship between the petitioner and those to whom the petitioner provides this airport access service, called owner-operators in the industry, which is at issue here.

The relationship between the petitioner and the owner-operators is governed by a written agreement which sets forth the rules to which the owner-operator must adhere.

This contract with the owner-operators, at first glance, looks like a recitation of control factors of the petitioner over the owner-operators such as using the petitioner's colors, complying with a dress code, maintaining weigh bills and trip sheets and keeping the vehicle in good condition. On closer examination, however, it becomes apparent that the controlling authorities are not the petitioner but the Public Utility Commission, the Airport Commission, the San Francisco Police Taxi Detail and the airport police. Each one of the elements of the contract relates to a requirement by one of these governing entities.

Other than these passed through rules, the petitioner has no authority or interest in or over the activities of the owner-operators or their vehicles.

The approximately 20 owner-operators contracting with the petitioner pay the petitioner a flat monthly fee chiefly for the privilege of using the petitioner's airport access which the owner-operator uses under the colors and logo of the petitioner. The fees range from $2,500 to $2,700 per month.

The petitioner provides other services for this fee such as advertising, dispatch services, scheduling and a credit card capacity.

The owner-operators own their own vans individually or with partners or through a business entity. The owner-operators pay all of the fuel and maintenance, insurance, licensing fees and airport trip fees which are billed to the owner-operators by the airport through the petitioner.

The owner-operators may also hire drivers to work on an hourly fee just as the petitioner does in the employer/employee part of the business.

The owner-operators set their own schedules. They work when they choose and need only inform the petitioner's dispatcher of their availability. They are not, nor can they be, required to take any fees or fares if they choose not to do so.

The petitioner maintains a PUC-approved rate schedule. However, owner-operators are free to negotiate the rate with individual passengers. The owner-operators assume all financial liability and risks. Likewise, they take all receipts

2056607-3                                     3

Exhibit D-000061

generated from their passengers. The petitioner has no interest, involvement, liability or risk associated with the owner-operators.

The owner-operators are at risk for the fee to the petitioner regardless of the income generated or expenses incurred. Likewise, the owner-operators keep all income in excess of expenses regardless of the amount.

Each of the owner-operators must apply independently to the PUC to obtain a Transportation Charter Permit (TCP) for display on any vehicle the owner operator uses to transport passengers for hire, whether in and around the airport or to any other destinations in California. The owner-operators are responsible directly to the PUC for financial responsibility, vehicle maintenance, clean driving records, proper driver training, adequate insurance and drug testing.

The flow of funds between the petitioner and owner-operator is solely in one direction from the owner-operator to the petitioner. The petitioner gives the owner-operator no funds. The owner-operators provide no service to the petitioner.

## REASONS FOR DECISION

The relationship contemplated as the basis for the legislation imposing unemployment insurance taxes is that of employer and employee; a principal for whom services are rendered by an independent contractor does not come within the scope of its provisions. (*Empire Star Mines v. California Employment Commission* (1946) 28 Cal.2d 33.)

In *Empire Star Mines Co., Ltd. v. California Employment Commission* (1946) 28 Cal.2d 33, the Supreme Court of California stated:

". . . In determining whether one who performs services for another is an employee or an independent contractor, the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. Strong evidence in support of an employment relationship is the right to discharge at will, without cause. [Citations]"

". . Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools and the place of work for the

2056607-3                                4

Exhibit D-000062

person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee."

Owner-operators do not perform any services for the petitioner. They are not employees. They are self-employed independent contractors who purchase privileges and services from the petitioner.

The petitioner has no right to control the manner and means the owner-operators use to accomplish the desired result of generating more income from passengers going to and from SFO. The petitioner has no right to control the manner and means the owner-operators use to control expenses for fuel, maintenance, insurance, license, trip fees and services purchased from the petitioner.

The owner-operators are in a distinct occupation requiring a permit from the PUC. They have made a significant financial investment in the instrumentalities of their businesses. They pay a flat fee to the petitioner for certain privileges and services in support of their business.

Having found that the petitioner is not an employer of the owner-operators, the assessment of California Unemployment Insurance Taxes do not accrue. The assessment, penalties and interest are cancelled.

DECISION

The petition for reassessment is granted and the assessment is cancelled. The petitioner is not liable for contributions, penalties or interests as set forth in the assessment issued March 9, 2007 for the audit period January 1, 2004 to June 30, 2006.

FOA:tp:mj

2056607-3                          5



**STATE OF CALIFORNIA**
UNEMPLOYMENT INSURANCE APPEALS BOARD

NOTICE TO PARTIES

TAX DECISION

**Board Appeal**
Any party adversely affected by this decision may appeal to the California Unemployment Insurance Appeals
Board.

An appeal to the Appeals Board shall be in writing and signed by the petitioner or its authorized agent. If an appeal
is signed by an authorized agent of the petitioner, the name of the petitioner shall be set forth in the appeal followed
by the signature of the authorized agent and the designation "Authorized Agent."

An appeal need not be formal but should set forth grounds or reasons for appealing. You may file your appeal by
letter or on forms available at any Office of Appeals of the Appeals Board. The appeal should identify the case
number of the Administrative Law Judge's decision.

**New Hearing Request**
If the enclosed decision is unfavorable, and you did not appear in the hearing, or you withdrew your petition,
you may request a new hearing and decision in your case. You must make your request, and specify your reasons,
in writing. If warranted by your request, a hearing will be scheduled before an administrative law judge who will
decide whether there is good cause to grant your request.

**Deadline and Address**
An appeal to the Appeals Board must be mailed to or filed with the Appeals Board no later than thirty (30) calendar
days after the date of mailing of this decision. A new hearing request must be made within twenty (20) calendar
days after the date of mailing of this decision. The time for filing an appeal or new hearing request may be
extended if good cause is found for the delay; a request for an extension should be explained with the appeal. Send
it to:

CUIAB – San Francisco Office of Appeals
185 Berry Street
Lobby 5, Suite 200
San Francisco, CA 94107
Phone: (415) 357-3801 Fax: (415) 357-3030

**Governing Procedure**
This notice gives general information. The governing procedure is in the rules of the California Unemployment
Insurance Appeals Board, Title 22, California Code of Regulations, Sections 5000-5200, available on the Internet at
http://ccr.oal.ca.gov, or from the Office of Appeals, without charge.

DE 4701 Rev.13 (11-01)

**EXHIBIT E**

Exhibit E

EMPLOYMENT DEVELOPMENT DEPT
VICTORVILLE UI
P.O.BOX 641
SAN BERNARDINO  CA 92402-0641



**EDD** Employment
Development
Department
State of California

### N O T I C E   O F   D E T E R M I N A T I O N

DATE MAILED          09/25/08
BENEFIT YEAR BEGAN 05/11/08

IldulIlaaludIluulududulIaaduIIluaIludukaII
A M JUAREZ                    0410
9106 WALNUT ST UNIT 6
BELLFLOWER         CA 90706-5640

EDD TELEPHONE NUMBERS:
ENGLISH        1-800-300-5616
SPANISH        1-800-326-8937
CANTONESE      1-800-547-3506
MANDARIN       1-866-303-0706
VIETNAMESE     1-800-547-2058
TTY            1-800-815-9387

SSA NUMBER      561 91 3345

YOU ARE NOT ELIGIBLE TO RECEIVE BENEFITS UNDER CALIFORNIA UNEMPLOYMENT
INSURANCE CODE SECTION 1256 BEGINNING 07/22/07 AND CONTINUING UNTIL YOU
RETURN TO WORK AFTER THE DISQUALIFYING ACT AND EARN $2220.00 OR MORE IN
BONA FIDE EMPLOYMENT, AND YOU CONTACT THE ABOVE OFFICE TO REOPEN YOUR
CLAIM.

YOU QUIT YOUR LAST JOB WITH SUPER SHUTTLE BECAUSE OF HARASSMENT ON THE JOB.
AFTER CONSIDERING AVAILABLE INFORMATION, THE DEPARTMENT FINDS THAT YOU DO
NOT MEET THE LEGAL REQUIREMENTS FOR PAYMENT OF BENEFITS.  SECTION 1256
PROVIDES - AN INDIVIDUAL IS DISQUALIFIED IF THE DEPARTMENT FINDS HE
VOLUNTARILY QUIT HIS MOST RECENT WORK WITHOUT GOOD CAUSE OR WAS DISCHARGED
FOR MISCONDUCT FROM HIS MOST RECENT WORK.  SECTION 1260A PROVIDES - AN
INDIVIDUAL DISQUALIFIED UNDER SECTION 1256 IS DISQUALIFIED UNTIL HE/SHE,
SUBSEQUENT TO THE DISQUALIFYING ACT, PERFORMS SERVICES IN BONA FIDE
EMPLOYMENT FOR WHICH HE/SHE RECEIVES REMUNERATION EQUAL TO OR IN EXCESS OF
FIVE TIMES HIS OR HER WEEKLY BENEFIT AMOUNT.

APPEAL:

YOU HAVE THE RIGHT TO FILE AN APPEAL IF YOU DO NOT AGREE WITH ALL OR PART
OF THIS DECISION.

TO APPEAL, YOU MUST DO ALL OF THE FOLLOWING:

A. COMPLETE THE ENCLOSED APPEAL FORM (DE1000M) OR WRITE A LETTER STATING
THAT YOU WANT TO APPEAL THIS DECISION.  IF YOU WRITE A LETTER TO APPEAL,
EXPLAIN THE REASON WHY YOU DO NOT AGREE WITH THE DEPARTMENT'S DECISION.
WRITE YOUR SOCIAL SECURITY NUMBER ON EACH DOCUMENT YOU SUBMIT TO THE
DEPARTMENT.  (TITLE 22, CALIFORNIA CODE OF REGULATIONS (CCR), SECTION
5008).

Exhibit E-000065



**EDD** Employment
Development
Department
State of California

B. MAIL THE DE1000M OR YOUR LETTER TO THE ADDRESS OF THE OFFICE LISTED ON THE FIRST PAGE OF THIS DECISION.

C.  FILE YOUR APPEAL WITHIN TWENTY (20) DAYS OF THE MAIL DATE OF THIS NOTICE OR NO LATER THAN 10/15/08.

YOUR HANDBOOK, "A GUIDE TO BENEFITS AND EMPLOYMENT SERVICES", GIVES MORE INFORMATION ABOUT APPEALS. IF YOU DO NOT HAVE A HANDBOOK, CONTACT THE OFFICE LISTED ON THE FIRST PAGE OF THIS NOTICE.

APPEAL INFORMATION:

WHEN YOUR APPEAL IS RECEIVED, YOUR CASE WILL BE REVIEWED. IF THE DECISION REMAINS THE SAME, WE WILL SEND YOUR APPEAL TO THE OFFICE OF APPEALS. IF YOU APPEAL AFTER THE 20 DAYS, YOU MUST INCLUDE THE REASON FOR THE DELAY. THE ADMINISTRATIVE LAW JUDGE WILL DETERMINE WHETHER YOU HAD GOOD CAUSE FOR THE DELAY.  IF THE ADMINISTRATIVE LAW JUDGE DETERMINES YOU DID NOT HAVE GOOD CAUSE FOR SUBMITTING YOUR APPEAL LATE, YOUR APPEAL WILL BE DISMISSED.

THE OFFICE OF APPEALS WILL SEND YOU A LETTER WITH THE DATE, PLACE, AND TIME OF YOUR HEARING AND A PAMPHLET EXPLAINING APPEAL HEARING PROCEDURES.  AT THE HEARING, THE ADMINISTRATIVE LAW JUDGE WILL LISTEN TO YOU, EXAMINE THE FACTS, AND MAKE A DECISION. YOU MAY HAVE A REPRESENTATIVE OR SOMEONE ELSE HELP YOU.

IF YOU ARE CLAIMING CONTINUING BENEFITS:

WHILE YOU WAIT FOR THE ADMINISTRATIVE LAW JUDGE'S DECISION, YOU MUST CONTINUE TO MAIL YOUR CLAIM FORMS TO THE EDD. IF YOU DO NOT RECEIVE CLAIM FORMS OR A FORM FROM THE OFFICE OF APPEALS, CONTACT THE OFFICE LISTED ON THE FIRST PAGE OF THIS NOTICE. IF THE ADMINISTRATIVE LAW JUDGE DECIDES YOU ARE ELIGIBLE FOR BENEFITS; WE CAN ONLY PAY BENEFITS IF CLAIM FORMS WERE RECEIVED FOR THAT WEEK.

OTHER SERVICES:  CONTACT EDD FOR INFORMATION ABOUT (1) JOB REFERRALS, (2) DISABILITY INSURANCE, (3) OTHER EDD SERVICES (4) SERVICES OFFERED BY OTHER AGENCIES.

DE1080 CZ  REV. 1 (06-05)                    (PWI)

Exhibit E-000066

**JS 44** (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Supershuttle International, Inc., Supershuttle Franchise Corporation, Supershuttle Los Angeles, Inc., et al. | Patrick W. Henning, California Employment Development Department and Does 1 through 30, inclusive |

**(b)** County of Residence of First Listed Plaintiff **Maricopa**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **Sacramento**
(IN U.S. PLAINTIFF CASES ONLY).

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Paul Marron, Esq., Marron Lawyers, 320 Golden Shore, Suite 410, Long Beach, CA 90802, Phone: (562) 432-7422

Attorneys (If Known)

**09 CV 1825 JAH   NLS**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury – Med. Malpractice
- ☐ 365 Personal Injury – Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities – Employment
- ☐ 446 Amer. w/Disabilities – Other
- ☒ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
  Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus – Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Title 42 U.S.C. § 1983, Equal Protection Clause, Due Process Clause , Contracts Clause

Brief description of cause:
Defendants are violating the Constitution & Civil Rights of SuperShuttle

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)

JUDGE _____   DOCKET NUMBER _____

DATE
08/21/2009

SIGNATURE OF ATTORNEY OF RECORD
*Paul Marron*

**FOR OFFICE USE ONLY**

RECEIPT # 4457   AMOUNT 350.—   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

CP   8/21/09

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS004459
Cashier ID: sramirez
Transaction Date: 08/21/2009
Payer Name: MARRON AND ASSOC.
------------------------------------
CIVIL FILING FEE
 For: SUPERSHUTTLE INTL. V. HENNING
 Case/Party: D-CAS-3-09-CV-001825-001
 Amount:        $350.00
------------------------------------
CHECK
 Check/Money Order Num: 9524
 Amt Tendered:  $350.00
------------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00

There will be a fee of $45.00
charged for any returned check.
```